IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION



United States Courts
Southern District of Texas
FILED

MAY 1 6 2018

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* Karen Miniex, | § § § | CIVIL NO. |
| | § | |
| Plaintiffs, | § | **18 CV 1609** |
| | § | |
| v. | § § | <u>FILED UNDER SEAL</u> |
| | § | |
| | § | |
| HOUSTON HOUSING AUTHORITY;<br>CITY OF HOUSTON | § § | JURY TRIAL DEMANDED |
| | § | |
| Defendants. | § § | |
| | § § | |
| | § § | |
| | § § | |

<u>ORIGINAL COMPLAINT</u>

I.    TABLE OF CONTENTS

II.    Introduction ........................................................................................ 1

III.   Parties ............................................................................................... 6

       A. Government Plaintiff ..................................................................... 6

       B. Relator Karen Miniex .................................................................... 6

       C. Defendants ................................................................................... 7

       1. Houston Housing Authority .......................................................... 7

       2. City of Houston ............................................................................ 7

IV.    Respondeat Superior and Vicarious Liability ................................... 7

V.     Jurisdiction and Venue .................................................................... 8

VI.    Public Housing Authority Certification .............................................. 8

VII.   Federal Regulations Governing Public Housing Authorities ............ 10

       A. Internal Controls for Public Housing Authorities (2 CFR Part 200.303, formerly 24
          CFR Part 85.20(b)(3)) ................................................................ 10

       B. Procurement for Public Housing Authorities (2 CFR Part 200.319–21) ...................... 12

       1. Houston Housing Authority Procurement Policy: Procurement Methods.................... 12

       2. Houston Housing Authority Procurement Policy: Approvals. ...................................... 14

       C. Fraud & Waste (2 CFR Part 200.113, 200.415) ............................. 15

VIII.  Relevant Houston Housing Authority Department & Offices ........... 15

       A. Overview ...................................................................................... 15

       B. HHA Board of Commissioners ...................................................... 15

       C. Tory Gunsolley: HHA President and Chief Executive Officer ...................... 16

       D. HHA Legal Department ................................................................. 17

       E. HHA Finance Department ............................................................. 18

       F. Housing Choice Voucher Program: Section 8 and Veterans Housing Vouchers .......... 19

i

G. Real Estate Investments & Development ("REID") ....................................................... 20

IX. Houston Housing Authority Fraud on the Federal Government ......................................... 20

A. Relator's Discovery of Houston Housing Authority's Fraud ......................................... 20

1. Early reporting about HHA's failure to comply with federal regulations. .................... 21

a. Ms. Miniex questions procurement practices and is effectively ignored...................... 21

b. Ms. Miniex questions certain practices in the Housing Choice Voucher Program and is
effectively ignored. ................................................................................................. 22

2. Subsequent complaints about REID's failure to comply with procurement regulations
are ignored. ............................................................................................................... 23

a. Independent contractor with no experience with procurement regulations serves as
REID Vice President—one of HHA's most highly regulated departments................... 24

b. Ms. Miniex questions REID procurements and attempts to educate new REID Vice
President...................................................................................................................... 24

3. HUD Office of the Inspector General begins unplanned HHA audit; Gunsolley attempts
to legitimize HHA's procurement practices. .............................................................. 25

a. Gunsolley and Bergmann craft a plan to create an almost impenetrable "Black Box"
around most of HHA's procurements. ........................................................................ 26

b. Gunsolley attempts to legitimize HHA's Change Order practices. .............................. 27

4. Fraud in the Housing Choice Voucher Program............................................................ 28

a. Ms. Miniex investigates back to back occurrences of fraud in HCVP. ........................ 28

b. Gunsolley works diligently to obfuscate ongoing fraud in HCVP and prevent detection
of other fraudulent activity in the department............................................................. 30

c. Gunsolley terminates Ms. Miniex for blowing the whistle........................................... 33

B. Defendants Knowingly & Recklessly Violated Federal Regulations. ............................ 33

1. Defendants knowingly and recklessly failed to implement effective internal controls in
violation of 24 CFR § 982.151 and 24 CFR § 85.20, now 2 CFR § 200.303............... 33

2. Houston Housing Authority knowingly and recklessly failed to adhere to its Plan and
utilized federal funds for activities that are not authorized by HHA's Plan or federal
regulations in violation of 24 CFR § 982.153............................................................... 37

X. Actionable Conduct............................................................................................................ 39

A. False Claims Act ...................................................................................................... 39

B. Houston Housing Authority Violated the False Claims Act ........................................... 40

   1. Houston Housing Authority Knowingly and Recklessly Failed to Comply with the Terms of its Annual Plan, a contract with the United States Government (Violation of 31 U.S.C. § 3729(a)(1)(A)). ....................................................................................... 40

   2. Houston Housing Authority Knowingly Made or Used False Records or Statements (Violation of 31 U.S.C. § 3729(a)(1)(B)). ................................................................... 42

   3. Houston Housing Authority Knowingly and Recklessly Failed to Disclose Its Obligation to Repay the Government (Violation of 31 U.S.C. § 3729(a)(1)(G)). ....... 44

XI.   Causes of Action ............................................................................................................. 44

A. Count I – False Claims 31 U.S.C. § 3729(a)(1)(A) ...................................................... 44

B. Count II – False Records or Statements 31 U.S.C. § 3729(a)(1)(B) .............................. 46

C. Count III – Reverse False Claims – 31 U.S.C. §3729(a)(1)(G) ..................................... 47

XII.  Voluntary Disclosure ....................................................................................................... 48

XIII. Demand For Jury Trial ..................................................................................................... 48

XIV. PRAYER ......................................................................................................................... 48

XV.  INDEX OF EXHIBITS ................................................................................................... 49

Plaintiff/Relator Karen Miniex ("Miniex" or "Relator") brings this action pursuant to the False Claims Act, 31 U.S.C. §§ 3729–3733, and seeks to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States of America and on her own behalf and would respectfully show the following:

## II.     INTRODUCTION

1.      The Houston Housing Authority (HHA) is one of the nation's largest public housing authorities.  As a result, it receives substantial funding from the federal government and is highly regulated.  HHA has been recognized in national media and by members of then President Barack Obama's Cabinet for effectively addressing homelessness in Houston, particularly veteran homelessness, through the Veterans' Affairs Supportive Housing (VASH) program.  The VASH program, like most of HHA's programs, is primarily funded using taxpayer dollars provided by the United States Department of Housing and Urban Development (HUD).

2.      HHA's leadership has a vested financial interest in HHA's success.  Tory Gunsolley, HHA's President and CEO, receives a bonus every year based on HHA's achievements, and the renewal of his contract by the HHA Board of Commissioners turns on HHA's success.  Similarly, when HHA executives and senior leadership are evaluated, their annual bonuses and pay increases are linked to the performance of their respective departments.

3.      During the course of Gunsolley's tenure at HHA, the organization has been restructured, policies changed and added, misrepresentations made, and individuals terminated to make HHA appear "pristine" and ensure that HHA leadership continues to receive financial rewards and prestige.  Indeed, Gunsolley has consistently received an annual bonus and the leadership of the Housing Choice Voucher Program (HCVP), which administers the highly successful VASH program, has received the highest performance reviews, bonuses, and pay raises

1

of any executive at HHA. Against this backdrop, Gunsolley and other HHA executives have *for years* engaged in the misconduct described herein, and the HHA Board has *for years* approved actions that are clearly suspect.

4. Before Gunsolley arrived at HHA in 2011, Corporate Integrity and the Legal Department were charged with HHA's "internal controls." Basically, these departments were responsible for ensuring that HHA adhered to federal law and HHA policies and procedures and waving the proverbial red flag if HHA failed to adhere to those laws and policies. Without consulting any federal regulations or guidebooks, one of Gunsolley's first official acts as President and CEO was to dismantle Corporate Integrity and make leadership in each HHA department responsible for their respective department's internal controls—detecting deficiencies, unauthorized activities, waste, and fraud. Because HHA's leadership received financial incentives if their departments were successful, there was no incentive for HHA departments to report fraud to anyone outside the department. Thus, this new method for implementing internal controls was worthless. HHA leadership could detect fraud in their department and no one outside of the department would know. Put differently, there could be rampant fraud in a department, but to anyone outside the department, it would appear that the department was in compliance with the laws, policies, and procedures. The fox was guarding the hen house.

5. Relator Karen Miniex was hired in late 2012 to serve as HHA Vice President and General Counsel. Her responsibilities included helping HHA navigate the numerous federal regulations that governed HHA's operations and services. This would be an uphill battle from the beginning for Ms. Miniex because Gunsolley admittedly views HUD's regulatory guidance as mere "suggestions" and does not think he needs to get into that "nitty gritty" part of handling federal funding.

6.     Almost immediately after starting at HHA, Ms. Miniex began to detect problems with HHA procurement—one of the most highly regulated aspects of HHA.  HHA's method of maintaining procurement files violated HHA policy.  The procurement files were generally disorganized, and procurement employees lacked awareness of federal regulations.  Ms. Miniex raised these issues with Gunsolley and was ignored.  HCVP had minimal and ineffective supervision, and the department had minimal and ineffective internal controls.  Ms. Miniex also raised these issues with Gunsolley and was ignored.  The problems with procurement and HCVP continued and intensified.

7.     HHA policies required Ms. Miniex to approve all procurements that were less than $100,000.  Beginning in 2014, she began to notice a troubling pattern with several procurements. She would approve a project that was right under the $100,000 threshold that triggered the Board approval process.  After the project was approved, a "Change Order" was submitted to modify the scope and cost of the project.  The Change Order increased the cost of the project to more than $100,000; however, because the procurement was already approved, there was no need for additional approvals from the Board. Change Orders were clearly being used so that federal funds could be spent without the approvals and oversight that are required by law.  Ms. Miniex brought her concerns to Gunsolley and other HHA leadership, but she was ignored. Often, when Ms. Miniex refused to approve certain procurements, Gunsolley would override her decision.

8.     In June 2015, HUD's Office of Inspector General (OIG) informed HHA that it would audit the authority.  This was a problem for Gunsolley because 2015 was a critical time. The HHA Board of Commissioners would vote on whether to renew his contract within the next 18 months, and the HUD audit would take at least that long.  Realizing that some of HHA's procurement practices were questionable—at best—Gunsolley persuaded the Board to adopt

3

certain policies to ensure that HHA's questionable practices had an air of legitimacy and, thus, would not draw scrutiny from HUD. As usual, the Board rubberstamped Gunsolley's policy changes with little pushback.

9.      Specifically, Gunsolley convinced the Board to allow HHA onsite property managers—with little to no oversight—to handle most of HHA's procurements. This policy change was suspect because, historically, private management companies (PMCs) handled applications for residency, rent collection, minor and routine property repairs, landscaping, tenant complaints, and non-payment evictions. At most, PMCs handled micro purchases—$3,000 or less—and had no familiarity with the complexities of HHA policies or federal regulations governing procurements. The Board rubberstamped the policy change without any due diligence and without asking questions that would reasonably elicit information necessary to make an informed decision about the policy.

10.     Gunsolley also convinced the Board to adopt a policy meant to curb HHA's practice of using Change Orders to increase the contract to more than $100,000 without Board approval, a practice that Ms. Miniex had previously red-flagged to no avail. Again, the Board rubberstamped the policy change without any due diligence and without asking the necessary questions to vet the policy change.

11.     Despite Gunsolley's best efforts to legitimize HHA's questionable practices, right as the HUD OIG audit intensified, there were two back-to-back occurrences of HCVP employees blatantly selling housing vouchers in violation of the law. The first occurrence in March 2016 was quickly resolved and, at Ms. Miniex's recommendation, the employee selling housing vouchers was terminated. The second occurrence in April 2016 involved the sole HCVP employee responsible for administering the VASH program. For months, the HCVP employee had been

selling veterans housing vouchers.  Ms. Miniex recommended that HHA terminate not only the employee who sold the vouchers, but also HCVP leadership for allowing the fraud and other misconduct to occur in their department.  She also recommended that the HHA Board be apprised of the situation. Ms. Miniex's recommendations were disregarded.  Gunsolley also refused to fully disclose the fraud to the Board.  Deeply troubled by Gunsolley's inaction, Ms. Miniex went outside the HHA chain of command and reported the full extent of the fraud to the Board.  The next day, Gunsolley attempted to terminate Ms. Miniex.  Less than six months later, Ms. Miniex was terminated allegedly for poor attendance.

12.    Because of Gunsolley's efforts to obscure HHA's intentional mismanagement of federal funds, HHA's longtime violations of the law have gone undetected, unchecked, and thus, uncorrected.  HHA's Board has been complicit in the misconduct and has done almost nothing to curtail HHA's regulatory violations or Gunsolley.  Even after repeat issues in HCVP, the HUD OIG audit determination that HHA had to return $3 million, and Ms. Miniex's reports about misconduct in HHA, the Board renewed Gunsolley's contract for five years in January 2017.  Thus, HHA's misconduct persists.

13.    For example, after HUD OIG completed its audit, employees at HHA thought that they could persuade HUD auditors that certain defective procurement files were accurate and lessen the amount of HHA's penalty.  Internal communications show HHA employees scrambling to locate documentation to make incomplete procurement files "complete."  These efforts were dubious because some of the files were more than five years old.  Further, Kevin Coleman, HHA Procurement Manager, often discussed HHA's questionable procurements with Ms. Miniex.  Over the years, he has documented procurements he believes are questionable and saves these procurement files on a jump drive.  Similarly, an HHA third-party investigator

identified several questionable HCVP tenant files, but those files were not investigated.

14.     From at least 2011 to the present, HHA has been in violation of the False Claims Act.   HUD requires PHAs to implement significant oversight and approval processes to ensure that federal money is expended in accordance with federal regulations.   To this end, PHAs are required to design and implement their own procurement procedures and policies, which are reviewed and approved by HUD as a part of a PHA's Plan review.   Once adopted, a PHA *must* adhere to its policies and procedures.   HHA did not adhere to its Plan.   Further, although HHA certified to the Government every year that it would implement effective internal controls and comply with its own policies and procedures, HHA lacked the requisite internal controls and failed to comply with its own policies and procedures.   Indeed, HHA's internal controls rewarded HHA executives and leadership for effectively concealing fraud, waste, and abuse.   Thus, HHA has been allowed for years to evade the federally required oversight and approval necessary to ensure that federal money is expended in accordance with federal regulations.

III.     PARTIES

A.     GOVERNMENT PLAINTIFF

15.     The governmental plaintiff in this case is the United States of America.

B.     RELATOR KAREN MINIEX

16.     Plaintiff/Relator Karen Miniex ("Ms. Miniex" or "Relator") is an individual residing in Harris County, Texas. She is the former Vice President and General Counsel of Houston Housing Authority.

17.     Ms. Miniex is a graduate of the University of Michigan Law School, where she served as an editor on two law journals. At the start of her career, Ms. Miniex received the prestigious Equal Justice Works Fellowship and worked in low income communities, addressing housing and other related poverty issues. She continued that work for approximately 4 years before

6

opening her own private practice that focused on real estate and construction litigation, as well as elder law and consumer law. In late 2012, Gunsolley hired Ms. Miniex to serve as HHA Vice President and General Counsel.

C.    DEFENDANTS

     1.    <u>Houston Housing Authority</u>

18.    Defendant Houston Housing Authority (HHA) is a political subdivision headquartered in Houston, Harris County, Texas and may be served with process by serving its registered agent, HHA Fountainview PFC, 2640 Fountain View Dr., Ste. 400, Houston, Texas 77057.

     2.    <u>City of Houston</u>

19.    Defendant City of Houston is a Texas home rule municipal corporation. Defendant City of Houston may be served with process by serving the City Secretary, Anna Russell, at 900 Bagby, City Hall Annex, Houston, Texas 77002.

IV.    <u>RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY</u>

20.    Any and all acts alleged herein to have been committed by Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the Defendants and within the course and scope of their employment.

21.    Defendants are related entities because HHA is governed by a Board of Commissioners appointed by the Mayor of the City of Houston. The Board is vested with the management of all HHA affairs. To this end, the Board guides HHA by setting policy and providing leadership and oversight to HHA. Pursuant to federal regulations, the Board is responsible for ensuring that HHA complies with applicable rules and regulations. Further, the past, present and continuing relations and dealings by and between these related entities are so

7

inextricably intertwined that for purposes of this suit, they should be considered as a single entity at law and equity.

22. Therefore, collectively with Defendant Houston Housing Authority, Defendant City of Houston will be referred to as Houston Housing Authority or Defendants.

## V. JURISDICTION AND VENUE

23. This action arises under the False Claims Act, 31 U.S.C. §§ 3729–33. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

24. This Court has personal jurisdiction over Defendants because they transact business within the Southern District of Texas.

25. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. § 1395, and 31 U.S.C. § 3732(a), because Defendants transact business and have offices within the Southern District of Texas.

## VI. PUBLIC HOUSING AUTHORITY CERTIFICATIONS

26. Federal regulations require that each year public housing authorities (PHAs) execute an Annual Contributions Contract, which sets forth the terms and conditions of receiving funding from HUD. 24 CFR 982.151. PHAs are also required to submit "5-Year and Annual PHA Plans" (hereinafter, "Plan") for HUD's approval. 24 CFR 982.153. The Plan provides information about a PHA's policies, rules, and requirements concerning the PHA's operations, programs, and services. During the course of HUD's review of a PHA's Plan, HUD evaluates the PHA's policies and rules. If the policies and rules align with federal regulations, HUD will approve them. After a PHA's Plan is approved, the federal regulations mandate that a PHA comply with its Plan, as

well as the certifications, rules, and policies cited in the Annual Contributions Contract and forms submitted with the Plan.  24 CFR 982.153.

27.     Relevant here, the Annual Contribution Contract requires every PHA to specifically agree to "develop and operate all projects covered by [the] ACC in compliance with all the provisions of this ACC and all applicable statutes, executive orders, and regulations issued by HUD, as they shall be amended from time to time, including but not limited to those regulations promulgated by HUD at Title 24 of the Code of Federal Regulations," now Title 2 of the Code of Federal Regulations.

28.     "High Performing" PHAs—authorities that own or manage more than 550 combined public housing units and housing choice vouchers[1]—also complete Form HUD-50077 "PHA Certifications of Compliance with the PHA Plans and Related Regulations."  Relevant here, pursuant to Form 50077, a PHA certifies as follows:

- 2 CFR Part 200, formerly 24 CFR Part 85: The PHA will comply with the policies, guidelines, and requirements of OMB Circular No. A-87 (Cost Principles for State, Local and Indian Tribal Governments), 2 CFR Part 225, and 24 CFR Part 85 [now 2 CFR Part 200,] ("Administrative Requirements for Grants and Cooperative Agreements to State, Local and Federally Recognized Indian Tribal Governments").

- Compliance with the Plan: The PHA will undertake only activities and programs covered by the Plan in a manner consistent with its Plan and will utilize covered grant funds only for activities that are approvable under the regulations and included in its Plan.

Form 50077 also admonishes a PHA that "HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. §§ 1001, 1010, 1012; 31 U.S.C. 3729 [the FCA], 3802)."[2]

---

[1] U.S. DEP'T OF HOUSING & URB. DEV. OFF. OF PUB. AND INDIAN HOUSING. Annual PHA Plan, available at https://www.hud.gov/sites/documents/50075-ST.PDF.
[2] U.S. DEP'T OF HOUSING & URB. DEV. OFF. OF PUB. AND INDIAN HOUSING. PHA Certifications of Compliance with PHA Plans and Related Regulations, available at https://www.hud.gov/sites/documents/50077.PDF.

## VII.   FEDERAL REGULATIONS GOVERNING PUBLIC HOUSING AUTHORITIES

### A.   INTERNAL CONTROLS FOR PUBLIC HOUSING AUTHORITIES (2 CFR PART 200.303, FORMERLY 24 CFR PART 85.20(b)(3))

29.     Pursuant to Section 85.20(b)(3) ("Internal Controls"), PHAs must have "effective control and accountability must be maintained for all grant and subgrant cash, real and personal property, and other assets. Grantees and subgrantees must adequately safeguard all such property and must assure that it is used solely for authorized purposes."  Effective December 26, 2014, Section 85.20(b)(3) was abrogated by 2 CFR § 200.303 ("Internal Controls").

30.     Section 200.303 has more specifications about what is necessary for a PHA to have adequate "internal controls."  Specifically, Section 200.303 requires a PHA to "establish and maintain effective internal control over the Federal award that provides reasonable assurance that the non-Federal entity is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award." Thus, PHAs **must** implement and follow one of two approved internal control frameworks: The Government Accountability Office Standards for Internal Control in the Federal Government (commonly called "the Green Book") or the Internal Control—Integrated Framework  of the Committee of Sponsoring Organizations ("COSO").  2 C.F.R. § 200.303 (2014).  The Green Book is used by the Government, while publicly held companies use the COSO.  In 2013, the Green Book was amended to incorporate key concepts from the COSO Internal Control—Integrated Framework, and adapted them for the government environment.  Therefore, the internal control requirements in the two standards—the Green Book and COSO—substantially overlap.

31.     Pursuant to these standards, internal controls are "a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" in three categories: (1) Effectiveness and efficiency of

operations, (2) Reliability of financial reporting, and (3) Compliance with applicable laws and regulations. To this end, internal controls consist of five interrelated components:

1. **Control environment.** Sometimes referred to as the "tone at the top" of the organization, meaning the integrity, ethical values and competence of the entity's people, management's philosophy and operating style, the way management assigns authority and responsibility, organizes and develops its people, and the attention and direction provided by the board of directors. It is the foundation for all other components of internal control, providing discipline and structure.

2. **Risk assessment.** The identification and analysis of relevant risks to achieve the objectives which form the basis to determine how risks should be managed. This component should address the risks, both internal and external, that must be assessed. Before conducting a risk assessment, objectives must be set and linked at different levels.

3. **Control activities.** Policies and procedures that help ensure that management directives are carried out. Control activities occur throughout the organization at all levels in all functions. These include activities like approvals, authorizations, verifications, reconciliations, reviews of operating performance, security of assets and segregation of duties.

4. **Information and communication.** Addresses the need in the organization to identify, capture and communicate information to the right people to enable them to carry out their responsibilities. Information systems within the organization are key to this element of internal control. Internal information, as well as external events, activities and conditions must be communicated to enable management to make informed business decisions and for external reporting purposes.

5. **Monitoring.** The internal control system must be monitored by management and others in the organization. This is the framework element that is associated with the internal audit function in the company, as well as other means of monitoring such as general management activities and supervisory activities. It is important that internal control deficiencies be reported upstream, and that serious deficiencies are reported to top management and the board of directors.

A PHA is required to implement an internal control program that incorporates these fundamental concepts in order for the program to be effective.[3]

---

[3] U.S. DEP'T OF HOUSING & URB. DEV.OFF. OF PUB. AND INDIAN HOUSING. Internal Control Questionnaire and Assessment, available at
https://www.hud.gov/sites/documents/IC_QUESTIONNAIRE_ATOOL.PDF

B.    P̲R̲O̲C̲U̲R̲E̲M̲E̲N̲T̲ ̲F̲O̲R̲ ̲P̲U̲B̲L̲I̲C̲ ̲H̲O̲U̲S̲I̲N̲G̲ ̲A̲U̲T̲H̲O̲R̲I̲T̲I̲E̲S̲ ̲(̲2̲ ̲C̲F̲R̲ ̲P̲A̲R̲T̲ ̲2̲0̲0̲.̲3̲1̲9̲–̲2̲1̲)̲

32.    A substantial part of the funds that PHAs receive from HUD are expended on various procurements, including constructing new housing properties and repairing existing properties.   Therefore, HUD requires PHAs to implement significant oversight and approval processes to ensure that federal money is expended in accordance with federal regulations.   To this end, PHAs are required to design and implement their own procurement procedures and policies, which are reviewed and approved by HUD as a part of a PHA's Plan review.   Once adopted, a PHA *must* adhere to its policies and procedures.

33.    The aim of procurement procedures and policies is to ensure that procurements are "reasonable."   Most purchases are "reasonable" if the PHA obtains the requisite number of quotes or bids.   If the PHA is unable to obtain the requisite number of quotes or bids, the PHA must determine whether the purchase is reasonable using an Independent Cost Estimate ("ICE").   Once adopted, a PHA must adhere to its policies and procedures.

1.    Houston Housing Authority Procurement Policy: Procurement Methods.

34.    HHA's Procurement Policy identifies four methods for procurement that are relevant here: micro-purchases, small purchases, sealed bids, and competitive proposals.

35.    *Micro-Purchases* are purchases of $3,000 or less. These purchases are considered "reasonable" if HHA obtains one quote.

36.    *Small Purchases* are purchases from $3,001 to $50,000.   These purchases are considered "reasonable" if HHA obtains the ICE and three quotes, which are compared to the ICE. If HHA is unable to obtain the requisite number of quotes, a small purchase is "reasonable" if HHA has documentation reflecting price reasonableness, "such as prior purchases of this nature, catalog prices, the Purchasing Officer's personal knowledge at the time of purchase, comparison to the ICE, or any other reasonable basis."

37.     ***Sealed Bids*** are purchases of more than $50,000 pursuant to a firm fixed-price contract and are primarily used for construction-related bids.  This procurement method begins with HHA formally soliciting a request for sealed bids for a project.  The invitation must include the "job specifications and all contractual terms and conditions applicable to the procurement, and a statement that the award will be made to the lowest responsible and responsive bidder whose bid meets the requirements of the solicitation."  The bidder has a minimum of 30 days to submit a proposal, and any changes to the 30-day deadline (increase or decrease) must be reviewed by HHA's Legal Department and approved by the President and CEO.

38.     Sealed bids are actually "sealed" before they are delivered to HHA.  When HHA receives a sealed bid, it is stored until the "Bid Opening."  At the Bid Opening, all of the sealed bids are placed on an HHA conference room table and opened one at a time by an HHA employee, typically the HHA Procurement Manager.  The event is open to the public, but typically, only the bidding companies attend the Bid Opening.  After the envelopes are opened, HHA is able to determine who the successful bidder is based principally on whether a bidder has the lowest price.

39.     A purchase made pursuant to a sealed bid is "reasonable" if there are, among other things, two or more bidders.  If HHA is unable to obtain the requisite number of bidders or if a bid received is substantially more than the ICE, the purchase is reasonable if HHA conducts a cost analysis of the purchase price.

40.     Sealed bids are HHA's preferred method for "procuring construction, supply, and non-complex service contracts."  *Id.*

41.     The ***Competitive Proposal*** procurement method involves procurements of more than $50,000 that require HHA to obtain bids pursuant to a formal Requests for Proposals.  Unlike a Sealed Bid procurement method, the Competitive Proposal method considers several other

factors other than price and is more subjective. This method of procurement begins with HHA formally soliciting a request for proposals to complete a project.

42.     After proposals are received, an Evaluation Committee is appointed. The Committee is required to evaluate the proposal based on the factors set forth in the solicitation and submit a report summarizing the results of the evaluation. An award is normally made on the basis of the proposal that represents the best overall value to the HHA, considering price and other factors, e.g., technical expertise, past experience, quality of proposed staff, etc., set forth in the solicitation and not solely the lowest price.

43.     A procurement pursuant to a Competitive Proposal is reasonable if there is adequate competition. If there are not "sufficient proposals," HHA must compare the purchase price with the ICE. When proposal prices cannot be easily compared, where there is not adequate competition, or where the price is substantially greater than the ICE, HHA must conduct a cost analysis.

44.     Competitive proposals are HHA's preferred method and most common method for procuring professional services above $50,000.

> 2.     Houston Housing Authority Procurement Policy: Approvals.

45.     Procurements and purchases *less than $25,000* can be approved by the HHA Procurement Manager or Purchasing Officer. Procurements in the amount of *$25,001 to $100,000* must be approved by the General Counsel, as executive-level leader of the Procurement Department. However, the CEO has final approval of all Competitive Proposal awards less than $100,000. Procurements *exceeding $100,000* must be approved by the HHA Board of Commissioners.

46.     However, HHA's President and CEO has the power to "delegate in writing all procurement authority as is necessary and appropriate to conduct the business of HHA." *Id.* at 18.

And as the final approver, the President and CEO has the power to approve procurements even when the Procurement Manager, Purchasing Officer, or General Counsel do not agree.

C.    FRAUD & WASTE (2 CFR PART 200.113, 200.415)

47.    The regulations governing PHAs generally prohibit fraud and require that the PHA certify that their submissions to the Government are "true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award." 2 C.F.R. § 200.415.  The PHA is further required to certify that it is not aware of "any false, fictitious, or fraudulent information, or the omission of any material fact." *Id*.  If the PHA becomes aware of any fraud or waste, such as the kind prohibited by 2 C.F.R. § 200.415, the PHA is required to timely disclose those infractions to the Government. 2 C.F.R. § 200.113.

VIII.    RELEVANT HOUSTON HOUSING AUTHORITY DEPARTMENTS & OFFICES

A.    OVERVIEW

48.    Houston Housing Authority (HHA) is a public housing authority tasked with providing affordable housing to low-income Houstonians.  Created by the Houston City Council in 1938, HHA is one of the largest housing authorities in the country.   As of 2014, HHA has served more than 60,000 low-income persons.  The majority of funding for HHA comes from the United States Department of Housing and Urban Development (HUD).  In 2014, HUD provided more than $125,000,000 in federal funding to HHA, including more than $100,000,000 in funding for the Housing Choice Voucher Program (HCVP).  Thus, HHA is governed primarily by the rules and regulations that govern recipients of HUD funding, such as 2 CFR Part 200.

B.    HHA BOARD OF COMMISSIONERS

49.    HHA is governed by a Board of Commissioners appointed by the Mayor of the City of Houston.  Two of the Commissioners are "resident" Commissioners, meaning that they either

live as a tenant at one of HHA's public housing communities or are the recipient of a housing voucher from an HCVP program (*see discussion infra* re HCVP).  Each Commissioner is appointed to serve for six years.  The Board is vested with the management of all HHA affairs.  To this end, the Board guides HHA by setting policy and providing leadership and oversight to HHA.  Pursuant to federal regulations, the Board is responsible for ensuring that HHA complies with applicable rules and regulations.  Below is a list of HHA Board members from 2012 to the present.

| HHA Board of Commissioners | | |
|---|---|---|
| 2012 | 2013 | 2014 |
| Lance Gilliam, Chair<br>Assata-Nicole Richards, Vice Chair<br>Tory Gunsolley, Secretary<br>Phillis Wilson<br>Bobbie Figures<br>Rueben Casarez<br>LaRence Snowden<br>Nicola Toubia | Lance Gilliam, Chair<br>Assata-Nicole Richards, Vice Chair<br>Tory Gunsolley, Secretary<br>Phillis Wilson<br>Bobbie Figures<br>LaRence Snowden<br>Nicola Fuentes Toubia<br>Tina Peterman | Lance Gilliam, Chair<br>Assata-Nicole Richards, Vice Chair<br>Tory Gunsolley, Secretary<br>Phillis Wilson<br>Bobbie Figures<br>LaRence Snowden<br>Nicola Fuentes Toubia<br>Tina Peterman |
| 2015 | 2016 | 2017 |
| Lance Gilliam, Chair<br>Assata-Nicole Richards, Vice Chair<br>Tory Gunsolley, Secretary<br>Phillis Wilson<br>Bobbie Figures<br>LaRence Snowden<br>Nicola Fuentes Toubia<br>Tina Peterman | Lance Gilliam, Chair<br>LaRence Snowden, Vice Chair<br>Tory Gunsolley, Secretary<br>Bobbie Figures<br>Nicola Fuentes Toubia<br>Shondra E. Wygal<br>Veronica Chapa<br>Phillis Wilson | LaRence Snowden, Chair<br>Phillis Wilson, Vice Chair<br>Tory Gunsolley, Secretary<br>Tim Horan<br>Nicola Fuentes Toubia<br>Shondra E. Wygal<br>Kristy Kirkendoll |
| 2018 | | |
| LaRence Snowden, Chair<br>Phillis Wilson, Vice Chair<br>Tory Gunsolley, Secretary<br>Tim Horan<br>Shondra E. Wygal<br>David Enrique Ruiz<br>Kristy Kirkendoll | | |

C.    TORY GUNSOLLEY: HHA PRESIDENT AND CHIEF EXECUTIVE OFFICER

        50.    In 2011, Tory Gunsolley became HHA President and CEO.  Exhibit A at 9:11-15

and 10:1-7 (Gunsolley Deposition).   Prior to this, Gunsolley served as the Chief Administrative Officer at the Newark, New Jersey Housing Authority (2006-2011) and the Cambridge, Massachusetts Housing Authority (1997-2006) in a number of positions.  *Id.* at 9:4-10 and 13:6-14.  After years serving as "second in command," HHA was Gunsolley's opportunity to lead his own organization.   *Id.* at 12:1-9.

51.     As discussed further *infra*, Gunsolley made significant changes to HHA's organization during his first few years as President & CEO.  He decentralized Corporate Integrity, terminated the Corporate Integrity compliance officers, and changed the responsibilities for the Legal Department and Finance Department.   *Id.* at 15:8-19:9.  Gunsolley also changed the HHA chain of command.  Instead of each HHA department reporting directly to the Board at the monthly Board meetings, now, only Gunsolley speaks to the Board during the meetings.

D.     HHA LEGAL DEPARTMENT

52.     Prior to Gunsolley's tenure at HHA, the General Counsel provided legal guidance and representation and administered HHA's loss prevention program.   Exhibit B.  In 2011, Gunsolley renamed the "Office of the General Counsel" and, going forward, it was called the "HHA Legal Department." Exhibit C. The responsibilities of the Legal Department were reduced to generally providing "legal guidance and representation" to HHA. *Id.*   HHA's loss prevention program was moved from the Legal Department to the Public Housing Operations (PHO) department, which manages 4,000 units in 19 public housing developments and more than 1,600 tax-credit units in six housing communities throughout Houston. *Id.*

53.     In late 2013, the Legal Department's responsibilities were changed again.   In addition to providing legal guidance and representation to HHA, the Legal Department is now also responsible for HHA's compliance with Section 504 of the Rehabilitation Act of 1973 and the American Disabilities Act, both of which prohibit discrimination against people with disabilities.

Exhibit D.  The Legal Department also now supervises the Procurement Office, which secures the goods and services necessary for HHA operations and oversees bid solicitations and requests for proposals.  *Id.*  Further, the Legal Department took over management of HHA's fleet of vehicles and for facilitation of necessary language and translation services for HHA.

54.    From 2012-2016, Karen Miniex was the HHA General Counsel and Vice President at HHA.  In May 2017, Gita Bolt was named HHA Vice President & General Counsel.

E.    HHA FINANCE DEPARTMENT

55.    Prior to Gunsolley's tenure, HHA's Finance Department managed all fiscal matters, including operating budgets, audits and internal controls, and investment management.  Exhibit B. Corporate Integrity was a sub department in HHA's Finance Department. Corporate Integrity was managed by the Director of Corporate Integrity, Andrew Smith, who oversaw HHA's internal controls and supervised the department's compliance officers.  In 2011, Gunsolley expanded the Finance Department's responsibilities to include management of the Information Technology Department and Procurement Office.  Exhibit C.

56.    In 2014, Gunsolley reshuffled the Finance Department's responsibilities again. Exhibit D.  As noted *supra*, the Legal Department was assigned responsibility for the Procurement Office and the Administration Office, which handled policy and publicity matters, and took responsibility for the Information Technology Department.  According to HHA's website, the Finance Department still manages HHA internal controls.  *Id.*  However, as noted *supra*, Gunsolley decentralized Corporate Integrity and terminated the compliance officers.   Going forward, leadership in each department is responsible for their respective department's internal controls— detecting deficiencies, unauthorized activities, waste, and fraud.  Gunsolley's primary reason for making this drastic change in procedure: Corporate Integrity was causing "significant tension between the departments." Exhibit A at 18:16-19:1 (Gunsolley's Deposition).

57.     In 2014, Mike Rogers was named Vice President for Fiscal and Business Operations and is responsible for the Finance Department.

F.     HOUSING CHOICE VOUCHER PROGRAM: SECTION 8 AND VETERANS HOUSING VOUCHERS

58.     HCVP, formerly known (and commonly referred to) as "Section 8" provides housing assistance in the form of a voucher to low-income families, seniors, and persons with disabilities.  HHA provides payments directly to participating property owners to offset the price of rent at the rental unit chosen by the tenant receiving the Section 8 voucher.  The waiting list for a Section 8 voucher is extremely long and includes thousands of families in need because there are a limited number of Section 8 vouchers and a dearth of affordable housing in Houston.  As vouchers become available, if at all, applicants from the waiting list are contacted to continue the admissions process, in the numeric order of application.  The HCVP Department that administers the Section 8 vouchers since approximately 2011 has been led by Mark Thiele and Robin Walls.

59.     Through the HCVP Department, HHA also administers a unique HUD program known as Veterans' Affairs Supportive Housing (VASH); the vouchers from this program are allocated specifically to provide housing vouchers to homeless U.S. veterans.  VASH vouchers stem from a joint effort of funding through HUD and the United States Veterans' Administration (VA).  These particular vouchers follow a different application and admissions system from the general Section 8 vouchers.  HHA's VASH program is one of the nation's largest.

60.     A homeless U.S. veteran may only receive a VASH voucher through a verified referral by a VA caseworker to HHA.  Prior to referring any veteran to HHA for housing assistance, the VA verifies that the veteran meets certain eligibility requirements, which include: (1) being a veteran of the United States Armed Forces; (2) having an "Honorable Discharge" from the U.S. military; (3) participating in supportive services through the VA with an assigned VA caseworker; and (4) passing a criminal background check.  The criminal background rules are more relaxed for

veterans entering through the VASH program than the rules are for the Section 8 vouchers sought by the general population.

61.     The VASH program is viewed as one of the crown jewels of HHA and Gunsolley's tenure. HHA has received numerous public accolades from local, state, and federal entities and additional funding for its administration of the VASH voucher program. The VASH program has been highly recognized in national media and by members of then President Barack Obama's Cabinet for effectively marking an end to the issue of homelessness, particularly veteran homelessness, in Houston.

62.     Because of HCVP's success with the VASH program, every year HHA receives more HUD funding and HCVP leadership—Mark Thiele and Robin Walls—receives the highest evaluation ratings and, as a result, the largest pay raises. Likewise, because of HCVP's success, Gunsolley receives an annual bonus in addition to his salary.

G.     REAL ESTATE INVESTMENTS & DEVELOPMENT ("REID")

63.     REID is the HHA department responsible for the development and improvement of all HHA housing, including, but not limited to, the acquisition, construction and rehabilitation of the real estate developments. To this end, REID manages HHA housing capital improvement programs and new housing development efforts. The Vice President of REID was independent contractor Christopher Bergmann, a consultant for Apartment Realty Advisors (ARA), the leading investment advisory firm in the multi-housing industry. Bergmann resigned or was terminated at some point in 2017. Lawrence Bowie is HHA's Capital Funds Projects Manager and was selected by Bergmann to manage REID's projects.

IX.     HOUSTON HOUSING AUTHORITY FRAUD ON THE FEDERAL GOVERNMENT

A.     RELATOR'S DISCOVERY OF HOUSTON HOUSING AUTHORITY'S FRAUD

64.     Karen Miniex is a graduate of the University of Michigan Law School, where she

served as an editor on two law journals. Exhibit E. At the start of her career, Ms. Miniex received the prestigious Equal Justice Works Fellowship and worked in low income communities, addressing housing and other related poverty issues. *Id.* She continued that work for approximately 4 years before opening her own private practice that focused on real estate and construction litigation, as well as elder law and consumer law. *Id.* In late 2012, Gunsolley hired Ms. Miniex to serve as HHA Vice President and General Counsel and help HHA navigate the numerous federal regulations that governed HHA's operations and services. Exhibit F. Because of Ms. Miniex's skill set, she was ideal for HHA and became a stellar employee and General Counsel. Exhibit A at 27:23-36:20 (Gunsolley's Deposition). Every year, she received a raise, outstanding performance reviews, and as a result of her good work, additional responsibilities. *Id.* at 36:8-38:10.

65.     From the beginning, Ms. Miniex detected issues with HHA's compliance with federal regulations. Many of HHA's practices were either blatant violations of the law or bordered on improper and illegal. Ms. Miniex raised these issues with Gunsolley many times during the almost five years she worked at HHA. At first, she was placated and told that the matter would be handled. Later, she was ignored and eventually terminated. Specifically, Ms. Miniex raised concerns about questionable procurement practices and problems in the HCVP department.

1.     Early reporting about HHA's failure to comply with federal regulations.

a.     Ms. Miniex questions procurement practices and is effectively ignored.

66.     Soon after Ms. Miniex began at HHA, she began evaluating departmental practices to ensure that they complied with the laws governing HHA. One of the first issues that she brought to Gunsolley was REID's practice of maintaining the files for its procurements, including sealed bids, competitive proposals, and the ICE for each procurement. These documents according to HHA policy should have been kept by the Procurement Manager. She also noted that procurement

files were generally disorganized and employees lacked a general awareness of federal regulations. She reported all of her concerns to Gunsolley and was told that the matter would be resolved. It was not.

          b.     <u>Ms. Miniex questions certain practices in the Housing Choice Voucher Program and is effectively ignored.</u>

67.     HHA had received numerous complaints about Robin Walls, the Director of HCVP, since she was hired by HHA in 2011. Employees complained that Walls retaliated against them, harassed them because of their sexuality and race, threatened them, and generally, failed to properly supervise the more than 50 people under her leadership. *See, e.g.,* Exhibit G. Thus, numerous grievances were filed against Walls, and HCVP had (and still does have) a high turnover rate. In 2013, HHA hired outside counsel to investigate whether HHA was being exposed to liability because of Ms. Wall's conduct. *Id.* Although counsel determined that there was no legal exposure, Ms. Miniex continued to have concerns about Walls and her department.

68.     Specifically, HCVP Housing Specialists—who were supervised by Walls—would terminate a tenant's Section 8 privilege, a property right protected by the United States Constitution, but would not attend the due process hearing regarding the termination. Each time the hearing would have to be rescheduled and the tenant would have to come back for another hearing—all the while, the tenant's Section 8 status would be in limbo. Because Ms. Miniex supervised the Hearing Officers, she heard about the repeat absences and discussed them with Walls. Astonishingly, Walls explained that Housing Specialists—who terminated tenants' Section 8 privileges every day—did not know enough about the rules and regulations to speak at the due process hearings. Ms. Miniex asked if the immediate supervisors for the Housing Specialists could attend the hearings instead. Walls agreed, but the supervisors, like the Housing Specialists, did not attend the hearings.

69.     Another issue that Ms. Miniex had with HCVP, particularly the Housing Specialists, was their failure to write letters properly terminating Section 8 privileges in accordance with applicable law.  Ms. Miniex conducted a training to teach the Housing Specialists and others in HCVP about writing a proper termination letter.  Ms. Miniex also provided HCVP with a template letter that had been vetted by the Legal Department.  After the training, Walls refused to use the letter and continued to allow Housing Specialists to use outdated forms to terminate benefits.

70.     Ms. Miniex also noticed problems with HCVP's routine denial of tenants' requests to move properties.  These requests were made for numerous reasons: uninhabitability, the desire to move away from an abusive co-tenant (this move would be governed by the Violence Against Women Act), or simply because the tenant wanted to move closer to a new job.  Tenants would come to HHA and ask why their move had not taken place or been denied.  Tenants would be told that there was no record of their move requests.  Later, Ms. Miniex learned that there was no documentation because HCVP routinely threw away documents without recording that the documents were received.  Exhibit H at HHA545.  HCVP's failure to maintain the documents was a clear violation of federal regulations and the Texas Public Information Act that expressly require HCVP to maintain or at least record information received from tenants.

71.     Ms. Miniex reported all of her concerns to Gunsolley and was told that the matter would be resolved.  It was not.  When she raised these HCVP issues again, Gunsolley told her that she had a personality conflict with Walls that was affecting her judgment.  Ms. Miniex was temporarily silenced.

2.     <u>Subsequent complaints about REID's failure to comply with procurement regulations are ignored.</u>

a.    Independent contractor with no experience with procurement regulations serves as REID Vice President—one of HHA's most highly regulated departments.

72.    Gunsolley terminated Bobken Simonians, Vice President of REID, in 2014. Despite interviewing several qualified candidates, Gunsolley hired Chris Bergman, who was a close friend of then HHA Board Chair Lance Gilliam.  Bergmann appealed to Gunsolley because of his background in affordable housing real estate development.  Indeed, during his entire tenure at HHA, Bergmann served as an "Affordable/Workforce Housing Specialist" with the Apartment Realty Advisors (ARA).  In this capacity, he provided consulting services for clients involved with Low-Income Housing Tax Credit (LIHTC) and HUD assisted properties.

73.    Bergmann was not hired as a full-time employee; instead, he was hired to be an independent contractor and paid an exorbitant consulting fee for his work as Vice President of REID.  Because Bergmann was an independent contractor, he was not supposed to be under the regular supervision of anyone at HHA and should not have had an HHA-supplied office, furniture, or supplies pursuant to tax and labor laws.  However, Bergmann's position was regularly supervised because most of his actions required approval by Gunsolley, Ms. Miniex, and/or the HHA Board.  This type of compulsory oversight is the antithesis of an independent contractor, as defined under tax and labor laws.  Further, Bergmann had his own office, executive assistant, staff, and parking spot.

b.    Ms. Miniex questions REID procurements and attempts to educate new REID Vice President.

74.    Though Bergmann had experience in affordable housing real estate development, he had very little experience with federal regulations and HHA policies, particularly procurement policies and regulations.  The problem with Bergmann's lack of experience became apparent almost immediately.  As early as 2015, Ms. Miniex began to flag certain of REID's procurements

24

that did not comply with federal regulations or HHA procedures. She raised these issues with Gunsolley, but was ignored.

75.     Notably, HHA policies required Ms. Miniex to approve all procurements that were less than $100,000. Beginning in 2014, she began to notice a troubling pattern with several REID procurements. She would approve a project that was right under the $100,000 threshold that triggered the Board approval process. After the project was approved, a "Change Order" would be submitted to modify the scope and cost of the project. The Change Order increased the cost of the project to more than $100,000; however, because the procurement was already approved, there was no need for additional approvals from the Board. Change Orders were clearly being used so that federal funds could be spent without the approvals and oversight that are required by law. Ms. Miniex brought her concerns to Gunsolley and other HHA leadership, but she was ignored. Often, when Ms. Miniex refused to approve a procurement because it did not conform to HHA policies or federal regulations, Gunsolley would override her decision.

76.     After repeated issues with REID's procurements, Ms. Miniex asked Bergmann to meet with her on multiple occasions so that she and the other attorneys in the Legal Department could explain the federal regulations and procedures that govern the procurement process. Ms. Miniex even offered to hire outside counsel, who were subject matter experts on insurance requirements and the use of federal funds for construction projects, to explain procurement regulations to Bergmann. But Bergmann did not like being questioned and grew annoyed with Ms. Miniex's oversight. On one occasion, Bergmann began to yell at Ms. Miniex and said, if she kept questioning him, he would "throw [her] ass under the bus." Soon after, she discontinued her efforts to educate Bergmann.

3.     HUD Office of the Inspector General begins unplanned HHA audit; Gunsolley attempts to legitimize HHA's procurement practices.

77.     In June 2015, HUD OIG informed HHA that it would audit the agency.  This was a problem for Gunsolley because 2015 was a critical time.  The HHA Board would vote on whether to renew his contract within the next 18 months, and the HUD audit would take at least that long. Realizing that some of HHA's procurement practices were questionable—at best—Gunsolley persuaded the Board to adopt certain policies to ensure that HHA's questionable practices had an air of legitimacy and, thus, would not draw scrutiny from HUD.   As usual, the Board rubberstamped Gunsolley's requested policy changes with little pushback.

  a.     Gunsolley and Bergmann craft a plan to create an almost impenetrable "Black Box" around most of HHA's procurements.

78.     Most HHA procurements involve the maintenance and rehabilitation of existing properties. This process was primarily handled by Ms. Miniex, PHO, and REID. These departments were theoretically supposed to work together to ensure that federal regulations and HHA policies were followed during each procurement.

79.     In January 2016, Ms. Miniex suffered a catastrophic ankle injury.  She required surgery, and post-surgery, Ms. Miniex was confined for a significant time to her bed and, at times, required a catheter.  HHA executives and employees continued to email and call Ms. Miniex about ongoing matters.  Shortly after she was homebound, Ms. Miniex received a call from Gunsolley and Bergmann.   They informed her that all capital improvement projects, construction, remodeling, and renovation for HHA properties would be delegated to HHA's Private Management Companies (PMCs). Ms. Miniex vehemently disagreed with Gunsolley and Bergmann's proposal and thought it was suspect. Historically, PMCs handled applications for residency, minor and routine property repairs, landscaping, tenant complaints, and non-payment evictions. PMCs also collected rent. At most, PMCs handled micro purchases—$3,000 or less— and had no familiarity with the complexities of HHA policies or federal regulations governing

26

procurements.   Gunsolley and Bergmann's proposal would hand over most of HHA's procurement—some worth millions of dollars—to the PMCs.  They would be responsible for documenting every step in the procurement process, such as obtaining an ICE and ensuring that adequate efforts are made to hire minority and women-owned businesses.

80.     When Ms. Miniex explained that she was concerned about PMC's ability to adhere to complex HHA policies and federal regulations governing procurement, Gunsolley and Bergmann claimed that Lawrence Bowie, HHA's Manager of Capital Funds Projects, would monitor the PMCs.  Bowie had little experience with HHA procurement policies and no experience with federal regulations governing procurement.  It was the blind leading the blind.  The Board approved Gunsolley and Bergmann's proposal in March 2016 (Exhibit I), and it was incorporated into the HHA Procurement Policy in August 2016 (Exhibit J).

b.     Gunsolley attempts to legitimize HHA's Change Order practices.

81.     Ms. Miniex previously explained to Gunsolley that it was improper for HHA departments to use Change Orders as a means to evade Board oversight and approval and, thus, compliance with HHA policies and federal regulations.  Her admonishment was ignored.

82.     However, after HUD began its audit, Gunsolley asked the Board to adopt formal procedures and policies for Change Orders. The policy limited the amount of Change Orders and required certain approvals.  The new policy regarding approvals stated as follows:

- Department Heads may approve change orders that, individually or when accumulated with prior change orders, are less than $20,000.

- The President & CEO must approve change orders that, individually or when accumulated with prior change orders, are more than $20,000.

- The President & CEO must approve change orders exceeding $100,000 and need only report the modifications to the Board.

Exhibit K at 19-21.  Notably, the policy also provided that if a contract is worth less than

$100,000, the Board of Commissioners must approve a change that would increase the contract amount to more than $100,000. *Id*. This policy was meant to curb HHA's practice of using Change Orders to increase the contract to more than $100,000 without Board approval, precisely what Ms. Miniex previously reported as improper conduct.

83.     Despite Gunsolley's "Clean Up" efforts, he failed to repair the underlying illegality of HHA's procurement practices.  Because Ms. Miniex and Kevin Coleman, HHA Procurement Manager, often discussed HHA's questionable procurements, Coleman has kept a thumb drive of procurements that he believes are questionable.  Similarly, HUD noted deficiencies with certain HHA procurement files. Exhibit L.  HHA believed that it could persuade HUD OIG to change its mind. So, Brian Gage, HHA's Senior Policy Advisor, circulated internally a list of the problematic procurements and asked for assistance "finding" documentation to make the files "complete." Exhibit M.  Making the files complete was a dubious task because several of the files involved projects that occurred more than five years ago.  Further, any documentation located would not change HHA's longtime failure to adhere to federal regulations and its own policies.

       4.     <u>Fraud in the Housing Choice Voucher Program.</u>

84.     HCVP's continued lack of internal controls, supervision and oversight, as well as the department leadership's general disregard for federal regulations and HHA policies, led to increasing issues in HCVP.  Within a three month period, two HHA employees were caught blatantly selling housing vouchers. This was extremely problematic for Gunsolley because these issues arose right as the HUD OIG audit intensified.  As discussed further *infra*, Ms. Miniex's efforts to report these and other issues to the HHA Board led to her termination.

       a.     <u>Ms. Miniex investigates back to back occurrences of fraud in HCVP.</u>

85.     In March 2016, while Ms. Miniex was still homebound, HHA received an anonymous tip regarding an HCVP employee selling Section 8 vouchers for personal profit.

Exhibit N.  Because of the significance of the alleged fraud, Ms. Miniex immediately met with HHA's Fraud Investigator, Benjamin Skalka, who reported directly to her and discussed the case and next steps.  But for the anonymous tip, it is unclear whether the Legal Department or anyone else outside of HCVP would know about the voucher fraud.  This was a clear example of the problems caused by Gunsolley letting each department handle its own internal controls.

86.    After meeting with Skalka, Ms. Miniex reported to Gunsolley about the ongoing fraud investigation.  Ultimately, HHA quickly confirmed that one of HCVP's employees was selling Section 8 vouchers for personal profit.  Ms. Miniex reported the results of the investigation to Gunsolley and, soon after, Gunsolley reported the fraud to the HHA Board.  Based upon Ms. Miniex's recommendation, HHA immediately terminated the individual.  Per Ms. Miniex's directive, Skalka communicated this fraud information to HUD OIG.

87.    Approximately a month later, a second anonymous tip came into HHA's fraud hotline.  Another HCVP employee was selling vouchers for personal profit.  This time it was VASH vouchers, reserved exclusively for homeless veterans.  This fraud tip was passed on to Ms. Miniex by Fraud Investigator Skalka.  Like the Section 8 fraud, the VASH fraud also occurred in HCVP.  Because HHA received numerous public accolades from local, state, and federal entities and additional funding for its administration of the VASH voucher program, Ms. Miniex promptly told Gunsolley.

88.    The VASH fraud troubled Ms. Miniex because this was the second occurrence of blatant fraud in the HCVP department in less than six months.  The same issues that arose from Wall's lack of oversight years ago were reoccurring, but now they were more overt and substantial violations of the law.  Further, Walls and Thiele knew about the VASH fraud for some time and had been investigating it before HHA received the anonymous tip, but had not told anyone outside

of HCVP.  Exhibit H at HHA 541 and Exhibit O at HHA 10.

89.     Ms. Miniex returned to the office on or about May 10, 2016, after being out of the office for five months due to her ankle injury.  Shortly after her return, Ms. Miniex followed up with Fraud Investigator Skalka to discuss the status of the VASH fraud investigation.  Skalka said that he had not been able to get any traction or substantiate anything; so, the investigation had stalled.  To Ms. Miniex's surprise, Gunsolley had met with Skalka and asked Skalka to quickly wrap up his investigation of the VASH fraud, which made Skalka uncomfortable about doing any work on the project.  Exhibit P.  Nevertheless, Ms. Miniex instructed Skalka to make the investigation a priority.

        b.      **Gunsolley works diligently to obfuscate ongoing fraud in HCVP and prevent detection of other fraudulent activity in the department.**

90.     In early June 2016, Skalka completed the VASH fraud investigation and confirmed that an HCVP employee sold VASH vouchers for personal profit.   Skalka believed and stated in his report that further investigation would likely lead to the discovery of additional, more pervasive acts of fraud.  Exhibit Q.

91.     Based on the preliminary results of the VASH fraud investigation, in May 2016, Ms. Miniex met with Gunsolley to report the results.  Gunsolley's initial reaction to the news was dismissive: "Well, it is not like we don't have more vouchers than veterans anyway."  Ms. Miniex informed Gunsolley that due to the fraud and crimes alleged, she would report the matter to HUD OIG.  Ms. Miniex also recommended that the employee committing the fraud be suspended, pending the outcome of the investigation and that the HHA Board be advised of the fraud allegation at the next meeting.  Though Gunsolley was hesitant to suspend the employee, Ms. Miniex was persistent and the employee was suspended without pay the next day.

92.     On or about June 14, 2016, Ms. Miniex submitted her second report, but first

written report, of fraud to Gunsolley.  Exhibit Q.  Again, Gunsolley was dismissive of what Ms. Miniex reported.  He refused to look at the report exhibits and claimed that the evidence presented was not a "slam dunk."  In the report, Ms. Miniex again recommended that the matter and investigation be fully disclosed to the HHA Board.  Ms. Miniex also recommended the termination of HCVP leadership, Thiele and Walls, because for years they had failed to properly supervise the HCVP department.  On numerous occasions, even after being corrected, Thiele and Walls had allowed violations of HHA's Record Retention Schedule (which comports with HUD's required Records Retention Schedule) and Texas Public Information Act requirements; had allowed multiple due process violations in proposed participant voucher terminations; observed employees bullying and mistreating other employees in the department, but still allowed the bullies to supervise others in the HCVP Department; and further, allowed repeated, blatant fraud to occur in the voucher programs that they were tasked with supervising.  Gunsolley declined to take any action.

93.     On June 20, 2016, Ms. Miniex submitted a revised fraud report.  Exhibit R.  Yet again, Gunsolley was dismissive.  Subsequently, at the June 21, 2016 Board meeting, Gunsolley intentionally provided the Board misleading and incomplete information about the VASH fraud. Exhibit P.  Though the VASH fraud investigation was complete, he told the Board that the investigation was ongoing. After hearing Gunsolley's report, Ms. Miniex went outside HHA's "chain of command" and, that night, reported the fraud accurately, directly to the Board's Vice Chair LaRence Snowden. Exhibit P.  The next day she reported the fraud to other Board members. Almost immediately after Ms. Miniex reported fraud to the Board, Gunsolley asked Board Chair Gilliam if he could terminate Ms. Miniex.  This retaliation is the subject of a separate lawsuit: *Miniex v. HHA*, No. 4:17-cv-00624, in the United States District Court for the Southern District of

Texas, Houston Division (Hon. Nancy Atlas).

94.     After reporting the VASH fraud to the Board, Ms. Miniex stayed in close contact with Board Vice Chair Snowden, who later became Chair of the Board, and HHA Board counsel about the problems with HCVP and HHA's procurement practices.  At times, Ms. Miniex would send Snowden questions to ask Gunsolley at Board meetings because the Board did not understand HHA's daily operations and, thus, did almost nothing to hold Gunsolley accountable for HHA's failings.  Exhibit P.

95.     Despite Gunsolley's efforts to minimize the repeat occurrences of fraud, Ms. Miniex continued to implore the Board to investigate the repeat occurrences of fraud in the HCVP department.  The Board finally relented and engaged Katie Anderson of Strasburger & Price LLP to investigate and determine whether there was fraud in the HCVP Department.   Exhibit S. Anderson interviewed HHA employees from August 4, 2016, to August 22, 2016, and completed her investigation in September 2016.  Anderson's report was seven double-spaced pages, mostly summarizing suggestions made by HHA employees (many of them Ms. Miniex's) with little detail or explanation. Exhibit T. Curiously, she concluded that there was no fraud in HCVP, even though the employee who had sold the VASH housing vouchers had been terminated and was being prosecuted and even though Anderson had uncovered multiple, additional questionable files in the HCVP Department.  Exhibits U, V.  Anderson determined that the issues with these files were simply errors, but acknowledged in her report that the lack of internal controls at HHA made it difficult to discern errors from fraud.  Exhibit W.

96.     Based on Anderson's findings, at the September 2016 Board meeting, the HHA Board told Ms. Miniex to cease her claims that there was fraud in HCVP.  Anderson never independently confirmed that the questionable files were investigated; she took Ben Skalka's word

in Fall 2016 that everything was fine.  Interestingly, in the middle of her investigation, Ms. Anderson warned Ms. Miniex that she should "get out" of HHA and discussed other career opportunities with her.

c.     <u>Gunsolley terminates Ms. Miniex for blowing the whistle.</u>

97.     As soon as Ms. Miniex voiced her disagreement with Gunsolley's handling of the VASH fraud, Gunsolley immediately began retaliating against and terrorizing Ms. Miniex.  For example, Gunsolley began a pattern of sending thinly veiled threatening messages to Ms. Miniex that her job was in serious jeopardy if she continued bringing attention to the VASH investigation. Gunsolley also played vindictive games with Ms. Miniex, concealing information that she needed in order to complete tasks that he gave her.  Though Ms. Miniex filed an internal grievance against Gunsolley and requested a hearing, her request for a hearing was ignored by the HHA Board.

98.     Effective December 12, 2016, Ms. Miniex was terminated as a result of her efforts to stop fraud at HHA.  Gunsolley told HHA employees that Ms. Miniex was terminated after an investigation into her conduct, barred employees from going in Ms. Miniex's office, and told employees not to speak to Ms. Miniex about work or anything else.  Exhibit X.  Gunsolley maliciously perpetuated the falsehood that Ms. Miniex was terminated for fraud or some other deception.  Though Ms. Miniex has applied for almost 100 positions since her termination from HHA, she has yet to be hired.

B.    <u>DEFENDANTS KNOWINGLY & RECKLESSLY VIOLATED FEDERAL REGULATIONS.</u>

1.     <u>Defendants knowingly and recklessly failed to implement effective internal controls in violation of 24 CFR § 982.151 and 24 CFR § 85.20, now 2 CFR § 200.303.</u>

99.     HUD cannot create a one-size-fits-all set of policies and procedures for all PHAs and cannot micromanage the more than 3,000 PHAs in the United States.  Instead, pursuant to 24 CFR § 982.151, the Government requires and relies on each PHA to submit a Plan outlining its

33

policies, rules, and requirements concerning the PHA's operations, programs and services. The Plan and forms that must be submitted with the Plan require every PHA to certify that it will comply with 24 CFR § 85.20 as a condition of receiving funding from the Government. Section 85.20 mandates that a PHA have effective internal controls and accountability and must adequately safeguard federal funds and must assure that it is used solely for authorized purposes. In 2014, Section 85.20 was abrogated by 2 CFR § 200.303, but the regulations still require that a PHA fundamentally have effective internal controls that protect the Government from unacceptable risk of errors, omissions, and fraud, as well as the waste of tax payer dollars. Section 200.303 also mandates that a PHA adhere to the internal controls in the Green Book or the COSO. Here, HHA does not have effective internal controls and definitely not the type of internal control systems described in the Green Book or the COSO.

100. ***First***, HHA has not had effective internal controls as required by Section 85.20 and, later, Section 200.303. One of Gunsolley's first actions when he became HHA CEO and President was to dismantle Corporate Integrity and allow each HHA department to take responsibility for its own internal controls—detecting deficiencies, unauthorized activities, waste, and fraud. Regarding HHA procurement, Ms. Miniex made numerous attempts to implement some sort of internal control system, provide oversight of procurement spending, and enforce policies and regulations. Every time, those efforts were rebuked. Gunsolley's attempt to legitimize the games HHA, particularly REID, played with Change Orders was too little too late. Gunsolley's success in persuading the Board to adopt new policies and the fact that the Board rubberstamped the policies does not change the impropriety of HHA's actions.

101. Likewise, "simplifying" the procurement process by delegating those responsibilities to PMCs was nothing more than an effort by Gunsolley to obscure REID's failure

to comply with HHA policies and federal regulations and the lack of internal controls at HHA. This also was too little too late and, in fact, further reduced the controls. PMCs have minimal oversight, despite implementing a highly regulated and complex part of HHA's administration of HUD funding. Now, to determine if federal dollars were being properly spent, one would have to dig through many layers of inadequate regulatory oversight: PMCs that effectuated the procurement, Lawrence Bowie—HHA's Manager of Capital Funds Projects—who managed the PMCs, Gunsolley who approved the procurement or presented the procurement to the Board, and the Board that ultimately approved. None—PMCs, Bowie, Gunsolley, or the Board—had experience and familiarity with procurement regulations and policies.

102.    Regarding HCVP, there were wholly inadequate internal controls. The circumstances surrounding the VASH fraud is illustrative. Specifically, Carmen Newland, the employee that committed the VASH fraud, was responsible for the entire process—start to finish— for issuing VASH housing vouchers: receiving the names of potential tenants from Veterans Affairs, determining whether the potential tenant would receive housing privileges, and checking to ensure that the award complied with HHA policies and the law. There can be no doubt that this one-person process is the reason that Newland could sell housing vouchers unchecked for months. Interestingly, Newland had a prior narcotics conviction, numerous interpersonal issues with other HHA employees, failed the Housing Choice Voucher certification test at least three times, and been previously disciplined for time clock fraud. Exhibit Y. However, she was not terminated. Instead, HCVP leadership hired contract employees to assist Newland and gave her *unlimited* overtime and stringently defended that overtime when HR questioned HCVP's actions. *Id.* All of this extra labor and overtime was funded using taxpayer dollars.

103.    Further, the VASH fraud and the Section 8 fraud were first discovered and

investigated by HCVP. The Legal Department did not learn about the fraud until anonymous calls were made and reported. This is because HCVP's leadership received financial incentives if HCVP is successful. Thus, there is no incentive for HCVP leadership—Walls and Thiele—to report fraud to anyone outside the department. The same can be said for every HHA department. Thus, HHA's method for implementing internal controls is entirely worthless. There could be rampant fraud in a department, but to anyone outside the department, it would appear to be in compliance with the laws, policies, and procedures. The fox was guarding the hen house.

104.    ***Second***, HHA has failed to implement an internal control system that conforms to the Green Book and COSO as required by Section 200.303. Gunsolley explained during a deposition, taken as a part of Ms. Miniex's retaliation lawsuit, that he dismantled Corporate Integrity because it was allegedly causing "significant tension between the departments." Exhibit A at 18:16-19:1 (Gunsolley's Deposition). He then explained that the guidance in HUD Handbooks is the "nitty gritty" of spending federal funding that he does not handle; he need only be familiar with and follow the federal regulations. *Id.* at 32:18-23 (Gunsolley's Deposition). Yet, Gunsolley admits that he did not consult any HHA guidelines or federal regulations when he implemented HHA's internal control system. *Id.* at 32:18-33:4 (Gunsolley's Deposition). He merely copied the internal control process used by one of his previous employers, the Cambridge Housing Authority. *Id.* at 18:16-19:9 (Gunsolley's Deposition). And despite Gunsolley's so called familiarity with the federal regulations that govern PHAs, during his deposition, Gunsolley could not completely list a single federal regulation that governs fraud, waste, and abuse. He was able to scribble "24 CFR"; however, that regulation—assuming that he is referring to 24 CFR 85—was abrogated years ago. Exhibit Z.

105.    Under HHA's leadership, HUD money has been treated like "Monopoly money"

and spent by each of the departments with minimal oversight or regulation. HHA had no written internal control policies and procedures, not even for HHA's most regulated departments, REID and HCVP. HHA's culture encouraged employees to do what was convenient and not what comports with the law. HHA leadership refused to comply with even some of the most fundamental regulations and policies, discouraged employees from complying with the laws, and hid or attempted to cover-up blatant violations of HUD regulations and other laws. HHA leadership knowingly undermined the internal control process because, if HHA maintained its pristine veneer, Gunsolley would have his contract renewed and HHA leadership would continue to receive bonuses and raises. Thus, it is unsurprising that, when Ms. Miniex tried to enforce the regulations at HHA, she was ignored and, later, terminated.

2.   <u>Houston Housing Authority knowingly and recklessly failed to adhere to its Plan and utilized federal funds for activities that are not authorized by HHA's Plan or federal regulations in violation of 24 CFR § 982.153.</u>

106.   As noted *supra*, pursuant to 24 CFR § 982.151, the Government requires and relies on each PHA to submit a Plan outlining its policies, rules, and requirements concerning the PHA's operations, programs and services. Further, pursuant to 24 CFR § 982.153, the Government requires every PHA to certify that it will undertake only activities and programs covered by the Plan in a manner consistent with its Plan and will utilize grant funds only for activities that are approvable under the regulations and the policies, procedures, and rules included in the Plan. Here, HHA not only knowingly and recklessly failed to adhere to its Plan, but also allowed federal funds to be spent for unauthorized purposes.

107.   *First*, in violation of Section 982.153, HHA allowed procurements that did not conform to the policies and procedures articulated in HHA's Plan. As noted *supra*, HHA policies required Ms. Miniex to approve all procurements that were less than $100,000. However, after a project was approved, a department—most often REID—would submit a Change Order and

increase the cost of the project to more than $100,000.  Because the procurement was already approved, there was no need for additional approvals from the Board.  The very purpose of the Board approval process was to ensure that the federal funds provided to HHA were being spent according to HHA policies and federal regulations.  Change Orders were being used so that federal funds could be spent to evade the approvals and oversight that were mandated by the federal Government via HHA's Plan.  Ms. Miniex repeatedly brought her concerns to Gunsolley and other HHA leadership, but she was ignored.  HHA refused to make any changes until HUD OIG audited HHA years after Ms. Miniex first raised the issue.

108.    ***Second***, in violation of Section 982.153, HHA has allowed federal funds to be spent for unauthorized purposes.  After HHA uncovered the VASH fraud—the second of two back-to-back incidents of fraud in HCVP—Gunsolley expressly told HHA's fraud investigator to "wrap up" his investigation and pressured him to move quickly.   Likewise, Katie Anderson, the Strasburger & Price attorney hired to "investigate" fraud in HCVP, did not audit HCVP's tenant files.  She simply interviewed various HHA employees, the same employees that the Legal Department previously interviewed for the Section 8 fraud and VASH fraud.  Without conducting an in depth audit, Anderson located files that were questionable and requested that the Legal Department investigate the files.  However, the Legal Department never conducted any additional investigations, despite Anderson's claim that Skalka investigated the additional questionable files. The Board determined that Ms. Miniex's claim of mismanagement and fraud in HCVP was unfounded.  Again, the Board allowed HHA's misconduct to continue, this time by rubberstamping Strasburger & Price's superficial investigation without even asking her questions about her findings and recommendations.

## X.   ACTIONABLE CONDUCT

A.   FALSE CLAIMS ACT

109.   This is an action to recover damages and civil penalties on behalf of the Government and the Relator arising from false or fraudulent statements, records, claims, and acts by the Houston Housing Authority made in violation of the False Claims Act, 31 U.S.C. §§ 3729–32.  The FCA provides that any person who

(A)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim

. . .

(G)   knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government

is liable to the Government for a civil penalty of not less than $10,957 and not more than $21,916 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.  *See* 31 U.S.C. § 3729(a)(1).

110.   "Knowing" or "knowingly" for purposes of the FCA means that a person, with respect to the information: (1) had actual knowledge of the falsity of the information, (2) acted in deliberate ignorance of the truth or falsity of the information, or (3) acted in reckless disregard of the truth or falsity of the information. 31 USC § 3729(b)(1)(A).  A defendant need not have a specific intent to defraud the Government.  31 USC § 3729(b)(1)(B).

111.   The FCA defines "claim" as:

(A)   [] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

     (i)     is presented to an officer, employee, or agent of the United States; or

     (ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

          (I)    provides or has provided any portion of the money or property requested or demanded; or

          (II)   will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . .

31 U.S.C. § 3729(b)(2).

112.    The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for themselves and for the Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

B.    HOUSTON HOUSING AUTHORITY VIOLATED THE FALSE CLAIMS ACT

    1.    Houston Housing Authority Knowingly and Recklessly Failed to Comply with the Terms of its Annual Plan, a contract with the United States Government (Violation of 31 U.S.C. § 3729(a)(1)(A)).

113.    From at least 2011 to the present, HHA knowingly presented and/or caused to be presented false and/or fraudulent claims for payment or approval to the United States Government.

114.    Every year, HUD renews its agreement to provide HHA funding, which includes significant funding to implement HHA's Section 8 and VASH programs through the HCVP department.  Prior to each renewal, pursuant to 24 CFR § 982.151, the Government requires and relies on each PHA to submit a Plan outlining its policies, rules, and requirements concerning the PHA's operations, programs and services.  The Plan and forms that must be submitted with the Plan require every PHA to certify that it will comply with its Plan and specific regulations as a condition of receiving funding from the Government.

115.   Specifically, a PHA certifies that it will comply with 24 CFR § 85.20, which mandates that a PHA have effective internal controls and accountability and must adequately safeguard federal funds and must assure that it is used solely for authorized purposes.  In 2014, Section 85.20 was abrogated by 2 CFR § 200.303, but the regulations still require that a PHA fundamentally have effective internal controls that protect the Government from unacceptable risk of errors, omissions, and fraud, as well as the waste of tax payer dollars.  Section 200.303 also mandates that a PHA adhere to the internal controls in the Green Book or the COSO.  However, HHA does not have effective internal controls as required by Section 85.20 and, later, Section 200.303.  HHA also has failed to implement an internal control system that conforms to the Green Book and COSO as required by Section 200.303.

116.   Further, pursuant to  24 CFR § 982.153, the Government requires every PHA to certify that it will undertake only activities and programs covered by the Plan in a manner consistent with its Plan and will utilize grant funds only for activities that are approvable under the regulations and the policies, procedures, and rules included in the Plan.  Here, in violation of Section 982.153, HHA allowed procurements that did not confirm to the policies and procedures articulated in HHA's Plan. Also in violation of Section 982.153, HHA has allowed federal funds to be spent for unauthorized purposes.

117.   Each time HHA submitted its Plan in order to receive funds from the Government, HHA certified that it would comply with its Plan and specific regulations as a condition of receiving funding from the Government. HHA's representations were false.  HHA knowingly made numerous express false certifications of compliance because HHA complied with neither the regulations nor the Plan.  Likewise, HHA knowingly made numerous implied false certifications of compliance when it requested funding from HUD knowing that it made procurements without

following HHA policies and procedures and had not implemented adequate internal controls, which allowed fraud to continue and go unchecked and federal funds to be spent without the requisite approvals and oversight. If the Government had known that HHA would not adhere to its Plan and would not comply with the applicable regulations, the Government would not have provided funding to HHA and would not have renewed its contract. As a result of HHA's misconduct, the Government has suffered substantial damages.

        2.      <u>Houston Housing Authority Knowingly Made or Used False Records or Statements (Violation of 31 U.S.C. § 3729(a)(1)(B)).</u>

118. From at least 2011 to the present, HHA knowingly made and/or used or caused to be made and/or used, false records or statements material to false and/or fraudulent claims paid or approved by the Government.

119. Every year, HUD renews its agreement to provide HHA funding, which includes significant funding to implement HHA's Section 8 and VASH programs through the HCVP department. Prior to each renewal, pursuant to 24 CFR § 982.151, the Government requires and relies on each PHA to submit a Plan outlining its policies, rules, and requirements concerning the PHA's operations, programs and services. The Plan and forms that must be submitted with the Plan require every PHA to certify that it will comply with its Plan and specific regulations as a condition of receiving funding from the Government.

120. Specifically, a PHA certifies that it will comply with 24 CFR § 85.20, which mandates that a PHA have effective internal controls and accountability and must adequately safeguard federal funds and must assure that it is used solely for authorized purposes. In 2014, Section 85.20 was abrogated by 2 CFR § 200.303, but the regulations still require that a PHA fundamentally have effective internal controls that protect the Government from unacceptable risk of errors, omissions, and fraud, as well as the waste of tax payer dollars. Section 200.303 also

mandates that a PHA adhere to the internal controls in the Green Book or the COSO. However, HHA does not have effective internal controls as required by Section 85.20 and, later, Section 200.303. HHA also has failed to implement an internal control system that conforms to the Green Book and COSO as required by Section 200.303.

121.    Further, pursuant to 24 CFR § 982.153, the Government requires every PHA to certify that it will undertake only activities and programs covered by the Plan in a manner consistent with its Plan and will utilize grant funds only for activities that are approvable under the regulations and the policies, procedures, and rules included in the Plan. Here, in violation of Section 982.153, HHA allowed procurements that did not confirm to the policies and procedures articulated in HHA's Plan. Also in violation of Section 982.153, HHA has allowed federal funds to be spent for unauthorized purposes.

122.    HHA represented that it would comply with its Plan and specific regulations as a condition of receiving funding from the Government. HHA made these representations knowing that it would comply with neither the regulations nor the Plan and knowing that such representations would fraudulently induce the Government into renewing HHA's funding. If the Government had known that HHA would not adhere to its Plan and comply with the applicable regulations, the Government would not have provided funding to HHA and would not have renewed its contract. As a result of HHA's misconduct, the Government has suffered substantial damages.

3.   Houston Housing Authority Knowingly and Recklessly Failed to Disclose Its Obligation to Repay the Government (Violation of 31 U.S.C. § 3729(a)(1)(G)).

123.   From at least 2011 to the present, HHA knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money to the Government. An "obligation" is "an established duty," fixed or unfixed, "arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, *or from the retention of any overpayment*." 31 U.S.C § 3729(b)(3) (emphasis added).

124.   HUD will not provide funding to a PHA that knowingly and recklessly fails to comply with its Plan and the certifications that are a part of that Plan. Thus, any amount HUD pays a PHA for services that are not in compliance with the Plan and certifications made by the PHA constitutes an overpayment.

125.   HHA has not complied with its Plan and the certifications that are a part of that Plan. Thus, any reimbursement by HUD to HHA is an overpayment. By creating and carrying its fraud and by retaining HUD funds, HHA knowingly and repeatedly violated Section 3729(a)(1)(G) of the False Claims Act. HHA's knowing concealment or knowing and improper avoidance of an obligation to pay or transmit money to the Government was a foreseeable factor in the Government loss and a consequence of HHA's fraud. By virtue of the Defendants' failure to disclose their obligation to repay the government, the Government has suffered substantial monetary damages.

XI.   CAUSES OF ACTION

A.   COUNT I – FALSE CLAIMS 31 U.S.C. § 3729(a)(1)(A)

126.   Relator alleges and incorporates by reference each and every allegation contained in all paragraphs of this Complaint. Relator seeks relief against Defendants under Section 3729(a)(l)(A) of the False Claims Act.

127.    From at least 2011 to the present, HHA knowingly presented and/or caused to be presented false and/or fraudulent claims for payment or approval to the United States Government.

128.    A PHA certifies that it will comply with 24 CFR § 85.20, which mandates that a PHA have effective internal controls and accountability and must adequately safeguard federal funds and must assure that it is used solely for authorized purposes.  In 2014, Section 85.20 was abrogated by 2 CFR § 200.303, but the regulations still require that a PHA fundamentally have effective internal controls that protect the Government from unacceptable risk of errors, omissions, and fraud, as well as the waste of tax payer dollars.  Section 200.303 also mandates that a PHA adhere to the internal controls in the Green Book or the COSO.  However, HHA does not have effective internal controls as required by Section 85.20 and, later, Section 200.303.  HHA also has failed to implement an internal control system that conforms to the Green Book and COSO as required by Section 200.303.

129.    Further, each time HHA submitted its Plan in order to receive funds from the Government, HHA certified that it would comply with its Plan and specific regulations as a condition of receiving funding from the Government. HHA's representations were false.  HHA knowingly made numerous express false certifications of compliance because HHA complied with neither the regulations nor the Plan.  Likewise, HHA knowingly made numerous implied false certifications of compliance when it requested funding from HUD knowing that it made procurements without following HHA policies and procedures and had not implemented adequate internal controls, which allowed fraud to continue and go unchecked and federal funds to be spent without the requisite approvals and oversight.  If the Government had known that HHA would not adhere to its Plan and would not comply with the applicable regulations, the Government would not have provided funding to HHA and would not have renewed its contract.

130.    By virtue of the false and/or fraudulent claims that Defendants knowingly presented or caused to be presented, the United States Government has suffered substantial monetary damages.

B.    COUNT II – FALSE RECORDS OR STATEMENTS 31 U.S.C. § 3729(a)(1)(B)

131.    Relator alleges and incorporates by reference each and every allegation contained in all paragraphs of this Complaint. Relator seeks relief against Defendants under Section 3729(a)(l)(B) of the False Claims Act.

132.    From at least 2011 to the present, HHA knowingly made and/or used or caused to be made and/or used, false records or statements material to false and/or fraudulent claims paid or approved by the Government.

133.    A PHA certifies that it will comply with 24 CFR § 85.20, which mandates that a PHA have effective internal controls and accountability and must adequately safeguard federal funds and must assure that it is used solely for authorized purposes.  In 2014, Section 85.20 was abrogated by 2 CFR § 200.303, but the regulations still require that a PHA fundamentally have effective internal controls that protect the Government from unacceptable risk of errors, omissions, and fraud, as well as the waste of tax payer dollars.  Section 200.303 also mandates that a PHA adhere to the internal controls in the Green Book or the COSO.  However, HHA does not have effective internal controls as required by Section 85.20 and, later, Section 200.303.  HHA also has failed to implement an internal control system that conforms to the Green Book and COSO as required by Section 200.303.

134.    Further, HHA represented that it would comply with its Plan and specific regulations as a condition of receiving funding from the Government.  HHA made these representations knowing that it would comply with neither the regulations nor the Plan and knowing that such representations would fraudulently induce the Government into renewing

46

HHA's funding.

135. If the Government had known that HHA would not adhere to its Plan and comply with the applicable regulations, the Government would not have provided funding to HHA and would not have renewed its contract.

136. By virtue of the false records and/or statements that Defendants made and/or used or caused to be made and/or used, the United States Government has suffered substantial monetary damages.

C.    COUNT III – REVERSE FALSE CLAIMS – 31 U.S.C. §3729(a)(1)(G)

137. Relator alleges and incorporates by reference each and every allegation contained in all paragraphs of this Complaint. Relator seeks relief against Defendant under Section 3729(a)(l)(G) of the False Claims Act.

138. HHA schemed to falsely and/or fraudulently submit claims for reimbursement (i.e. for payment or approval) to the United States and falsely and/or fraudulently represent that it would comply with its Plan and 2 CFR § 200.303, formerly 24 CFR § 85.20, and 24 CFR § 982.153 as a condition of receiving funding from the Government.  As a result of HHA's misconduct, the Government has been falsely and/or fraudulently overcharged for HHA's services. Throughout this scheme, Defendants have knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease and obligation to pay money to the Government. These false statements or records include but are not limited to false certifications or representations made or caused to be made by Defendants to the Government in requesting payment from the Government for HHA's services.

139. By creating and carrying out its fraud and by retaining HUD funds, HHA knowingly and repeatedly violated Section 3729(a)(1)(G) of the False Claims Act.  HHA's knowing concealment or knowing and improper avoidance of an obligation to pay or transmit

money to the Government was a foreseeable factor in the Government loss and a consequence of HHA's fraud.

140.    By virtue of the Defendants' failure to disclose their obligation to repay the Government in violation of current 31 U.S.C. § 3729(a)(1)(G), the United States has suffered substantial monetary damages.

## XII.    VOLUNTARY DISCLOSURE

141.    As required pursuant to 31 U.S. U.S.C. § 3730(b) and (e), Relator has voluntarily provided information, oral and/or written, and sent disclosure statements describing all material evidence, and information, related to her Original Complaint, both before and contemporaneously with filing her Original Complaint, to the Attorney General of the United States and the United States Attorney for the Southern District of Texas, Houston Division.

## XIII.    DEMAND FOR JURY TRIAL

142.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

## XIV.    PRAYER

143.    WHEREFORE, Relator prays for judgment in his favor and against Defendant for the following:

- Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendant's conduct;
- Civil penalties against Defendant equal to $21,563 for each violation of 31 U.S.C. § 3729;
- The maximum amount allowed pursuant to 31 U.S.C. § 3730(d);
- All costs and expenses of this litigation, including attorneys' fees and costs of court;
- Relator's individual damages;

- Pre-judgment interest at the highest rate allowed by law; and

- All other relief on Relator's behalf or on behalf of the United States Government to which it may be entitled and that the Court deems just and proper.

XV.    INDEX OF EXHIBITS

144.    At present, the documentary evidence relevant to this case consists of the exhibits listed below.

| Exhibit | Description | Bates Ranges |
|---------|-------------|--------------|
| A | Excerpts from Tory Gunsolley's Depositions | MINIEX00001-000034 |
| B | 2009 Screenshots of HHA Department Descriptions | MINIEX00035-000036 |
| C | 2011 Screenshots of HHA Department Descriptions | MINIEX00037-000039 |
| D | 2014 Screenshots of HHA Department Descriptions | MINIEX00040-000041 |
| E | Karen Miniex Resume | MINIEX00042-000050 |
| F | News Story about Karen Miniex as General Counsel | MINIEX00051-000053 |
| G | 2013 Robin Walls Investigation Report | MINIEX00054-000065 |
| H | August 2016 email chain between Karen Miniex and Katie Anderson with Attachments | MINIEX00066-000099 |
| I | HHA Board of Commissioners March 22, 2016 Meeting Minutes | MINIEX00100-00143 |
| J | August 2016 HHA Procurement Policy | MINIEX00144-00164 |
| K | January 2017 HHA Procurement Policy | MINIEX00165-00188 |
| L | HUD HHA Audit Report | MINIEX00189-00264 |
| M | Email from Brian Gage dated January 26, 2017 | MINIEX00265-00268 |
| N | Ben Skalka February 2016 Report | MINIEX00269-00326 |
| O | Email from Robin Walls to Katie Anderson dated August 16, 2016 | MINIEX00327-00333 |
| P | June 2016 – September 2016 Text Messages between LaRence Snowden and Karen Miniex | MINIEX00334-00355 |

| Q | Ben Skalka's June 2016 Report re Carmen Newland Fraud | MINIEX00356-00365 |
|---|---|---|
| R | Karen Miniex's Amended June 2016 Report re Carmen Newland Fraud | MINIEX00366-00395 |
| S | Email between Karen Miniex and HHA Board Members dated July 21, 2016 | MINIEX00396-00405 |
| T | Katie Anderson Report with Cover Email dated September 15, 2016 | MINIEX00406-00414 |
| U | Katie Anderson Email discussing Questionable HCVP files dated August 10, 2016 | MINIEX00415-00418 |
| V | Katie Anderson Email discussing Questionable HCVP files dated August 12, 2016 | MINIEX00419-00438 |
| W | Katie Anderson Email discussing Questionable HCVP files dated August 17, 2016 | MINIEX00439-00441 |
| X | Transcript December 2016 HHA Legal Department Meeting | MINIEX00442-00449 |
| Y | Email dated August 17, 2016 between Karen Miniex and Katie Anderson | MINIEX00450-00453 |
| Z | Exhibit from Tory Gunsolley Deposition | MINIEX00454-00455 |

*/s/ Zenobia Harris Bivens*_____
Zenobia Harris Bivens
State Bar No. 24065378
Joel M. Androphy
State Bar No. 01254700
Justin C. Pfeiffer
State Bar No. 24091473
Berg & Androphy
3740 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785

*Email: zbivens@bafirm.com*
*Email: jandrophy@bafirm.com*
*Email: jpfeiffer@bafirm.com*

ATTORNEYS    IN    CHARGE    FOR
RELATOR KAREN MINIEX

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 16, 2018, a true and correct copy of this Original Complaint was delivered to the United States Attorney's Offices for the Southern District of Texas and the Department of Justice in Washington, D.C. via electronic mail and certified mail.

Dated this 16th day of May, 2018.

<u>/s/ *Zenobia Harris Bivens*</u>
Zenobia Harris Bivens

BERG & ANDROPHY
3704 Travis Street
Houston, Texas 77002
Tel.  713-529-5622

I