IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* Karen Miniex, | § | |
| | § | |
| Plaintiff, | § | |
| | § | No. 4:18-cv-1609 |
| v. | § | |
| | § | |
| | § | |
| HOUSTON HOUSING AUTHORITY, | § | |
| | § | JURY TRIAL DEMANDED |
| | § | |
| Defendant. | § | |

## FOURTH AMENDED COMPLAINT

Plaintiff/Relator Karen Miniex brings this action pursuant to the False Claims Act, 31 U.S.C. §§ 3729–33, and seeks to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States of America and respectfully submits the following:

## INTRODUCTION

1.     The Houston Housing Authority ("HHA") is a public housing authority tasked with providing affordable housing to low-income Houstonians. Created by the Houston City Council in 1938, HHA is one of the largest housing authorities in the country. HHA primarily administers two types of programs: public housing and housing vouchers. HHA's public housing developments are communities of properties constructed, operated, and owned by HHA. Anyone who is low income, elderly, or disabled may qualify for public housing. Tenants at HHA's public housing properties pay rent based upon a formula developed by the United States Department of Housing and Urban Development ("HUD").

HHA's housing voucher programs provide rent subsidies to veterans and those who are low income. The majority of funding for HHA's public housing and voucher programs comes from HUD. For example, in 2014, HUD provided more than $125,000,000 in federal funding to HHA, including more than $100,000,000 in funding for HHA's voucher programs. Because HHA receives significant funding from the Government, HHA is required to follow the federal procurement regulations (2 CFR Part 200, previously 24 CFR Part 85).

2.      From at least 2012 to 2018, Defendant HHA has habitually and routinely failed to comply with federal procurement regulations. HHA's knowing failure to comply with fundamental procurement laws is compounded by HHA's decision in early 2015 to delegate significant procurement compliance responsibilities to companies that manage HHA's public housing properties—Property Management Companies ("PMCs"). The Board approved these measures in March 2016. Yet these PMCs (including J. Allen Management Co., Inc.; Allied Orion Group, LLC; Orion Real Estate Services Texas, Inc.; The Lynd Company; CF Real Estate Services LLC (formerly, CF Lane, Inc.); and Tarantino Properties, Inc.) also violated the procurement laws and regulations that HHA agreed to follow.

3.      Relator Karen Miniex served as HHA's General Counsel. She later also became HHA's Director of Procurement. In this capacity, she noticed repeat problems with HHA's procurement practices, as well as the practices of the PMCs. For example, HHA routinely failed to obtain an Independent Cost Estimate to ensure that it obtained the best goods and services at the lowest prices, a fundamental requirement of federal procurement

laws.  As another example, to avoid oversight, HHA used PMCs that it knew encouraged and knowingly and willfully allowed contractors to use "bid splitting," the breaking up of contracts into smaller quantities and amounts, or dividing contract implementation into artificial phases or subcontracts, for the purpose of making it fall below the threshold for oversight. Ms. Miniex raised her concerns on multiple occasions, was ignored, and eventually was terminated in December 2016.[1]

4.     Defendant's continued misconduct undermines the procurement process and the protections that it provides through open and fair competition.  Undeniably, open and fair competition is integral to the procurement process because it helps maximize government efficiency by getting the best quality work for the best price for taxpayers. Without it, taxpayer dollars are at high risk of being squandered and wasted on subpar products and services.   Defendant has habitually and repeatedly failed to follow procurement laws and regulations, knowing that its conduct is in violation of the law. Accordingly, Ms. Miniex brings the following suit on behalf of the United States Government pursuant to the False Claims Act.

### PARTIES

**I.     Government Plaintiff.**

5.     The governmental plaintiff in this case is the United States of America.

---

[1] On March 21, 2019, a jury found in Ms. Miniex's favor in her FCA retaliation suit against HHA. *Miniex v. Houston Housing Authority*, Verdict Form, No. 4:17-cv-00624, Dkt. No. 233 (S.D. Tex. Mar. 21, 2019)

**II.    Relator Karen Miniex.**

6.    Relator Karen Miniex is an individual residing in Harris County, Texas. Ms. Miniex is the former HHA Vice President and General Counsel and, later, also served as the HHA executive in charge of procurement. She is a graduate of the University of Michigan Law School, where she served as an editor on two law journals. At the start of her career, Ms. Miniex received the prestigious Equal Justice Works Fellowship and worked in low income communities, addressing housing and other related poverty issues. She continued that work for approximately four years before opening her own private practice that focused on real estate and construction litigation, as well as elder law and consumer law. Ms. Miniex worked at HHA from March 2012 until she was unlawfully terminated in December 2016.

7.    Relator is an original source of information concerning the fraud alleged in this Complaint. Relator has firsthand knowledge that is independent of any publicly disclosed information concerning HHA's fraud by virtue of her positions as Vice President and General Counsel of HHA, and as the HHA executive in charge of procurement. Relator's knowledge materially adds to any publicly disclosed information concerning HHA's fraud, ranging from evidence of the particulars of HHA's scheme that were never publicly disclosed to evidence of how HHA was deliberately ignorant and recklessly disregarded its certifications of compliance with its governing regulations.

8.    Relator worked at HHA from March 2012 to December 2016. As referenced, she served as HHA's General Counsel and later as HHA's Director of Procurement. When Relator became the HHA executive responsible for procurement in 2013, she almost immediately noticed repeat problems surrounding HHA's compliance with procurement

policies and procedures, as well as the practices of the PMCs. Relator witnessed firsthand repeat instances when HHA did not follow basic procurement procedures. For instance, HHA failed to determine whether a contractor was giving HHA the best price for goods and services—a key considering required by procurement laws and regulations when evaluating bids and proposals. Relator not only observed this misconduct as it occurred, but she also knew HHA's business practices and was privy to internal meetings, discussions, and communications involving the misconduct. Relator raised these issues and was ignored. These allegations have not been publicly disclosed.

III.  **Defendant.**

9.     Defendant HHA is a political subdivision headquartered in Houston, Harris County, Texas and may be served with process by serving its registered agent, HHA Fountainview PFC, 2640 Fountain View Drive, Suite 400, Houston, Texas 77057, or through HHA's counsel.

## RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

10.     Any and all acts alleged herein to have been committed by Defendant were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of Defendant and within the course and scope of their employment.

## JURISDICTION AND VENUE

11.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729–33. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

12.    This Court has personal jurisdiction over Defendant because it transacts business within the Southern District of Texas.

13.    Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. § 1395, and 31 U.S.C. § 3732(a), because Defendant transacts business and has offices within the Southern District of Texas.

## BACKGROUND

14.    HHA is required to have written procurement policies and procedures that follow applicable federal, state, and local laws and regulations.  2 CFR § 200.318(a). To this end, procurements by HHA must be made through open competition. Open competition maximizes government efficiency and helps ensure that taxpayer dollars are protected from fraud, waste, and abuse. Without open competition, there is less incentive for contractors to innovate or provide genuine value for money. For example, in a 2009 memorandum—"Memorandum for the Heads of Executive Departments and Agencies – Subject: Government Contracting"— the Office of the President explained:

> The Federal Government has an overriding obligation to American taxpayers. It should perform its functions efficiently and effectively while ensuring that its actions result in the best value for the taxpayers. Since 2001, spending on Government contracts has more than doubled, reaching over $500 billion in 2008. During this same period, there has been a significant increase in the dollars awarded without full and open competition and an increase in the dollars obligated through cost-reimbursement contracts. Between fiscal years 2000 and 2008, for example, dollars obligated under cost-reimbursement contracts nearly doubled, from $71 billion in 2000 to $135 billion in 2008. Reversing these trends away from full and open competition and toward cost-reimbursement contracts could result in savings of billions of dollars each year for the American taxpayer.

> *Government Contracting*, 74 FR 9755 at 9755 (emphasis added).

15.     To this end, there typically are two types of competitive procurement methods: <u>sealed bidding</u> or the <u>competitive proposal</u> process.

16.     <u>Sealed bidding</u> is a competitive method of contracting that employs the solicitation of work by HHA, the submission of bids each sealed in envelopes, and a public opening of bids. *See generally* 2 CFR § 200.320(c). The contract award goes to the party with the best price and that meets HHA's solicitation requirements. *Id.* § 200.320(c)(2)(iv). Sealed Bids are purchases of more than $50,000 pursuant to a firm fixed-price contract[2] and are primarily used for construction-related bids.  Exhibit A at MINIEX_000171–72.

17.     The <u>competitive proposal</u> process is used when the award will be based on more than price.  *Id.* § 200.320(d). An award is normally made on the basis of the proposal that represents the best overall value to the HHA, considering price and other factors, e.g., technical expertise, past experience, quality of proposed staff, etc., set forth in the solicitation and not solely the lowest price. *Id.* at MINIEX_000173.  Like sealed bids, competitive proposals also involve procurements of more than $50,000 that require HHA to obtain bids pursuant to a formal Requests for Proposals.  Exhibit A at MINIEX_000172–74.

18.     Though each procurement process is different, there are fundamental steps mandated by federal regulations (2 CFR Part 200) that HHA is required to follow for both:

> 1)     Develop a Solicitation or Request for Proposal (RFP) that describes the work involved and establishes a baseline for evaluation factors.  2 CFR §§ 200.319(c),   200.320(c)(2)(i), 200.320(d)(1).
>
> 2)     Complete an Independent Cost Estimate (ICE).  An ICE is

---

[2] A firm fixed-price contract allows the purchaser to pay a set price for the completion of project with no adjustments for the costs expended by the contractor that does the work.

HHA's estimate of the cost of goods and services being sought. It is used to evaluate whether a contractor's pricing is "reasonable." 2 CFR § 200.323(a).

3)   Determine the rationale for the procurement method used (sealed bidding or competitive proposal). 2 CFR §§ 200.320(c)(1)(i)–(iii), 200.320(d).

4)   Solicit and receive quotes/bids/proposals. 2 CFR §§ 200.320(c)(2)(i), (d)(2).

5)   Determine responsive/responsible bidder, as applicable. 2 CFR §§ 200.318(h), 200.320(c)(2)(iv), 200.320(d)(3)–(4).

6)   Determine price reasonableness. 2 CFR § 200.323(a).

7)   Award the contract.

19.   Additionally, HHA is required to monitor and enforce contractors' compliance with the requirement to pay prevailing wages determined under the Davis-Bacon Act (40 U.S.C. 276a—276a–7) and complete documentation if a company claims to be a Minority- or Women-owned Business Enterprise.

20.   Every year, HHA certifies in Form 50077, a part of HHA's Annual Plan and/or Five-Year Plan (contracts to receive HUD funding), that it will follow statutes and regulations that require compliance with these basic procurement steps.[3]   Exhibit B, at 2, ¶ 16.   HHA also certifies that it will comply with these regulations or risk being held liable under the FCA. *Id.* at 2 (signature block).

---

[3] Form 50077 refers to 24 CFR Part 85 ("Administrative Requirements for Grants and Cooperative Agreements to State, Local and Federally Recognized Indian Tribal Governments"). The provision in Chapter 24 relevant to Public Housing Authorities and procurement was Section 85.36, which was removed from the Code of Federal Regulations. Effective December 26, 2014, procurement for Public Housing Authorities is governed by 2 CFR Part 200 ("Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"). Though the regulatory provision changed, the substantive of the regulations that are relevant to the present case remained the same.

21.     In 2013, Ms. Miniex became the HHA executive responsible for procurement. Ms. Miniex almost immediately noticed issues with HHA's compliance with procurement policies and procedures.  As time progressed, HHA's compliance problems became more pronounced.  There were repeat instances when HHA did not follow basic procurement procedures, such as determining whether a contractor was giving HHA the best price for goods and services, a key consideration required by procurement laws and regulations when evaluating bids and proposals.  Ms. Miniex raised these issues with HHA leadership and was ignored. On one occasion, a key member of HHA leadership yelled at Ms. Miniex and said that, if she kept questioning him, he would "throw [her expletive] under the bus."

22.     Instead of fixing its internal problems with procurement, HHA leadership outsourced procurements for its public housing properties above $25,000 and compliance with federal regulations for those procurements to the companies that managed the properties—PMCs. These companies had no experience with the federal procurement process, other than small procurements that did not require competitive bidding and were not subject to the federal procurement regulations.  The Board rubberstamped the policy change with little to no due diligence and without asking questions that would reasonably elicit information necessary to make an informed decision about the policy.

23.     Ms. Miniex vehemently disagreed with the change in policy and voiced her concerns to HHA leadership. Despite those concerns, HHA leadership explained that HHA's Manager of Capital Funds Projects, Lawrence Bowie, who had little experience with HHA procurement policies and no experience with federal regulations governing

procurement, would monitor the PMCs. The PMCs primarily used by HHA were J. Allen Management Co.; Allied Orion Group, LLC; and Orion Real Estate Services Inc.; The Lynd Company; CF Real Estate Services LLC (formerly, CF Lane, Inc.); and Tarantino Properties, Inc.  The Board approved the PMCs change in authority in March 2016. This was nothing more than an attempt to obscure continued failure to comply with HHA policies and federal regulations, as well as the lack of internal controls at HHA.

24.     Following the change in the PMCs' authority, their contracts were modified. Each of the contracts between HHA and the PMCs contained the following or similar language:

> **Owner** [HHA] hereby grants **Manager** [PMC] the authority to procure and manage all Capital Improvement projects on the **Development** up to $25,000.00 per project.  With the prior written consent of **Owner**, on a per project basis, **Manager** may procure and manage Capital Improvement projects above $25,000.00 per project after receiving written consent from **Owner** to proceed.

Exhibit C, at 2 [Article XI, 11.2]; *see also* Exhibit D, at 2 [Article XI, 11.2] and Exhibit E, at 2 [Article XI, 11.2].

25.     Because of the PMCs' new authority, like HHA, the PMCs certified in their contracts that they would follow statutes and regulations governing Public Housing Authorities. Exhibit F at 8–9 [Article V, 5.3(a)–(g)]; *see also* Exhibit G at 8–9 [Article V, 5.3(a)–(g)] and Exhibit H at 8–9 [Article V, 5.3(a)–(g)].  Importantly, the PMCs agreed to comply with "HUD's procurement requirements found in 24 CFR 85.36 and 24 CFR 200, as well as the procurement policies of **Owner** and Houston Housing Authority." Exhibit F at 8 [Article V, 5.3(f)]; *see also* Exhibit G at 8 [Article V, 5.3(f)] and Exhibit H at 8 [Article V, 5.3(f)].

26.     Further, in amendments to certain PMC contracts, the PMCs agreed to take

the following specific steps with respect to any procurement:

> In accordance with the increased authority permitted by section XI, above, **Manager's**, scope of work shall include the following:
>
> a.   Day-to-day construction management and supervision of Capital Improvement projects;
>
> b.   Production of preliminary cost estimates;
>
> c.   Preparation of solicitations for procurement of requisite Capital Improvement projects;
>
> d.   Distribution of solicitations to various potential vendors in accordance with HHA's Procurement Policy and applicable HUD regulations;
>
> e.   Review bids and make recommendations to **Owner** for selection of winning bid;
>
> f.   Prepare and enter contracts with the selected contractors;
>
> g.   Provide quality control monitoring;
>
> h.   Review contractors' progress billings and notify **Owner** of any apparent billing concerns;
>
> i.   Schedule and garner all necessary permits, city code inspections, and certificates of occupancy on all projects managed by **Manager**;
>
> j.   Procure all warranty manuals and close-out documents from the contractors;
>
> k.   Monitor and enforce vendor/contractor compliance with Section 3, Davis-Bacon, and M/WBE requirements, including requiring vendor to complete all necessary forms for these requirements.

Exhibit C at 2–3 [Article XII, 12.1]; *see also* Exhibit D at 2–3 [Article XII, 12.1] and

Exhibit E at 2–3 [Article XII, 12.1].

27.     HHA and the Board of Commissioners were required to oversee the procurement process.  *Id.* at 2 [Article XI, 11.2]. But they did not do so and ignored Ms. Miniex when she repeatedly raised concerns about the PMCs' procurement practices and failure to comply with procurement laws.

28.     For several years, HHA has continued to habitually and repeatedly violate federal procurement laws, with full knowledge that it was doing so. Accordingly, Ms. Miniex brings this action pursuant to the False Claims Act.

## FALSE CLAIMS ACT

29.     This is an action to recover damages and civil penalties on behalf of the Government and the Relator arising from false or fraudulent statements, records, claims, and acts by Defendant made in violation of the False Claims Act, 31 U.S.C. §§ 3729–32.

30.     The FCA provides that any person who

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

\* \* \*

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or  knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government

is liable to the Government for a civil penalty of not less than $10,957 and not more than $21,916 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1).

31.     "Knowing" or "knowingly" for purposes of the FCA means that a person, with respect to the information: (1) had actual knowledge of the falsity of the information, (2) acted in deliberate ignorance of the truth or falsity of the information, or (3) acted in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A). A defendant need not have a specific intent to defraud the Government. 31 U.S.C. § 3729(b)(1)(B).

32.     The FCA defines "claim" as:

> (A)     [] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—
>
> (i)     is presented to an officer, employee, or agent of the United States; or
>
> (ii)     is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
>
> (I)     provides or has provided any portion of the money or property requested or demanded; or
>
> (II)     will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded….

31 U.S.C. § 3729(b)(2).

33.     The FCA allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for themselves and for the Government and to share in any recovery as authorized by 31 U.S.C. § 3730. For the reasons articulated below, HHA has and continues to violate the FCA.

**ACTIONABLE CONDUCT**

34.     From at least 2012 to 2018, HHA has knowingly and willfully failed to ensure open competition during the procurement process and failed to follow procurement laws. For example, HHA routinely failed to obtain an ICE to ensure that it obtained the best goods and services at the lowest prices during the competitive bidding process.  Another example, to avoid oversight, HHA used PMCs that it knew encouraged and knowingly and willfully allowed contractors to use "bid splitting," the breaking up of contracts into smaller quantities and amounts, or dividing contract implementation into artificial phases or subcontracts, for the purpose of making it fall below the threshold for oversight.  HHA and the PMCs individually and together engaged in at least the following conduct in violation of federal procurement regulations:

a)     HHA routinely failed to obtain an ICE for projects before obtaining bids, including, but not limited to the following transactions between 2012 and 2014. Exhibit I at 7. When HUD audited[4] a small fraction of HHA's procurement files (Exhibit J at 1), HHA leadership scrambled to find supporting documentation for more than 25 procurements completed without an ICE:

---

[4] The HUD audit was conducted from November 2014 to June 2015, and covered the period from January 1, 2012 to October 31, 2014. Relator's observation of actionable behavior from HHA, however, occurred before the audit's initiation. The audit thus does not provide the basis for Relator's allegations. When Relator became the HHA executive responsible for procurement in 2013, she almost immediately noticed repeat problems concerning HHA's compliance with procurement policies and procedures, as well as the practice of the PMCs. Relator raised these issues at the time—before the audit—with HHA's leadership and was ignored. What's more, the audit did not disclose the schemes observed and reported by Relator. Rather, the audit's purpose was to review and report deficiencies in procurement requirements. The audit's findings never state or allude to accusations of fraud by HHA or any PMC. Moreover, the audit does not reference the fraudulent scheme associated with HHA's leadership outsourcing procurement duties to the PMCs, or to the PMC's misconduct thereafter. Indeed, the audit's time period (January 1, 2012 to October 31, 2014) reviewed only practices from before when HHA provided the PMCs procurement responsibilities in March 2016. Relator witnessed the PMCs engage in conduct at HHA's behest after March 2016 that violated federal procurement regulations.

- January 20, 2012 Replacement of HVAC system at Bellerive by RDI Mechanical Inc.

- May 22, 2012 Replacement of Floor Decking by General Contractor Services.

- July 6, 2012 Commercial double door by On the Spot America, Inc.

- August 23, 2012 Community Building Interior by Southwest Painting Contractors, Inc.

- October 18, 2012 Exterior painting at Forest Green by ERC (Payment No. 1)

- October 26, 2012 Exterior painting at Forest Green by ERC (Payment No. 2)

- November 8, 2012 Demo and Replacement of ADA Parking Spaces by FSI Construction.

- December 14, 2012 Exterior painting at Forest Green by ERC (Payment No. 3)

- January 10, 2013 Construction at Irvinton Village by FSI Construction.

- May 3, 2013 Pressure wash surface at Kelly Village by FSI Construction

- May 24, 2013 Removal and Replacement at Clayton Homes by FSI Construction.

- June 14, 2013 A/C Repair: Install Compressors at Cuney Homes by Atex Air Company

- July 3, 2013 Construction work on Lyerly 2nd Floor by FSI Construction

- July 3, 2013 Pressure wash all iron and remove dirt, mildew at Cuney Homes by QT Pressure Wash

- August 23, 2013 Scope of Work installation bid at Lyelry by Elevator Transportation Services Inc

- August 30, 2013 Demolitions (Building 133-140) at Kelly Village by AAR Incorporated

- December 6, 2013 HVAC and heater maintenance (100 units) at Forest Green by Atex Air Company

- December 13, 2013 Lease Buyout Agreement at Wilmington House by Coinmach Corporation

- February 14, 2014 Lyerly Bid Job, Unit 236 (Fire) by FSI Construction

- March 7, 2014 Brief Scope of Work at Long Drive by FSI Construction

- May 9, 2014 Hallway construction by FSI Construction

- May 22, 2014 Hallway construction by FSI Construction

- July 8, 2014 Gutter Cleaning and Repair by FSI Construction.

- July 10, 2014 Job 100% by FSI Construction

- July 10, 2014 Painting and touch up by Mercal Refinishing

- July 11, 2014 Exterior concrete repairs by A & K Remodeling Turnkey

- July 18, 2014 Appliances at Irvinton Village by HD Supply Facilities Maintenance, LTD.

[Exhibit J.]

b)  PMCs did not understand the regulations and, thus, failed to follow fundamental procurement procedures and award contracts arbitrarily. [Exhibit K.]

c)  PMCs encouraged contractor to engage in bid splitting.  PMCs told contractors to send them multiple invoices for the same job wherein each individual invoice is under the micro purchase amount (less than $25,000), which does not require oversight by HHA. [Exhibits L, M.]

d)  PMCs hired contractors do work that were not properly licensed.  [*Id.*]

e)  PMCs allowed contractors to bring children on sight to do labor at HHA properties. [*Id.*]

f)  PMCs would submit projects that were well below what the cost of a project would be and a price that was below the amount that would require HHA oversight.  The PMCs were later allowed to submit change orders that would increase the amount paid to the contractor, but never require oversight. [Exhibit N.]

35.     Ms. Miniex attempted to bring these issues to HHA's attention on multiple occasions, but she was ignored. In May 2018, Ms. Miniex filed this suit pursuant to the FCA.  HHA's routine failure to follow fundamental procurement laws is a clear violation of the certification HHA made to receive funding from the federal government.  Thus, Defendant's conduct constitutes violations of the FCA.

## CAUSES OF ACTION

### Count I – False Claims 31 U.S.C. § 3729(a)(1)(A).

36.     Relator alleges and incorporates by reference every allegation contained in all paragraphs of this Complaint. Relator seeks relief against Defendant under Section 3729(a)(l)(A) of the False Claims Act.

37.     From at least 2012 to 2018, Defendant knowingly presented and/or caused to be presented false and/or fraudulent claims for payment or approval to the United States Government.

38.     HHA certified that it will comply with 2 CFR Part 200, which mandates compliance with federal procurement regulations, but failed to comply with those regulations. Thus, Defendant's representations to the United States Government were false.

39.     Defendant knowingly made numerous express false certifications of compliance because Defendant complied with neither the regulations nor the laws governing procurement. Likewise, Defendant knowingly made numerous implied false certifications of compliance when they requested funding from HUD knowing that they made procurements without following the procurement regulations.

40.    If the Government had known that Defendant would knowingly and habitually fail to adhere to procurement regulations, the Government would not have provided funding to HHA and would not have renewed HHA's contract.

41.    By virtue of the false and/or fraudulent claims that Defendant knowingly presented or caused to be presented, the United States Government has suffered substantial monetary damages.

### Count II – False Records or Statements 31 U.S.C. § 3729(a)(1)(B).

42.    Relator alleges and incorporates by reference each allegation contained in all paragraphs of this Complaint. Relator seeks relief against Defendant under Section 3729(a)(l)(B) of the False Claims Act.

43.    From at least 2012 to 2018, Defendant knowingly made and/or used or caused to be made and/or used, false records or statements material to false and/or fraudulent claims paid or approved by the Government.

44.    HHA certified that it will comply with 2 CFR Part 200, which mandates compliance with federal procurement regulations, but failed to comply with those regulations. Thus, Defendant's representations to the United States Government were false.

45.    Defendant represented that it would comply with federal regulations governing procurement, a condition of receiving funding from the Government. Defendant made these representations knowing that it would make and continue to make procurements without following the procurement regulations and knowing that such representations would fraudulently induce the Government into renewing HHA's funding.

46.     If the Government had known that Defendant would knowingly and habitually fail to adhere to procurement regulations, the Government would not have provided funding to HHA and would not have renewed its contract.

47.     By virtue of the false records and/or statements that Defendant made and/or used or caused to be made and/or used, the United States Government has suffered substantial monetary damages.

### Count III – Fraudulent Inducement and Promissory Fraud

48.     Relator alleges and incorporates by reference each allegation contained in all paragraphs of this Complaint. Relator seeks relief against Defendant under the False Claims under the theories of fraudulent inducement and promissory fraud.

49.     From at least 2012 to 2018, Defendant knowingly made and/or used or caused to be made and/or used, false records or statements material to false and/or fraudulent claims paid or approved by the Government.

50.     HHA certified that it will comply with 2 CFR Part 200, which mandates compliance with federal procurement regulations, but failed to comply with those regulations. Thus, Defendant's representations to the United States Government were false.

51.     Defendant represented that it would comply with federal regulations governing procurement, a condition of receiving funding from the Government. Defendant made these representations knowing that it would make and continue to make procurements without following the procurement regulations and knowing that such representations would fraudulently induce the Government into renewing HHA's funding.

52.     If the Government had known that Defendant would knowingly and habitually fail to adhere to procurement regulations, the Government would not have provided funding to HHA and would not have renewed its contract.

53.     By virtue of the false records and/or statements that Defendant made and/or used or caused to be made and/or used, the United States Government has suffered substantial monetary damages.

**Count IV – Reverse False Claims – 31 U.S.C. §3729(a)(1)(G).**

54.     Relator alleges and incorporates by reference each allegation contained in all paragraphs of this Complaint. Relator seeks relief against Defendant under Section 3729(a)(l)(G) of the False Claims Act.

55.     Defendant schemed to falsely and/or fraudulently submit claims for reimbursement (*i.e.*, for payment or approval) to the United States and falsely and/or fraudulently represent that it would comply with procurement regulations, including 2 CFR Part 200, as a condition of receiving funding from the Government. As a result of Defendant's misconduct, the Government has been falsely and/or fraudulently overcharged for HHA's services.

56.     Throughout this scheme, Defendant has knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease and obligation to pay money to the Government. These false statements or records include but are not limited to false certifications or representations made or caused to be made by Defendant to the Government in requesting payment from the Government for HHA's services.

57.    By creating and carrying out its fraud and by retaining HUD funds, Defendant knowingly and repeatedly violated Section 3729(a)(1)(G) of the False Claims Act. Defendant's knowing concealment or knowing and improper avoidance of an obligation to pay or transmit money to the Government was a foreseeable factor in the Government loss and a consequence of HHA's fraud.

58.    By virtue of the Defendant's failure to disclose their obligation to repay the Government in violation of current 31 U.S.C. § 3729(a)(1)(G), the United States has suffered substantial monetary damages.

## VOLUNTARY DISCLOSURE

59.    As required pursuant to 31 U.S.C. §§ 3730(b) and (e), Relator has voluntarily provided information, oral and/or written, and sent disclosure statements describing all material evidence, and information, related to the Original Complaint, both before and contemporaneously with filing the Original Complaint, to the Attorney General of the United States and the United States Attorney for the Southern District of Texas, Houston Division.

## DEMAND FOR JURY TRIAL

60.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

## INDEX OF EXHIBITS

61.    At present, the documentary evidence relevant to this case consists of the exhibits listed below.

| Exhibit | Description | Bates Ranges |
|---------|-------------|--------------|
| A | HHA Procurement Policy | MINIEX_000460 – 000483 |
| B | HUD Form 50077 | MINIEX_000484 – 000486 |
| C | First Amendment to APV Management Agreement Contract (2016 – HOAPV) | MINIEX_000487 – 000492 |
| D | First Amendment to APV Management Agreement Contract (2016 – APV) | MINIEX_000493 – 000498 |
| E | First Amendment to HRI Management Agreement Contract (2016-HRI) | MINIEX_000499 – 000504 |
| F | HOAPV Management Agreement Contract (2016-HOAPV) | MINIEX_000505 – 000535 |
| G | APV Management Agreement Contract (2016-APV) | MINIEX_000536 – 000566 |
| H | HRI Management Agreement Contract (2016-HRI) | MINIEX_000567 – 000597 |
| I | U.S. Department of Housing and Urban Development (HUD), Office of Inspector General's (OIG) – Results of Houston Housing Authority Procurement and Financial Operations Audit | MINIEX_000598 – 000672 |
| J | HHA Correspondence re need to find support for 25 transactions as a result of HUD/OIG Audit | MINIEX_000673 – 000676 |
| K | PMC Failure to Comprehend Procurement Regulations and Requirements | MINIEX_000677 – 000678 |
| L | HHA Correspondence re Bid Splitting, Unlicensed Contractors, and Child Labor | MINIEX_000679 – 000683 |
| M | Bill Bryant Correspondence re Bid Splitting, Unlicensed Contractors, and Child Labor | MINIEX_000684 – 000687 |
| N | HHA Correspondence re Change Orders | MINIEX_000688– 000689 |

## PRAYER

Relator prays for judgment in her favor and against Defendant for the following:

a. Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendant's conduct;

b. Civil penalties against Defendant equal to $21,563 for each violation of 31 U.S.C. § 3729;

c.   The maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.   All costs and expenses of this litigation, including attorneys' fees, expenses, and costs of court;

e.   Pre-judgment interest at the highest rate allowed by law; and

f.   All other relief to which Relator or the United States Government may be entitled and that the Court deems just and proper.

Respectfully submitted,

**REESE MARKETOS LLP**

By: */s/ Joshua M. Russ*

    Joshua M. Russ
    Texas Bar No. 24074990
    josh.russ@rm-firm.com
    Jamison M. Joiner *(admission renewal pending)*
    Texas Bar No. 24093775
    jamison.joiner@rm-firm.com

    750 N. Saint Paul St. Ste. 600
    Dallas, Texas 75201-3201
    Telephone: (214) 382-9810
    Facsimile: (214) 501-0731

**ATTORNEYS FOR RELATOR**

## CERTIFICATE OF SERVICE

On January 12, 2024, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Southern District of Texas, Houston Division. I certify that I have served the documents on all counsel of record by a manner authorized by Federal Rule of Civil Procedure 5(b)(2)(E).

                        */s/ Joshua M. Russ*
                        Joshua M. Russ