# EXHIBIT H

MINIEX_000567

# REVISED MANAGEMENT AGREEMENT

## for

## HISTORIC RENTAL INITIATIVE
## (TX005000003)

### by and between

## HOUSTON HOUSING AUTHORITY

### and

## ORION REAL ESTATE SERVICES, INC.



MINIEX_000568

<table>
<tr><td>HRI<br>MANAGEMENT AGREEMENT<br><em>Contract (2016-HRI)</em></td></tr>
</table>

# Table of Contents

RECITALS ........................................................................................................... 1
ARTICLE I. DEFINITIONS ................................................................................ 2
ARTICLE II. ENGAGEMENT AND ACCEPTANCE ...................................... 3
ARTICLE III. COMPLIANCE AND REGULATION ...................................... 3
ARTICLE IV. TERM .......................................................................................... 3
ARTICLE V. MANAGER'S RESPONSIBILITIES ........................................... 5
ARTICLE VI. COMPENSATION OF MANAGER............................................ 17
ARTICLE VII. MONETARY PENALTIES FOR NON-PERFORMANCE............................. 21
ARTICLE VIII. ACCOUNTING AND RECORDKEEPING .................................... 22
ARTICLE IX. INSURANCE................................................................................ 23
ARTICLE X. MISCELLANEOUS PROVISIONS ................................................ 25

**THIS REVISED MANAGEMENT AGREEMENT** is made and entered into by and between **HOUSTON HOUSING AUTHORITY ("Owner")**, which is a which is a public housing authority pursuant to Section 392 of the Texas Local Government Code, having its principal place of business at 2640 Fountain View, Houston, Texas 77057, and **ORION REAL ESTATE SERVICES, INC.** ("**Manager**"), a Texas corporation, having its principal place of business at 2051 Greenhouse Road, Suite 300, Houston, Texas 77084 (collectively **Owner** and **Manager** shall be called the "Parties").

## RECITALS

WHEREAS, **Owner** has the authority to manage the operations and affairs of the units comprising Historic Rental Initiative and to make decisions regarding its business, including the operations of the Historic Rental Initiative property located at 1600 Allen Parkway, Houston, Texas 77019 (the "**Development**");

WHEREAS, the **Owner** is a public body corporate and politic, duly organized and validly existing and in good standing under the laws of the State of Texas and currently engaged in such business as defined in the Housing Authorities Law in the Local Government Code of the State of Texas, including the services of providing decent, safe and sanitary housing to the residents of its facilities, low income families, the elderly, the handicapped and the disabled; and

WHEREAS **Manager** is engaged in the business of managing, operating, maintaining and securing residential dwelling units and related facilities and is competent in said business; and

1

WHEREAS the **Owner,** in order to carry out efficient management of the **Development**, has extended its agreement with **Manager** to continue with its duties in managing the **Development** from the previous Management Agreement that became effective on November 1, 2014 and said agreement has continued to remain in effect by agreement of the parties through the execution of this revised Management Agreement, which revises and amends the previous Management Agreement.

**NOW, THEREFORE, IN CONSIDERATION OF THE PREMISES AND OF THE MUTUAL AND DEPENDENT COVENANTS AND AGREEMENTS HEREIN CONTAINED, THE PARTIES HERETO AGREE AS FOLLOWS:**

## ARTICLE I.  DEFINITIONS

"**ACC**" shall mean the Annual Contributions Contract between HUD and the Housing Authority, as the same may be further amended from time to time.

"**Act**" shall mean the United States Housing Act of 1937 (42 U.S.C. §1437, et seq.), as amended from time to time, any successor legislation, and all implementing regulations issued thereunder or in furtherance thereof.

"**Agreement**" means this revised Management Agreement, all exhibits thereto including, the Admissions and Continuing Occupancy Policy (which is attached as **Exhibit A**), and the Certifications and Representations (which are attached as **Exhibit B**).

"**Applicable Public Housing Requirements**" means all requirements applicable to public housing, including, but not limited to, the Act, HUD regulations thereunder (and, to the extent applicable, any HUD-approved waivers of regulatory requirements), the ACC, HUD notices, the HUD-approved Declaration of Trust and Restrictive Covenants in favor of HUD, the Authority's admissions and occupancy policies applicable to the Development, as set forth in its PHA Plan, and all applicable Federal statutory, executive order and regulatory requirements, as those requirements may be amended from time to time.

"**Lease**" shall mean the form of agreement (approved by **Owner**) between **Owner** and a Resident under the terms of which the Resident is entitled to enjoy possession of a unit in the **Development**.

"**Non-Housing Income**" shall mean all amounts actually collected by **Manager**, other than Rent, including, all income and charges from normal operations of the **Development** other than Rent, including, if applicable, parking fees, forfeited security deposits, pet deposits where pets are permitted, other fees and deposits, and other miscellaneous income.

"**Rent**" shall mean that monthly amount which a Resident is obligated to pay **Owner** pursuant to the terms of a Lease, other than Non-Housing Income.

"**Resident**" shall mean a person occupying a unit in the Development pursuant to a Lease.

2

## ARTICLE II. ENGAGEMENT AND ACCEPTANCE

**Owner** hereby engages **Manager** to act, in its capacity as an independent contractor, on behalf of **Owner** for the purpose of managing, maintaining, operating and securing the Development for the account of **Owner**, and **Manager** hereby accepts such engagement, under and subject to the terms and conditions herein contained. This revised Agreement revises and amends the previous Agreement that was effective as of November 1, 2014, which the parties have extended and operated under through the date of execution of this revised Agreement. The parties also understand and acknowledge that **Owner** is the Houston Housing Authority for all purposes of this Agreement.

## ARTICLE III. COMPLIANCE AND REGULATION

**3.1.**    Compliance with Federal Requirements.    **Manager** understands that the development units will be receiving subsidies pursuant to Section 9 of the Act, including, but not limited to, the provisions thereof requiring compliance by **Owner** with the requirements of Section 9 of the Act and all related regulations, including, the terms of the ACC to which the Development is subject. In managing the Development, **Manager** agrees to comply with the aforementioned provisions.

**3.2.**    Resolving Conflicts and Ambiguities.    The Admissions and Continuing Occupancy Policy (which is attached as **Exhibit A**) is incorporated herein as if fully copied verbatim and made part of this Agreement. In the event that this Agreement, and the Admissions and Continuing Occupancy Policy shall conflict or contradict with respect to any item or provision, the provisions of this Agreement shall prevail.

**3.3.**    Certifications and Representations.    In connection with **Manager's** entry into this Agreement, the parties incorporate **Manager's** Certifications and Representations herein (attached as **Exhibit B**) previously submitted by **Manager** in response to RFP No. 14-34, as amended.

## ARTICLE IV. TERM

**4.1.**    Generally.    This Agreement is effective as of March __ , 2016, and shall continue in effect until July 1, 2017 or until terminated sooner. **Owner**, at its own option, may extend the term of this Agreement for up to one additional one (1) year term.

**4.2.**    Termination for Convenience.    Notwithstanding Section 4.1, this Agreement and the obligations of the parties hereunder may be terminated in the following manner: Either **Owner** or **Manager** may terminate this Agreement in whole or in part whenever such party determines that such termination is in the best interest of such party. Any such termination shall be effective sixty (60) days after delivery to the non-terminating party of a notice of termination

3

specifying the extent to which the performance of the work under this Agreement is terminated and the date upon which such termination becomes effective.

If the performance of the work is terminated, either in whole or in part, pursuant to this Section 4.2, **Owner** shall be liable to **Manager** only for reasonable and proper costs through the date of termination resulting directly from such termination upon receipt by **Owner** of a properly presented claim setting out in detail (a) the total cost of the work performed to date of termination less the total amount of payments made hereunder to **Manager**; (b) the cost of settling and paying claims under contracts and materials orders for work performed and materials and supplies delivered to the Development, payment for which has not been made by **Owner** to **Manager** hereunder or by **Manager** to the contractor or supplier; (c) the cost of preserving and protecting the work already performed until **Owner** takes possession thereof or assumes responsibility therefor; and (d) all owed but unpaid management fees and reimbursement for employee compensation and benefits for onsite employees.

4.3. <u>Termination for Cause</u>. Notwithstanding Section 4.2, this Agreement and the obligations of the parties hereunder may be terminated by **Owner** for cause, which for purposes of this provision shall be deemed to mean negligence, fraud, malfeasance, bad faith or any breach of this Agreement or any inability of **Manager** to perform **Manager**'s duties hereunder, including, but not limited to, an inability or failure of **Manager** to comply with any requirements applicable to **Owner** or an inability or failure of **Manager** to comply with any performance standard/obligation or other covenant of this Agreement or any exhibit thereto.

In the event this Agreement is terminated pursuant to this Section 4.3, such termination shall be deemed for all purposes of the parties' rights hereunder to be a contractual right of the terminating party as a direct result of the default by the other party of such other party's obligations hereunder. A termination for cause will require written notice of thirty (30) days, or less, if the health or safety of Residents is impaired or threatened by a notice period of thirty (30) days.

4.4. <u>Duties Upon Termination</u>. Should any termination occur, it is understood that the respective rights and obligations of the parties shall continue to be governed by this Agreement until the effective date of termination, which effective date shall be designated in the notice of termination. **Manager** shall cease its operations on the Development effective as of such date of termination (with duties to be performed by **Manager** up to such date of termination).

4.5. <u>Effect of Termination</u>. Upon termination of this Agreement for any reason, **Manager** shall:

> (a)     have no further authority to represent **Owner** or take or cause to be taken any action on **Owner**'s behalf or to disburse any of **Owner**'s funds;

> (b)     promptly deliver to **Owner** all books, keys, records and documents, including, but not limited to, all original Leases, service contracts, unpaid invoices and accounting records, etc., maintained by **Manager** pursuant to this Agreement and do all that is reasonably necessary to facilitate the orderly transition of management of the Development;

> (c)     no later than ten (10) days following such termination, render to **Owner** an accounting of all funds of **Owner** held by **Manager** relating to the Development and reflecting the balance of income and expenses on the

MINIEX_000572

Development as of the date of termination (all of which funds **Manager** shall promptly cause to be delivered to **Owner**), and

(d)    perform all reporting and accounting functions hereunder for the period from the date of the last report or accounting to the effective date of termination.

## ARTICLE V. MANAGER'S RESPONSIBILITIES

**5.1.**    <u>Management</u>. **Manager** shall have full responsibility for the management, operation, maintenance and securing of the Development during the term of this Agreement. **Manager** shall perform these duties in an efficient and economical manner by applying customary and acceptable management techniques appropriate for the nature of the Development.  **Manager** shall not have a vendor, contract, or business relationship with any entity or individual related to site-based staff or **Manager's** employees by marriage or blood relationship.  **Manager** shall act in a fiduciary capacity with respect to the proper protection of and accounting for **Owner**'s assets. In this capacity, **Manager** shall deal at arm's length with all third parties and **Manager** shall serve **Owner**'s interests at all times. In fulfilling these responsibilities, and without intending to limit the generality of Section 10.2, **Manager** will be subject to **Owner**'s direction in accordance with the terms and provisions of this Agreement, but in no event shall **Manager** have any obligation to follow any direction of **Owner** which is contrary to law, which would expose **Manager** to liability not otherwise undertaken by **Manager** pursuant to this Agreement, or which is contrary to the terms and conditions of this Agreement.

**5.2.**    <u>Employees</u>.  **Manager** shall have either in its employ or under contract at all times a sufficient number of capable personnel to enable it to properly manage, operate, maintain and secure the Development. All matters pertaining to the employment of such employees and the retention of contract labor are the responsibility of **Manager**. On the basis of wage rates to be set forth in the annual operating budget and approved by **Owner**, **Manager**, on behalf of **Owner**, shall screen, hire, pay, supervise and discharge all Managerial and non-Managerial personnel for the Development. Compensation for the services of such employees (as evidenced by certified payrolls) and employee benefits regularly provided to Manager's employees in general shall be considered an operating expense of the Development. **Manager** shall hire in **Manager's** name, and have physically present at the Development, all Managerial and non-Managerial personnel necessary for the full and efficient performance of its duties under this Agreement, including, the physical presence of responsible personnel at such times as may reasonably be requested by **Owner**.

Failure of **Manager** to assign individuals designated in this Agreement to perform the services required hereunder, if any, shall be a default under this Agreement which, without intending to limit any of **Owner**'s rights or remedies by reason thereof, will entitle **Owner** in addition to such rights and remedies to withhold funds otherwise due **Manager** hereunder. All personnel of **Manager** shall be employees of **Manager** and shall not be employees, subcontractors or agents of **Owner**, and shall be hired, paid, supervised and discharged solely by **Manager**. **Manager** shall be responsible and liable for all state and federal payroll and social

5

security taxes, and any and all payments and reimbursements to **Manager**'s employees. **Manager** hereby indemnifies and holds harmless **Owner** in every respect against and from any liability connected with the foregoing.

**Manager** acknowledges that, in regard to **Manager**'s employees involved in the alteration or repair of any improvement at the Development, as well as services rendered under this Agreement to the Development, Davis-Bacon, HUD approved, and prevailing wage rates apply.

**Manager** shall possess acceptable Property Management Certifications, or obtain such certifications no more than ninety (90) days from the date of contract award. Acceptable Property Management Certifications include Certified Apartment Management Certification (CAM) and/or Public Housing Management Certification (PHM).

    **5.2.1.**    <u>Minority Business Participation: Non-Discrimination</u>. **Manager** understands that **Owner's** policy is to ensure that Minority Business Enterprises ("MBEs") and Women-Owned Business Enterprises participate, to the extent feasible, in all contracts administered directly or indirectly by **Owner** in accordance with Executive Orders 11625 and 12138. **Owner** strongly encourages business associations, such as joint ventures, between minority and non-minority firms. To achieve greater participation of MBEs and WBEs in contracts administered directly or indirectly by **Owner**. **Manager** hereby agrees to utilize **Manager's** good faith, best efforts to implement the meet the HHA goal of minimum of thirty percent (30%) of contract dollars being expended on one or more M/WBEs. **Owner** has agreed that **Manager** shall, and **Manager** hereby agrees to utilize **Manager's** good faith, best efforts to implement the following steps in order to assure that whenever appropriate, subcontracts are awarded to MBEs and WBEs:

    (a)    placing qualified MBEs and WBEs and small businesses on solicitation lists;

    (b)    dividing the total requirements, when economically and legally feasible, into smaller tasks or quantities to permit maximum participation by MBEs and WBEs and small businesses; and

    (c)    using the services and assistance of the U.S. Small Business Administration, the Minority Business Development Agency of the U.S. Department of Commerce, any local minority assistance organizations and various state and local government small business agencies.

    **5.2.2.**    <u>Section 3 of HUD Act of 1968</u>. Pursuant to Section 3 of the HUD Act of 1968, 12 U.S.C. 1701u, and its implementing regulations, 24 CFR Part 135 ("**Section 3**"), if additional job training, employment and other economic opportunities are generated by a contract administered directly or indirectly by **Owner**, then, to the greatest extent feasible, these opportunities must be directed to low-income and very low-income persons. In addition to employment and training opportunities, Section 3 also seeks to benefit businesses owned by public housing residents and other low-income persons. **Owner** has agreed that **Manager** shall, and **Manager** hereby agrees to comply with **Owner**'s Section 3 policy, where applicable.

    a)    The work to be performed under this contract is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 1701u (section 3). The purpose of section 3

MINIEX_000574

is to ensure that employment and other economic opportunities generated by HUD assistance or HUD-assisted projects covered by section 3, shall, to the greatest extent feasible, be directed to low- and very low-income persons, particularly persons who are recipients of HUD assistance for housing.

b)   The parties to this contract agree to comply with HUD's regulations in 24 CFR part 135, which implement section 3. As evidenced by their execution of this contract, the parties to this contract certify that they are under no contractual or other impediment that would prevent them from complying with the part 135 regulations.

c)   The contractor agrees to send to each labor organization or representative of workers with which the contractor has a collective bargaining agreement or other understanding, if any, a notice advising the labor organization or workers' representative of the contractor's commitments under this section 3 clause, and will post copies of the notice in conspicuous places at the work site where both employees and applicants for training and employment positions can see the notice. The notice shall describe the section 3 preference, shall set forth minimum number and job titles subject to hire, availability of apprenticeship and training positions, the qualifications for each; and the name and location of the person(s) taking applications for each of the positions; and the anticipated date the work shall begin.

d)   The contractor agrees to include this section 3 clause in every subcontract subject to compliance with regulations in 24 CFR part 135, and agrees to take appropriate action, as provided in an applicable provision of the subcontract or in this section 3 clause, upon a finding that the subcontractor is in violation of the regulations in 24 CFR part 135. The contractor will not subcontract with any subcontractor where the contractor has notice or knowledge that the subcontractor has been found in violation of the regulations in 24 CFR part 135.

e)   The contractor will certify that any vacant employment positions, including training positions, that are filled (1) after the contractor is selected but before the contract is executed, and (2) with persons other than those to whom the regulations of 24 CFR part 135 require employment opportunities to be directed, were not filled to circumvent the contractor's obligations under 24 CFR part 135.

f)   Noncompliance with HUD's regulations in 24 CFR part 135 may result in sanctions, termination of this contract for default, and debarment or suspension from future HUD assisted contracts.

g)   With respect to work performed in connection with section 3 covered Indian housing assistance, section 7(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450e) also applies to the work to be performed under this contract. Section 7(b) requires that to the greatest extent feasible (i) preference and opportunities for training and

7

employment shall be given to Indians, and (ii) preference in the award of contracts and subcontracts shall be given to Indian organizations and Indian-owned Economic Enterprises. Parties to this contract that are subject to the provisions of section 3 and section 7(b) agree to comply with section 3 to the maximum extent feasible, but not in derogation of compliance with section 7(b).

**5.3.**   Compliance with Laws.   **Manager** shall not violate any applicable federal, state, municipal or other governmental or quasi-governmental law, ordinance, rule or regulation in the performance of its duties pursuant to this Agreement. Immediately upon **Manager** becoming aware of any such violation, **Manager** shall notify **Owner** of any violation of any federal, state, or municipal or other governmental or quasi-governmental law, ordinance, rule or regulation applicable to the structure or condition of the Development or the use made thereof by any Resident.

In addition to MBE requirements, WBE requirements and the requirements of Section 3, and without intending to limit the generality of the foregoing provisions of this Section 5.3, **Manager** shall, in the course of the performance of its duties hereunder, comply with all applicable requirements of the following, as the same may be amended from time to time:

(a)   The Fair Housing Act, 42 U.S.C. 3601-19, and regulations issued thereunder; 24 CFR Part 100; Executive Order 11063 (Equal Opportunity Housing) and regulations issued thereunder; 24 CFR Part 107; the Fair Housing Poster Regulations; 24 CFR Part 110 and advertising guidelines, 24 CFR Part 109.

(b)   Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, and regulations issued thereunder relating to non-discrimination in federally assisted housing, 24 CFR Part 1.

(c)   Age Discrimination Act of 1975, 42 U.S.C. 6101-07, and regulations issued thereunder, 24 CFR Part 146.

(d)   Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, and regulations issued thereunder, 24 CFR Part 8; the Americans with Disabilities Act, 42 U.S.C. 12181-89, and regulations issued thereunder, 28 CFR Part 36.

(e)   Manager agrees to comply with HUD Form 52158-U.S. Department of Housing and Urban Development Maintenance Wage Rate Decision ("the Decision").   Manager further agrees that its employment positions for employees or contractors providing routine maintenance under this Agreement will be classified by the work classifications listed in the Decision. The Decision may be updated periodically as dictated by HUD, which will not require an amendment to this Agreement.

(f)   HUD's procurement requirements found in 24 CFR 85.36 and 24 CFR 200, as well as the procurement policies of **Owner.**

8

(g)     HUD's requirements for working with faith-based organizations found at 24 CFR parts 5, 92, 570, 574, 576, 578, and 1003, as amended.

Moreover, **Manager** shall, in the performance of its duties hereunder, without intending to limit the foregoing provisions of this Section 5.3, familiarize itself and affirmatively comply with 24 CFR Part 966 (Lease and Grievance Procedures) in connection with all leasing activities at the Development.

**5.4.**   Compliance with other agreements. **Manager** shall not in performance of its services hereunder violate the terms of any Lease, deed of trust or other security instrument binding on or affecting the Development or any portion thereof, provided **Manager** is aware or should reasonably be aware of the existence of any such document.   **Manager** shall not be required to make any payment or incur any liability, other than those expressly required under the terms of this Agreement, in order to comply with any such terms or conditions of any such instruments.

**5.5.**   General Reporting. **Manager** agrees that all financial statements, billings and reports rendered to **Owner,** as provided for in this Agreement, will properly reflect the facts about all activities and transactions handled for the account of **Owner**, which data may be relied upon as being complete and accurate in any further recording and reporting made by **Owner** for whatever purpose. **Manager** agrees to notify **Owner** promptly upon discovery of any instance where **Manager** has reason to believe that this data is no longer accurate and complete. For purposes hereof, the fiscal year shall be from January 1 to December 31.

**5.5.1.**   Specific Reporting. In connection with the foregoing provisions of this Section 5.5, **Manager** shall, at a minimum, perform the following tasks:

(a)     **Manager** shall establish and maintain a comprehensive system of records, books, inventory and accounts in a manner satisfactory to **Owner** and HUD, and otherwise as required by the Act, the ACC Amendment, Generally Accepted Accounting Principles ("GAAP") and Governmental Accounting Standards Board Statement 34 ("GASB 34"). All records, books, and accounts shall be subject to examination at reasonable hours by any authorized representative of **Owner** and HUD or the Government Accounting Office.

(b)     **Manager** shall furnish such information as may be requested by **Owner** or HUD, respectively, from time to time with respect to the financial, physical or operational condition of the Development, including, without limitation, a monthly financial operating report which shall be furnished by **Manager** to **Owner**.  Financial operating reports shall be in a format acceptable to the **Owner**.

(c)     **Manager** shall prepare, execute, and file all forms, reports, and returns required by law in connection with the employment of personnel, including, unemployment insurance, workers' compensation insurance, disability benefits, social security, and other similar insurance benefits or taxes now in effect or hereafter imposed.

9

    (d)    **Manager** shall prepare and submit a monthly report to **Owner** detailing compliance with Davis Bacon requirements, HUD Mandated Wages Requirements, and Section 3 of HUD Act of 1968 requirements.

    5.5.2.    <u>Compilation of Specialized Data</u>. Again, without limiting the generality of the foregoing provisions of this Section 5.5, **Manager** shall familiarize itself with the requirements (as they relate to **Manager's** leasing and management duties hereunder) of the Act, the ACC, and applicable HUD regulations and guidance documents, and shall use its best efforts to comply with such requirements. To the extent **Manager** is unable to do so, **Manager** shall promptly notify **Owner** of such fact and the reasons therefor. The following provisions shall apply:

    (a)    **Manager** shall require each prospective Resident to certify, on the lease application or Lease the amount of such Resident's annual family income, family size and any other information required. **Manager** shall obtain from each prospective Resident's employer (if any) a verification of the prospective Resident's income, and shall perform such other verifications of such Resident's nonemployment income as are necessary or appropriate in order to provide necessary certification and verification of the amount of such Resident's annual family income, family size, and other information. **Manager** shall require Residents to certify in writing as to such matters on an annual basis, prior to such time as **Owner** needs the information for reporting purposes to third parties, including, but not limited to, if applicable, HUD, **Owner**, or any other governmental or quasi-governmental authorities having any jurisdiction thereover.

    (b)    **Manager** shall semi-annually, or upon request by the **Owner**, furnish **Owner** with a written schedule of maximum rents for the units for **Owner's** approval. Without **Owner's** express prior written consent, **Manager** shall not enter into any Lease on behalf of **Owner** at a rental amount exceeding the applicable maximum rent or below the applicable minimum rents.

    (c)    **Manager** shall maintain and preserve all written records of Resident family income and size, and any other information necessary to comply with **Owner's** or HUD requirements or otherwise requested by **Owner** throughout the term of this Agreement, and shall deliver all such records to **Owner** upon the termination or expiration of this Agreement.

    (d)    If requested by **Owner**, **Manager** shall prepare reports of low- income leasing and occupancy and other matters, including, but not limited to, **Manager's** obligations hereunder and the operation of the Development in form suitable for submission by **Owner** to all governmental and quasi-governmental authorities to which **Owner** must or desires to report.

    5.5.3.    <u>Monthly Reports</u>. **Manager** shall render to **Owner**, prepared as of the end of each calendar month during the term of this Agreement and submitted by the 10th day of the subsequent month, reports for the purpose of showing, in such detail as may be requested by **Owner**, net income from the Development and all collections, disbursements, delinquencies, uncollectible accounts, vacancies and other matters related to the management, operation,

10

maintenance and securing of the Development, including, such comparisons of actual income and expense figures to budget amounts as requested by **Owner**. As additional support to the monthly financial statements, **Manager** shall, at **Owner's** request, provide copies of the following: (a) all bank statements, bank deposit slips and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) general ledger listing; (d) all invoices for capital expenditures and non-recurring items; (e) summaries of adjusting journal entries; and/or (f) copies of paid bills.

    **5.6.**    Budgets.

    **5.6.1.**    Proposed Budget. **Manager** shall prepare and submit to **Owner** a proposed annual operating budget ("Operating Budget") and a proposed annual capital budget ("Capital Budget") for the promotion, operation, repair, securing and maintenance of the Development for the forthcoming calendar year. Within thirty (30) days of execution of this Agreement, **Manager** shall deliver to **Owner** the proposed Operating Budget and Capital Budget (for the remainder of the calendar year) within which this Agreement commences and for the following year. Subsequent proposed annual budgets shall be delivered to **Owner** one hundred twenty (120) days prior to the beginning of each calendar year. The proposed Operating Budget and the proposed Capital Budget shall be in a form acceptable to **Owner** and set forth an itemized statement of the anticipated receipts and disbursements for the Development for the oncoming calendar year.

    **5.6.2.**    Owner's Review. **Owner** will consider the proposed budgets and will attempt to consult with **Manager** within fifteen (15) days of receipt of the proposed budget. **Owner** will attempt to approve the Operating Budget within fifteen (15) days from receipt of HUD approval of **Owner's** portfolio subsidy calculation. **Manager** shall not proceed with implementation of a proposed Operating Budget or Capital Budget without **Owner's** prior written approval. For each calendar year after the calendar year within which this Agreement commences, and during the term of this Agreement, **Manager** shall have the right to operate the Development on the basis of the Approved Operating Budget for the prior calendar year to the extent that **Owner** does not approve **Manager's** proposed Operating Budget for such upcoming calendar year on or before December 31 of the prior year.

    **5.6.3.**    Approved Budget. Upon approval of the Operating Budget, **Manager** shall have the authority to expend funds in accordance therewith without any further approval by or notice to **Owner**, subject to and in accordance with all other provisions of this Agreement.

    **5.6.4.**    Cost-Effective Approach. **Manager** agrees to exercise due diligence and to employ all reasonable efforts to ensure that the actual costs of maintaining, operating, insuring and securing the Development shall not exceed the Approved Operating Budget (in total or in any operating category). **Manager** shall secure **Owner's** prior written approval for any expenditure that will result in an overrun of the Approved Operating Budget; provided however, **Manager** shall, each month, have the discretion to incur expenditures up to five percent (5%) in excess of the budgeted amount in any single operating expense category, so long as the aggregate of such expenditures do not result in an overrun of the entire Approved Operating Budget on a monthly basis.

    **5.6.5.**    Notification of Unplanned Expenditure. During the calendar year, **Manager** agrees to inform **Owner** and receive approval of any major increases (more than five percent (5%) in excess of the budgeted amount in any single operating expense category) in costs

MINIEX_000579

and expenses that were not foreseen during the budget preparation period, and thus, were not reflected in either approved budget.

**5.7.**  Capital Expenditures. The Approved Capital Budget shall not constitute an authorization for **Manager** to expend any money for capital items. Should capital funds be awarded to the property, the **Housing Authority** will administer the funds.  **Manager** shall recommend the purchase of capital items when **Manager** believes such purchase to be necessary or desirable. **Owner** may, at its sole discretion, contract with **Manager** to carry out certain work or make certain expenditures of Capital funds. Upon receipt of **Owner's** written approval, **Manager** may implement recommended capital fund items and the cost of implementation shall be paid from the Operating Account. **Owner** may, if desired, arrange to purchase and install capital items itself, but in no event shall **Manager** proceed with implementation of any capital fund item without **Owner's** prior written consent.

**5.7.1.**  Capital Expenditure Requests.  **Manager** must submit by September 1st of each calendar year to the Housing Authority, requests for any capital funding (covering a two (2) year time period) needed for each development.  **Manager** is responsible for informing the **Housing Authority** of any capital needs, using the methods and forms prescribed by the **Housing Authority**.  The information submitted will include a description of work needed, the quantity and location of work and the estimated cost.

**5.8.**  Collection of Rents and Other Income.  **Manager** shall exercise due diligence to collect all Rents, all Non-Housing Income due, and any other charges which may become due at any time from any Resident or from others for services provided in connection with or for the use of the Development or any portion thereof. **Manager** shall collect and identify any income due **Owner** for miscellaneous services provided. All monies so collected shall be deposited in the Operating Account (as defined hereafter, see Section 8.5) for the Development or, if **Owner** so instructs, in another account specified by **Owner**.  **Manager** shall terminate any Lease, lock out a Resident, or institute suit for Rent or for the possession of any Unit within the Development only in accordance with guidelines established by **Owner**. Upon receipt of **Owner's** prior written approval, such termination, lock out or suit shall only be conducted by **Manager** in strict accordance with 24 CFR Part 966 (Lease and Grievance Procedures). Expenses actually incurred by **Manager** in bringing such approved action will be paid from the Operating Account. **Manager** shall not write off any income items without prior written approval of **Owner**. **Manager** shall furnish **Owner** with an itemized list of all Residents with delinquent accounts immediately following the tenth (10th) day of each month. Notwithstanding anything to the contrary which may be construed under the foregoing, **Manager** shall not accept cash payments for any Rents or other charges due from Residents or otherwise transact business with cash.

**5.9.**  Continuing Service Contracts. **Manager** shall enter into continuing service contracts for the cleaning and maintenance of the Development and for other necessary services. Each service contract shall include a provision for cancellation thereof upon not more than thirty (30) days written notice. Any contract requiring more than thirty (30) day notice of cancellation will not be entered into without **Owner's** prior written approval. All service contracts shall require that all contractors provide evidence of sufficient insurance in the following minimum amounts:

(a)  Worker's Compensation - Statutory Amount;

MINIEX_000580

    (b)       Employer's Liability - $100,000 minimum;

    (c)       Comprehensive General Liability (minimum):

        (i).     $1,000,000 bodily injury per person,

                $1,000,000 per occurrence

                $1,000,000 property damage

                        or

        (ii).    $1,000,000 combined single limit.

      **Manager** shall obtain **Owner's** written approval prior to entering into any contract that waives these minimum limits. All service contracts shall be entered into by the **Manager** on behalf of the Development and the funds necessary to pay for the services so obtained shall be paid from the Operating Account.

      All such continuing service contracts, as well as any other contracts entered into by **Manager** with third-party contractors, shall only be entered into by **Manager** if the selection of such contractor, supplier or materialman and the contract resulting from such selection comply in all respects with the procurement/bidding requirements of the management plan. Nothing in this Agreement or the Management Plan is intended to preclude, nor shall be interpreted as precluding, **Owner** from being a selected contractor, supplier or materialman for the Development pursuant to any such procurement/bidding requirements.

    **5.10.**   <u>Repairs</u>.  **Manager** shall supervise ordinary and extraordinary repairs; however, no single expenditure for any repair shall, subject to subsection 5.6.4, exceed $2,000.00 without the prior written approval of **Owner**. In emergencies, **Manager** may make such repairs as are necessary and shall notify **Owner** thereof within 8 hours. Actual and reasonable expenses for materials and labor for all such purposes will be paid for from the Operating Account. Prior agreement by **Owner** of the Development's Annual Operating Budget shall not negate **Owner**'s right of approval with respect to individual expenditures exceeding the above limitations. If **Manager** uses its own in-house personnel to perform repairs within such personnel's expertise, **Manager** will nevertheless be entitled to bill **Owner** for its in-house personnel at hourly rates which are agreed upon by **Manager** and **Owner** in the Approved Operating Budget. **Owner** expressly reserves the right to require **Manager** to utilize other contractors for such services, if the annual increase in per hour rates is not, in **Owner's** sole judgment, reasonably consistent with competitive hourly rates for such labor and materials for the locale within which the Development is located. Should physical modification to structures or facilities be required that have costs that exceed funding available in **Manager's** budget, **Owner** shall include the cost of such modification in the first available capital program budget.

      **5.10.1.**  <u>Maintenance</u>. **Manager** shall cause the buildings, appurtenances, equipment and grounds of the Development to be maintained and repaired at all times according to standards set by **Owner** or any applicable insurance or other governmental or quasi-governmental standards, subject to the constraints of the Approved Operating Budget.

      **5.10.2.**  <u>Preventive Maintenance</u>. **Manager** shall develop a preventive maintenance schedule, including, but not limited to, periodic inspections of the units; residency commencement and termination check lists; inventory control; common area maintenance; equipment maintenance; exterior maintenance; and painting, decorating, and replacement

MINIEX_000581

timetables as necessary. **Owner** reserves the right to review all such preventive maintenance measures and to direct that additional steps be instituted where deemed necessary.

    **5.10.3.**   Inspection of Units and Common Areas.   **Manager** shall make no less than two (2) inspections annually of all Units, or more often if reasonably necessary, and report its findings in writing to **Owner**, as well as prepare a scheduled plan for correction of all deficiencies noted therein.

    **5.11.**   Taxes.   **Manager** shall, if so requested, obtain and verify bills for real estate and personal property taxes, or payments in lieu thereof, improvements, assessments, and other like charges which are or may become liens against the Development and recommend payment or appeal as its best judgment may dictate. If requested by **Owner**, **Manager** shall retain an independent tax consultant, but any costs attributable thereto shall be at **Owner**'s expense.

    **5.12.**   Leasing.   The form of Lease used to permit Residents to occupy any Unit within the Development shall be subject to the prior written approval of **Owner**. The **Manager** shall only utilize the approved lease format as provided by the **Owner**.  The lease shall be in its most current edition.

    **5.12.1.**   Relationship with Residents. **Manager** shall maintain businesslike relations with all Residents, whose service requests shall be received and considered in systematic fashion, and **Manager** shall use **Manager**'s best efforts to promptly perform and discharge (for and at the expense of **Owner**, subject to the Approved Operating Budget limits) all obligations and duties imposed upon **Owner** under all Leases of Units within the Development, as such obligations and duties are to be performed under such leases. All complaints of a serious and/or material nature relating to **Owner**'s obligations under the Leases shall be reported to **Owner** no later than twenty-four (24) hours after knowledge and, after thorough investigation, be reported to **Owner** in writing by **Manager**, with appropriate recommendations and details. **Manager** shall maintain a log of all service requests and complaints which shall include the date and time the request or complaint is received by **Manager**, the name and address of the party filing the request or the complaint, a detailed description of the request or complaint being filed, and the actions taken by **Manager** in response thereto.  **Manager** shall immediately notify **Owner** of all emergencies.

    **5.12.2.**   Resident Satisfaction Surveys.   **Manager** shall conduct resident satisfaction surveys on a bi-annual basis to gauge and assess resident satisfaction and any possible customer service trends of concern.  Surveys should be conducted by a third party, the cost of which may be deducted from the annual budget.  **Manager** must adhere to **Owner's** instruction on how the survey data must be collected and reported; **Manager** must promptly report survey results to **Owner**.  If resident surveys show an overall unsatisfactory level of customer service, **Manager** agrees to immediately implement a corrective action plan to address the low satisfaction score, up to an including the replacement of problem staff.  **Owner** reserves its right to terminate this Agreement if repeated surveys indicate an overall unsatisfactory customer service and **Manager** has failed to rectify the matter; such termination shall be for cause

    **5.13.**   Specialized Services of Manager.

    **5.13.1.**   Policies of Owner. **Manager** agrees to keep itself informed on the policies of **Owner** and, notwithstanding the authority given to **Manager** in this Agreement, to

MINIEX_000582

confer fully and freely with **Owner** in the performance of its duties hereunder. **Owner** hereby designates **Owner's** Vice President of Public Housing Operations as its principal representative with respect to this Agreement, provided that **Owner** may change its principal representative at any time by written notice to **Manager**.

      **5.13.2.**   <u>Meetings with Owner</u>.  **Manager** agrees to cause an officer of **Manager** to attend meetings with **Owner** at any time or times requested by **Owner**.

      **5.13.3.**   <u>Structure and warranties for modernization units</u>. **Manager** shall obtain from **Owner** a complete set of as-built plans and specifications and copies of all guaranties and warranties pertinent to construction, fixtures, and equipment. With the aid of this information and inspection by competent personnel, **Manager** shall thoroughly familiarize itself with the character, location, construction, layout, plan, and operation of the Development and especially with the electrical, heating, plumbing, air conditioning, and ventilating systems, and all other mechanical equipment. All such as-built plans and specifications as updated shall remain the property of **Owner**.

      (a)    <u>Inspection of modernization project(s)</u>. **Manager** and **Owner** shall participate in the final inspection to certify the readiness of the units for occupancy and shall (i) inform the architect, the contractor, and issuers of guaranties or warranties of all defects in material and workmanship discovered within the construction warranty period; (ii) monitor the action taken by the contractor to correct the defects; and (iii) participate in any formal inspection held for the purpose of identifying construction defects.

      (b)    <u>Inspection Prior to Occupancy</u>. Prior to occupancy of any Unit by a Resident, **Manager** shall inspect the unit and determine it to be decent, safe and sanitary.

      (c)    <u>Bonding</u>. **Manager** shall furnish fidelity bond insurance covering itself and its employees in accordance with the requirements of Section 9.3.

      (d)    <u>Notice of Authority</u>. **Manager** shall place in a conspicuous place at the Development a notice that **Manager** is authorized to manage the Development.

      **5.13.4.**   <u>Review of Operations</u>. **Manager** shall permit **Owner** to conduct on-site evaluations of the performance of any or all management services which **Manager** has agreed to provide in this Agreement. An authorized representative of **Manager** shall be available during on-site evaluations. If **Owner** prepares a written report based on such evaluations, **Owner** shall deliver such report to **Manager** who shall correct any deficiencies noted in such report within thirty (30) days of the receipt of the report from Owner.  If such correction cannot be made within thirty (30) days, **Manager** shall provide **Owner** with a written reason for such noncompliance and a plan for the correction of all deficiencies noted, including a timetable of proposed actions. **Manager** shall then correct the deficiencies within the timetable established by **Owner**. Copies of all such reports, written reasons for noncompliance and plans shall be forwarded to **Owner**.

MINIEX_000583

      **5.13.5.**   <u>Payments and Expenses.</u> From the funds collected and deposited by **Manager** hereunder, **Manager**, on behalf of **Owner**, shall cause such funds to be disbursed regularly and punctually in accordance herewith in the order and priority set forth below:

      (a)    all amounts, if any, required to be paid to **Owner** pursuant to any loan documents; and then

      (b)    all of the insurance premium payments, taxes, if any, and payments in lieu of taxes; and then

      (c)    all operating expenses of the Development, including administrative, maintenance, and utility expenses as set forth in the current **Owner**-approved operating budget (other than any operating expenses of the Development for which **Owner** has notified **Manager** in writing that **Owner** will make payment); and then

      (d)    all amounts required to be established monthly and annually in any Development reserve fund account required to be established by **Owner** in regard to the Development, based on the Approved Operating Budget.

**Manager** and **Owner** agree to:

      (e)    assure that all expenses are reasonable in amount and necessary to the operation of the Development; and

      (f)    exert their best efforts to maximize income and to assure that all necessary measures are taken to collect receivables due and owing the Development, including Rents, within the established standards of the industry; to take advantage of discounts, rebates or commissions (including any sales tax relief granted by the State government) received with respect to purchases, service contracts and other transactions made on behalf of the Development; and

      (g)    obtain contracts, materials, supplies and services, including the preparation of its financial reports, as applicable, on terms most advantageous to the Development and at costs not in excess of amounts ordinarily paid for such services rendered or supplies and materials furnished; and

      (h)    solicit written cost estimates as necessary to comply with this Agreement and document the reasons for accepting other than the lowest most responsive bid, and in this latter regard, **Manager** and **Owner** will maintain copies of such documentation available for inspection during normal business hours.

    **5.14.**   <u>Agreement to Operate and Maintain.</u>

      (a)    **Manager** acknowledges and agrees that **Owner** is required to maintain and operate the Development units in compliance with the Applicable Public Housing Requirements, and to ensure that rents, charges, and Operating Subsidies generated from the Development are used solely for eligible, reasonable and necessary expenditures related to the Development in accordance with the Operating Budget;

16

MINIEX_000584

(b) **Manager** is responsible to **Owner** for the management of the Development in accordance with the foregoing (and, in the event that Manager believes that conflict or potential conflict exists among the foregoing authorities, Manager shall consult with Owner and the Authority regarding the resolution thereof in accordance this Agreement).

5.15. <u>Grievance Procedure</u>. **Owner** will establish a resident grievance procedure available to the occupants of all of the dwelling units in the Development. The grievance procedures applicable to the Residents of the Project Units shall be in compliance with the requirements of section 6(k) of the Act and 24 CFR part 966, subpart B. All resident grievance procedures are detailed in the management plan and may not be inconsistent with the Authority's grievance procedures for the residents of an Authority-owned public housing. Such procedures shall provide for informal discussion and settlement of grievances by the **Managers** and hearing before a hearing officer appointed in accordance with procedures prescribed in the Housing Authority Annual Plan.

5.16. <u>Resident Selection and Admission</u>. **Manager** will offer for rent, and will rent the dwelling units in the Development, in accordance with **Owner's** policies and procedures, which will incorporate the following Manager responsibilities:

(a) **Manager** shall select applicants for admission to the Development using screening criteria that are consistent with the Applicable Public Housing Requirements (including the Admission and Continuing Occupancy Policy), and local preferences, set forth in the PHA Plan (as set forth in <u>Exhibit B</u> and attached hereto).

(b) Applicant screening procedures will include verification of credit references and criminal background checks for all applicants, in accordance with procedures set by **Owner**. The **Manager** will also comply with **Owner**'s procedures for informal review of application rejections for all applicants, including procedures for review of eligibility or suitability determinations or denial of preferences for applicants to the Development units, consisting of a written statement of the reason(s) for rejection and an opportunity to meet with a person, or persons, designated by the Agent other than the person who made the initial determination.

(c) **Manager** will prepare all leases and parking permits and will execute the same in its name, identified thereon as property manager for the Owner. Leases executed with respect to the Development units will be on forms approved by the Authority, subject to variations made in accordance with the requirements of 24 CFR part 966, subpart A, as amended from time to time.

## ARTICLE VI. COMPENSATION OF MANAGER

6.1. <u>Base Fee</u>. The sole compensation paid to **Manager** for all services performed under this Agreement shall be monthly payments equal to the product of Twenty-Three Dollars and No Cents ($23.00) multiplied by the total number of units in the Development that were

MINIEX_000585

occupied during any part of the preceding month.  For purposes hereof, compensation for any partial month shall be calculated on a prorated basis.  Payments will be made progressively within thirty (30) days of receipt of proper monthly invoices.

    **6.2.** <u>Performance Standards</u>.  **Owner** has established standards that **Manager** must meet in order to receive full compensation under the Agreement.  **Manager** shall maintain records to measure the performance standards set forth in this section on a monthly basis. **Manager** must report the monthly performance measures by the first (1st) business day of each subsequent month.  Each monthly report shall be in a format designated by **Owner** and shall report both a monthly performance measure as well as a cumulative quarterly and year-to-date average for each performance area described in this section.  Each performance area and the level of performance required by the **Owner** are set forth below:

(a)    Tenant Account Receivables ("TAR").  Receivables to be included in the TAR performance measure include rent and charges in addition to rent, which shall mean that monthly amount that a Resident is obligated to pay **Owner** pursuant to the terms of a lease.  **Owner's** monthly delinquency standard for TARs is a maximum of four percent (4%).  Delinquent receivables shall include all money due and not received on or before the fifth (5th) day of the month.  The TAR goal will be measured prior to any tenant monetary adjustment and/or quarterly write-offs.

(b)    Vacancy.  A vacancy is defined as a unit which becomes unoccupied during any part of the month and remains unoccupied at the end of the month.  **Owner's** monthly vacancy rate standard is a maximum of two percent (2%).

(c)    Vacancy Turnaround.  **Owner's** monthly standard for vacancy turnaround time is fifteen (15) days.  This includes make ready and lease-up time and begins either the day after the lease ends or the date **Owner** obtains legal possession, whichever is earlier, and ends when a new lease is signed.  The monthly report must include the following for each vacated unit:

(i)    The date the unit was vacated.

(ii)    The name of the former Resident who vacated.

(iii)    The unit number of the vacated unit.

(iv)    The size of the vacated unit.

(v)    Reason tenant vacated unit.

(vi)    The date maintenance began to "make ready" the unit.

(vii)    The date maintenance completed all "make ready" repairs.

(viii)    The date the unit was re-leased.

(d)    Development Hours.  **Manager** shall maintain the same business hours and holidays at the Development as those of **Owner**.  The **Owner's** standard business hours are Monday through Friday, 8:00 a.m. to 5:00 p.m. Central Standard Time (C.S.T). This provision does not preclude

MINIEX_000586

Manager from operating in excess of the hours of Owner as needed for operation of the Development.

(e)    Work Orders.

(i)    Emergency.  Emergency work orders are those that address an immediate threat to life, health, safety to property or to the resident or are related to fire safety.  **Owner's** standard for completion of an emergency work order is for all orders to be completed or abated within twenty-four (24) hours.

(ii)   Non-Emergency.  Non-emergency work orders are those that address conditions that do not pose an immediate threat to life, health, safety to property or to the resident or are not related to fire safety.  **Owner's** standard for the completion of non-emergency work orders is within four (4) days.

(f)    Inspections.  **Owner's** annual standard for inspections is for all Uniform Physical Condition Standards (UPCS) inspections to be conducted on or before September 30 of each year.  Accordingly, **Manager** must conduct a sufficient number of inspections each month beginning January 1 of each respective year in order to complete the inspections before September 30 of said year.  Further, all units must be inspected within twelve (12) months of the previous inspection.  All UPCS inspections include the site, building exteriors, common areas, units, and systems.  **Manager** shall submit to **Owner**, no later than December 31st of each year, a proposed inspection schedule designed to meet the foregoing criteria.

(g)    Recertifications.  **Owner**'s annual standard for recertifications is that each tenant household must be recertified no more than ninety (90) days and no less than thirty (30) days prior to the tenant's lease expiration unless the tenant is in eviction proceedings in which case no lease renewal may be executed until the legal eviction matter is resolved.  Tenants may be contacted regarding recertification no earlier than one hundred twenty (120) days prior to the tenant household's lease expiration.  The monthly report must indicate for each tenant whose lease expired during the preceding month the date the tenant was contacted regarding recertification and the date recertification was completed or that legal eviction is pending.

(h)    Lease Agreements.  New lease agreements shall be executed within twenty (20) calendar days of prior lease expiration or legal possession of the property, whichever is earlier.

(i)    HUD Physical Inspection – REAC Score.  **Manager** shall perform physical maintenance and repairs at the Development sufficient to ensure that the Development receives a minimum score of eighty-five (85) at multi-family sites, and ninety-five (95) at elderly housing sites, for the annual inspection conducted by the Real Estate Assessment Center ("REAC") of the U.S. Department of Housing and Urban Development.

19

**6.3.** <u>Reimbursements</u>.   Reasonable amounts incurred for the Development's front-line, day-to-day management tasks and activities that are documented in a manner satisfactory to **Owner** and otherwise consistent with the Approved Operating Budget may be charged as operating expenses, regardless of whether the staff work out of **Manager**'s office or at the site of the Development. Front-Line day-to-day management tasks and activities include, but are not limited to:

(a)   taking applications, screening possible Residents, leasing units, handling Residents' certification forms, and monitoring contributions of Residents;

(b)   costs of maintaining the Development, including maintenance staff,

(c)   accounting for income and expenses, including costs allowed by **Owner** for prorated shares of any centralized computer accounting system owned and maintained by **Manager**;

(d)   expenses of audits and compilation reports;

(e)   delinquency notices and evictions;

(f)   envelopes, postage, checks, copying and similar expenses;

(g)   travel expenses by front-line staff in discharging front-line responsibilities, e.g., making bank deposits, visiting the Development;

(h)   training approved by **Owner** to improve a front-line employee's management performance at the Development; and

(i)   preparation of normal Development reports required by **Owner**.

If **Manager**'s central office staff performs front-line activities for several of **Manager**'s projects, staff salaries and fringe benefits of persons performing their services must be prorated among the various projects served in proportion to actual usage, as approved by **Owner**.

In addition, if there are particular management costs not described in the Approved Operating Budget and this Section 6.3 which **Owner** approves in writing for payment out of the Operating Account, **Manager** may be reimbursed for these costs, but only with the specific written, prior consent of **Owner**.

**6.4.** <u>Management Costs Charged Against Fee</u>. The following costs shall be paid for by **Manager** itself and not charged to the Operating Account:

(a)   recruiting, hiring, supervising and monitoring oversight staff of **Manager**;

(b)   training Development personnel except as provided in subsection 6.3(h) above;

(c)   establishment and supervision of systems to keep Development books, records and accounts;

(d)   **Manager's** overhead expenses, such as office space and supplies and equipment;

(e)   bookkeeping expenses of **Manager's** company; and

(f)   the fidelity bond required hereunder.

MINIEX_000588

## ARTICLE VII. MONETARY PENALTIES FOR NON-PERFORMANCE

**7.1.**   Owner's Right to Withhold.  **Owner** reserves the right to withhold a percentage of management fees owed to **Manager** for **Manager's** failure to meet key performance indicators for two consecutive quarters. **Manager's** failure to adhere to the performance criteria as set out in **Exhibit A** and/or **Manager's** failure to adhere to the management responsibilities and performance standards set out herein shall also result in **Owner's** withholding of management fees.

**7.2.**   Non-Performance.    Repeated and/or serious incidents of non-performance may result in a withholding of not less than five percent **(5%)** of management fees. Such incidents include but are not limited to:

- Failure to use HHA approved documents and leases.

- Failure to timely submit files for legal action (e.g. for-cause eviction documentation).

- Submission of incomplete files for legal action (i.e. missing documents, missing signatures, etc.).

- Failure to timely file non-payment evictions.

- Failure to maintain the waiting list per HHA and HUD guidelines.

- Failure to receive a minimum annual inspection score of eighty-five percent (85%) at multi-family sites and ninety-five percent (95%) at elderly sites.

- Failure of the on-site Property Manager and the Regional Supervisor to complete monthly property inspections.

- Failure to procure contractors for deferred maintenance projects.

- Failure to complete annual resident recertification pursuant to HUD guidelines.

- Failure to utilize Section 3 and M/WBE certified vendors.

- Execution of new lease agreements with tenants who do not have a current approved criminal background check on file.

**7.3.**   Failure to Notify.  **Manager's** failure to timely notify **Owner** of any incident or occurrence requiring notification under this Agreement, including unsafe property conditions, will result in immediate withholding of no less than five percent **(5%)** of the management fee owed to **Manager,** and shall increase in percentage of withholding commensurate with the severity of the un-reported incident or occurrence.

**7.4.**   Withholdings are Cumulative.  Management fee withholdings for non-performance shall be calculated cumulatively per occurrence, per property.

MINIEX_000589

## ARTICLE VIII. ACCOUNTING AND RECORDKEEPING

**8.1.**    Monthly Visits and Remittances. **Manager** shall maintain or cause to be maintained at **Manager's** office at the Development a separate set of books of accounts reflecting operations of the Development. **Owner** shall have the right at all reasonable times during normal business hours to audit, examine, and make copies of, or extracts from, the books of accounts maintained by **Manager** pursuant to this Agreement. Such right may be exercised through any agent or employee designated by **Owner** and shall extend no longer than seven (7) years from the date of termination of this Agreement. **Owner** shall bear all expenses in connection with such examination and shall give **Manager** at least five (5) days advance notice of **Owner**'s desire to make such examination. **Manager** shall provide for an officer or representative of its company to make on-site visits to the Development at least once during each calendar month during the term of this Agreement, and the reports referred to in Section 5.5 shall provide a narrative of **Manager**'s observations from such on-site, monthly visits.

**8.2.**    Receipts and Records. **Manager** shall at all times during the term of this Agreement maintain a record of payment for all expenses of the Development paid by **Manager** for the benefit of **Owner**. **Manager** shall maintain, at **Manager**'s office, at the Development, or at such other place as may be mutually agreed upon by **Manager** and **Owner**, copies of bills, all Leases and other occupancy documents and correspondence, contracts, records of rental income and charges, and warranties with respect to the Development and its operation. **Manager** shall at all times keep and maintain full, true, and accurate books of account fully reflecting all of the monies received and paid out by **Manager** under this Agreement.

**8.3.**    Property of Owner. The records, reports, books of account and other documents and materials relating to the management, operation, maintenance and securing of the Development shall be the property of **Owner**. Upon the termination of this Agreement, or at any other time upon the request of **Owner**, **Manager** shall, after making copies of such portions thereof as **Manager** shall deem pertinent to its continuing operations or liability, turn the same over to **Owner**.

**8.4.**    Security Deposit Account. **Manager** shall promptly deliver to **Owner** all Resident security deposits, or if **Owner** so instructs, **Manager** shall deliver all Resident security deposits to an account specified by **Owner**. Such security deposits shall be maintained by **Owner** in accordance with applicable law. **Manager** shall maintain detailed records of all security deposits, and such records shall be open for inspection by **Owner** and **Owner's** employees and appointees.

**8.5.**    Operating Account.    **Manager** shall establish a general account (the "Operating Account") in a banking institution designated from time to time by **Owner** in **Manager**'s name for the benefit of **Owner** and to which **Manager** shall deposit all Rents and other funds collected from the operations of the Development. **Manager** shall promptly deposit in the Operating Account all revenues associated with the Development when the same are collected. The funds of the Operating Account may be used to pay the normal and reasonable expenses incidental to the operation and maintenance of the Development pursuant to the Approved Operating Budget and as requested by **Owner**, including without limitation, payment of **Manager**'s compensation provided for hereunder. The Operating Account is to be established solely for the Development. **Manager** shall not commingle any of its funds with the funds of **Owner**, **Manager,** or any other

22

person.  All funds deposited in the Operating Account are the property of **Owner** held in trust for **Owner** by **Manager**.  The Operating Account shall be subject to the control of both **Manager** and **Owner**, either of whom may draw thereon. **Manager** shall also maintain a petty cash fund in an amount not to exceed $500.00 (from money in the Operating Account) and make payments therefrom in a manner consistent with the usual course of dealing with such funds in the property management business. Such petty cash fund shall be subject to the same rules and restrictions set forth above as are applicable to the Operating Account. Each month **Manager** shall submit to **Owner** a copy of the monthly statement of the Operating Account. **Owner** shall deposit in the Operating Account on or about the first day of each month funds sufficient to provide for **Manager's** payment of the expenses described in the Approved Operating Budget and anticipated for that month as stated in the Approved Operating Budget and as further provided for and approved in accordance with the terms of this Agreement. At the end of each fiscal year, **Manager** shall make distributions to **Owner** of any funds held by **Manager** for **Owner**, provided that **Manager** may reserve funds reasonably required to operate the Development. Nevertheless, **Manager** shall maintain no less than $1,000.00 at all times in the Operating Account. Any and all real estate taxes, or payments in lieu thereof, due with regard to the Development shall be paid by **Manager** from the Operating Account.  If **Owner** so instructs, **Manager** shall, instead of depositing Rents and other funds into the Operating Account, deposit Rents and other funds collected from the operations of the Development into another account specified by **Owner**.

  **8.6.**   <u>Disbursements from Operating Account</u>.  Any amounts received in excess of the needs of the Development ("Excess Income") are required to be returned to **Owner,** provided, however, that **Owner** may direct **Manager** to retain such amounts in the Development Operating Account to reduce the need for operating subsidies for the Development in the following fiscal year.

## <u>ARTICLE IX. INSURANCE</u>

  **9.1.**   <u>Insurance by Manager</u>.  Before commencing work, **Manager** shall furnish **Owner** with complete copies of the relevant <u>certificates of insurance</u>, complete copies of the relevant <u>policies</u> required herein, the required <u>endorsements</u>, and copies of all respective policy <u>declarations</u>, showing that the following insurance is in force and will insure all operations under this Agreement:  **Manager** shall secure and maintain with one or more insurance companies satisfactory to **Owner**, (a) Worker's Compensation insurance covering all employees of **Manager** in accordance with the laws of the State of Texas, and if other than the State of Texas, also the state under which laws **Manager** is organized, (b) Employer's Liability insurance with minimum limits of $100,000.00 for any one accident, and (c) Automobile Liability insurance with minimum bodily injury limits of not less than $500,000.00 per person and $1,000,000.00 per occurrence and property damage limits of not less than $100,000.00 per occurrence. **Manager** shall furnish satisfactory evidence of the foregoing insurance to **Owner**, and **Owner** will be named an additional insured on all such policies (other than Worker's Compensation). All such policies shall include a waiver of subrogation endorsement and a thirty (30) day notice of cancellation or non-renewal in favor of **Owner**.  The Auto policy shall also be endorsed to be primary and noncontributing.  **Manager** is responsible for satisfying any and all deductibles or self-insured retentions that may apply to any of the policies referenced in this paragraph.

23

**9.2.**     Property Insurance by Manager. **Manager**, at **Owner's** request and at **Owner's** expense, will maintain and keep in force those types of property insurance coverages deemed appropriate by **Owner**, insuring against physical damage to any of the Development in amounts at least sufficient to prevent **Owner** from becoming a co-insurer under such policies. Insurance obtained by **Manager** at **Owner's** expense, shall include, Commercial General Liability ("CGL") insurance in an amount not less than $1,000,000.00 per occurrence insuring against loss, damage or injury to property or persons which might arise out of the occupancy, management, operation or maintenance of the Development.   The CGL insurance shall also protect **Owner** against claims of bodily injury or death, and include property damage to others. **Owner**, any affiliated entities or subsidiaries, and the respective owners, officers, directors, agents, and employees of each  will be named an additional insured on all such liability policies, the policy shall be endorsed to be primary and noncontributing, it shall include a waiver of subrogation, and include a thirty (30) day notice of cancellation or non-renewal in favor of **Owner**.  **Manager** is responsible for satisfying any and all deductibles or self-insured retentions that may apply to any policies referenced herein.  Before commencing work, **Manager** shall furnish **Owner** with complete copies of the relevant <u>certificates of insurance</u>, complete copies of the relevant <u>policies</u> required herein, the required <u>endorsements</u>, and copies of all respective policy <u>declarations</u>, showing that the aforementioned insurance is in force.   Manager shall attempt to obtain the best possible rate under **Manager's** umbrella policy.  In the event that any claim against **Manager** is made arising out of a fire or other casualty which is covered (or could have been covered) by the insurance required by this Article:

      (a)     **Manager** shall notify **Owner** in writing within 24 hours after **Manager** receives notice of any claims of such loss, damage or injury, or as soon thereafter as possible;

      (b)     **Manager** shall take no action (such as admission of liability) which might bar **Owner** from obtaining any protection afforded by any policy **Owner** may hold or which might prejudice **Owner** or its insurance carrier in the defense of a claim based on such loss, damage or injury;

      (c)     **Manager** shall cooperate with **Owner** in the defense of any such claims, demands or proceedings; and

      (d)     **Manager** agrees that **Owner** shall have the right, at **Owner's** option, to conduct the defense of any claim, demand or suit within limits prescribed by **Owner's** policy or policies of insurance, but **Manager** shall retain the right to defend and allow its insurers to defend under **Manager's** policies.

**9.3.**     <u>Fidelity Bond</u>.  Notwithstanding the above, **Manager** agrees to provide **Owner** with a fidelity bond or crime policy in an amount acceptable to **Owner** and in place on the Effective Date protecting **Owner** against losses incurred as a result of defalcations or similar acts on the part of **Manager's** employees or contractors.

**9.4.**     <u>Other</u>.  **Manager** shall furnish information available to **Manager** and requested by **Owner** for the purpose of placing such insurance coverage or making claims with respect to any loss thereunder.   All insurance shall be carried with companies that are financially responsible and admitted to do business in the State of Texas.   **Manager** shall not permit the insurance policies required for this Agreement to lapse during any period for which this Agreement is in effect.

24

## ARTICLE X. MISCELLANEOUS PROVISIONS

**10.1.**   Signature Authority of **Owner** over Operating Account. Notwithstanding any of the other provisions contained in this Agreement, **Owner**, in addition to **Manager**, shall have full signature authority over the Operating Account, provided, however, that **Owner** shall be fully liable for and hereby agrees to, to the extent permitted by law, indemnify and hold **Manager** harmless with respect to any wrongful action taken by **Owner** pursuant to such signature authority.

**10.2.**   Independent Contractor. **Manager** is an independent contractor and it is fully understood and agreed upon by the parties hereto that **Manager** shall have full power and authority to select the means, methods, and manner of performing the duties, obligations, and responsibilities assumed by **Manager** under this Agreement, subject to the terms and provisions hereof.

**10.3.**   Notices. Any notice, demand, consent, approval, request, or other communication or document to be provided hereunder to a party hereto shall be (a) in writing, and (b) deemed to have been provided: (i) (1) forty-eight (48) hours after being sent as certified or registered mail in the United States mails, postage prepaid, return receipt requested, (2) the next business day after having been deposited (in time for delivery by such service on such business day) with Federal Express or another national courier service, or (3) (if such party's receipt thereof is acknowledged in writing) upon having been sent by telefax or another means of immediate electronic communication, in each case to the address of such party set forth hereinbelow or to such other address in the United States of America as such party may designate from time to time by notice to each party hereto; or (ii) (if such party's receipt thereof is acknowledged in writing) upon being given by hand or other actual delivery to such party. The parties' notice addresses are as follows:

| | |
|---|---|
| If to **Owner**: | Houston Housing Authority |
| | Attn: Vice President of Public Housing Operations |
| | 2640 Fountain View, Suite 230 |
| | Houston, Texas 77057 |
| | Telephone: (713) 260-0733 |
| | |
| If to **Manager**: | Orion Real Estate Services, Inc. |
| | Attn: Gene Blevins or Pamela McGlashen |
| | 2051 Greenhouse Road, Suite 300 |
| | Houston, Texas 77084 |
| | Telephone: (713) 622-5844 |
| | Fax:  (713) 622-4762 |

**10.4.**   Assignment.  Subject to the restriction set forth in the next succeeding sentence, this Agreement shall be binding upon, and enforceable by, the parties' respective successors and assigns. This Agreement may not be assigned by **Manager** without the prior written consent of **Owner** (which consent may be withheld in **Owner's** sole discretion). It is understood, however,

MINIEX_000593

that **Manager** shall have the right to subcontract portions of its responsibility under this Agreement to others, but that **Manager** shall be fully and primarily responsible for fulfillment of all obligations in this Agreement.

**10.5.** <u>Governing Laws</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.

**10.6.** <u>Representations</u>. **Manager** represents and warrants that it is fully qualified and licensed, to the extent required by law, to manage real estate and perform all obligations assumed by **Manager** hereunder.

**10.7.** <u>Waiver</u>. The waiver by either party of any breach of any term, covenant or condition contained in this Agreement shall not be deemed a waiver of a subsequent breach thereof.

**10.8.** <u>Headings</u>. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

**10.9.** <u>Entire Agreement</u>. This Agreement, together with Exhibit A and Exhibit B, and any other documents referred to herein and made a part hereof, constitute the entire understanding between the parties with respect to the subject matter hereof. This Agreement shall be controlling in the event of any conflict between any documents made part of this Agreement and this Agreement. This Agreement may not be changed except by a writing executed by the parties hereto.

**10.10.** <u>Specific Limitations on Manager</u>. In addition to, and not in lieu of, any and all other limitations on the authority of **Manager**, **Manager** shall not be authorized without the express written prior consent of **Owner** to take any action that, if taken by or on behalf of **Owner**, might or would constitute a default under (a) any loan documents encumbering the Development, (b) any Lease of any unit, or (c) any other documents, instruments or agreements affecting or relating to the Development. Notwithstanding any provision of this Section, **Manager** shall not (a) convey or otherwise transfer or pledge or encumber any property or other asset of **Owner**; (b) pledge the credit of **Owner** except for purchases made in the ordinary course of business of operating the Development or otherwise contemplated pursuant to this Agreement; (c) borrow money or execute any promissory note or other obligation or mortgage deed, security agreement or other encumbrance in the name of or on behalf of **Owner**; (d) vary or change any portion of the insurance program required by **Owner**. Moreover, **Manager** shall not, without the express prior written consent of **Owner**, institute or defend lawsuits or other legal proceedings on behalf of **Owner** other than those pertaining to evictions for nonpayment of rent or collections. These limitations are in addition to all other restrictions on the authority of **Manager** set forth elsewhere in this Agreement.

**10.11.** <u>Indemnification of Owner</u>. **MANAGER SHALL INDEMNIFY, DEFEND, AND HOLD OWNER AND ITS OFFICERS, AGENTS, SUBSIDIARIES, AFFILIATED ENTITIES, DIRECTORS, COMMISSIONERS AND EMPLOYEES, (THE "INDEMNIFIED PERSONS") HARMLESS FROM ALL LIABILITY, LOSS OR DAMAGE, INCLUDING REASONABLE ATTORNEY FEES AND EXPENSES, RESULTING FROM ALL CLAIMS, DEMANDS, AND CAUSES OF ACTION OF EVERY KIND AND CHARACTER ASSERTED BY ANY PERSON (INCLUDING,**

MINIEX_000594

WITHOUT LIMITATION, THE MANAGER'S EMPLOYEES), FOR PERSONAL INJURY, DEATH, OR FOR LOSS OF OR DAMAGE TO ANY AND ALL PROPERTY IN ANY WAY ARISING OUT OF, IN CONNECTION WITH, OR TO THE EXTENT CAUSED BY THE MANAGER'S PERFORMANCE HEREUNDER.

OWNER SHALL NOTIFY MANAGER OF ANY CLAIM OWNER RECEIVES NOTICE OF ASSERTED AGAINST THE INDEMNIFIED PERSONS WITH RESPECT TO WHICH INDEMNIFIED PERSONS ARE INDEMNIFIED AGAINST LOSS BY MANAGER HEREUNDER WITHIN FIFTEEN (15) DAYS OF OWNER'S RECEIPT OF NOTICE OF SUCH CLAIM, AND SHALL PROMPTLY DELIVER TO MANAGER THE ORIGINAL OR A TRUE COPY OF ANY SUMMONS OR OTHER PROCESS, PLEADING, OR NOTICE ISSUED OR SERVED IN ANY SUIT OR OTHER PROCEEDING TO ASSERT OR ENFORCE ANY SUCH CLAIM. IF OWNER OR ANY OF THE INDEMNIFIED PERSONS DO NOT PROVIDE NOTICE WITHIN THE FIFTEEN (15) DAY PERIOD, IT DOES NOT WAIVE ANY RIGHT TO INDEMNIFICATION EXCEPT TO THE EXTENT THAT MANAGER IS PREJUDICED, SUFFERS LOSS, OR INCURS EXPENSE BECAUSE OF THE DELAY.

FOLLOWING SUCH NOTIFICATION, AND EXCEPT AS OTHERWISE PROVIDED BELOW, MANAGER SHALL DEFEND ANY SUCH SUIT AT ITS SOLE COST AND EXPENSE WITH ATTORNEYS OF ITS OWN SELECTION WHO ARE REASONABLY SATISFACTORY TO AGENCY.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, ANY LEGAL LIMITATIONS AFFECTING THE SCOPE OF PERMISSIBLE INDEMNITY SHALL BE READ INTO THESE CLAUSES SUCH THAT THE CLAUSE PROVIDES THE MAXIMUM INDEMNITY PURSUANT TO ITS TERMS WHILE STILL COMPLYING WITH THE LEGAL LIMITATIONS.  THIS SUBSECTION SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.  NOTHING CONTAINED WITHIN SECTION 10.11 HEREIN IS INTENDED TO LIMIT INSURANCE COVERAGE REFERENCED IN ARTICLE IX, ABOVE.

    **10.12.**  Conflicts. In the event of any conflict or inconsistency between any requirements contained in this Agreement, the documents relating to the Development, any applicable Tax Credit Restrictive Covenants, and the Applicable Public Housing Requirements, the requirements of the Applicable Public Housing Requirements shall in all instances be controlling.

    **10.13.**  Disclaimers.

        (a)    Nothing contained in the ACC or this Agreement, nor any act of HUD or **Owner**, shall be deemed or construed to create any relationship or third party beneficiary, principal or agent, limited or general partnership, joint venture, or any association or relationship involving HUD, except between HUD and the Authority as provided under the terms of the ACC, as applicable.

27

(b)     **Manager** acknowledges that any transfer of public housing development funds by **Owner** to **Manager** shall not be deemed an assignment of such funds.   **Manager** will not succeed to any rights or benefits of the Authority under the ACC or attain any privileges, authorities, interests, or rights in or under the ACC, as applicable.

(c)     **Manager** agrees to ensure that paragraphs (a) and (b) of this Section are inserted into any contracts or subcontracts involving the use of HUD funds in connection with the Development.

**10.14.** <u>Time of Essence</u>. Time is of the essence in this Agreement and each and all of its provisions.

**10.15.** <u>Statutes, Laws, etc.</u> All references in this Agreement to any specific law, statute, code, regulation or ordinance shall be deemed to be a reference to such as amended, from time to time, and to any successor law, statute, code, regulation or ordinance.

**10.16.** <u>Severability</u>.   In the event that any one or more provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such determination shall not affect any of the other provisions herein and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

**10.17.**  <u>Disputes</u>.  In the event of any controversy, claim, or dispute between **Owner** and **Manager** affecting or relating to the subject matter or the performance of this Agreement, the prevailing party will be entitled to recover from the non-prevailing party all the prevailing party's reasonable expenses, including but not limited to reasonable attorney's fees, expert witness fees, and court costs, pursuant to Texas Local Government Code Section 271.159, or as otherwise permitted by law.  Notwithstanding anything herein to the contrary, the preceding sentence shall not apply to attorney's fees incurred which are subject to **Manager**'s obligations to indemnify and defend any indemnitor.  Venue in any action brought shall lie exclusively in Harris County, Texas.

**10.18.** <u>Court Actions</u>.  **Manager** agrees to give **Owner** immediate notice in writing of any actions or suits filed and prompt notice of any claims made against **Owner** or any of the parties involved in the implementation and administration of this Agreement.

**10.19.** <u>Concurrent Remedies</u>.  No right or remedy herein conferred on or reserved to a party hereto is exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise, and may be enforced concurrently therewith or from time to time.

**10.20.** <u>Default</u>.  If **Manager** fails to execute the work with diligence and/or fails to complete the work within the time required under this Agreement, **Owner** may, by a written notice to **Manager**, terminate this Agreement.  In this event, **Owner** may complete the work as necessary and may take possession of and use any materials or equipment on the work site which is necessary for completing the work.  **Manager** shall be liable for any damages suffered by **Owner** resulting from **Manager**'s failure to complete the work within the required time, whether or not **Manager** continues to work under the terms of this Agreement.  This liability includes any increased costs incurred by **Owner** in completing the work.

28

MINIEX_000596

**10.21.** Nonappropriation.  **Manager** understands that the **Owner** is a governmental entity and should it not be funded for any period during the term of this Agreement any sums due for the remainder of the term shall be forgiven and the **Owner** shall not be liable for payment. The Owner shall give **Manager** written notice within thirty (30) days after learning that the funds will not be available.  Upon such written notice from the Owner, this Agreement will automatically terminate

**IN WITNESS THEREOF**, this document may be executed in multiple counterparts. Each counterpart is deemed an original.  All counterparts together constitute one and the same instrument.  Each party warrants that the undersigned is a duly authorized representative with the power to execute this contract.  This Agreement shall be signed by the **Manager** and **Owner**. **Manager** shall sign this Agreement first, and after signing, shall deliver the original signed Contract—along with any and all required proofs of insurance and fidelity bonds, if not already delivered—to **Owner** for review and signature by **Owner**.  The effective date of this Agreement shall be the date of signature by the **Owner**.


HOUSTON HOUSING AUTHORITY                  ORION REAL ESTATE SERVICES, INC.
(for "**Owner**")                                        (for "**Manager**")


By: _____          By: _____
    Tory Gunsolley                                   Kirk Tate
    President


Date: _____          Date: _____


*Contract (2016 HRI)*

29