# EXHIBIT I

MINIEX_000598



# Houston Housing Authority, Houston, TX

## Public Housing and Housing Choice Voucher Programs

**Office of Audit, Region 6**
**Fort Worth, TX**

**Audit Report Number: 2017-FW-1003**
**December 27, 2016**

MIN 0161

MINIEX_000599



**To:**        Lorraine Walls, Director, Office of Public Housing, 6EPH

        **//signed//**
**From:**      Theresa Carroll, Acting Regional Inspector General for Audit, 6AGA

**Subject:**   The Houston Housing Authority, Houston, TX, Needs To Improve Its
        Procurement and Financial Operations and Its Housing Choice Voucher Program
        Subsidy Determinations

Attached is the U.S. Department of Housing and Urban Development (HUD), Office of Inspector
General's (OIG) final results of our review of the Houston Housing Authority.

HUD Handbook 2000.06, REV-4, sets specific timeframes for management decisions on
recommended corrective actions. For each recommendation without a management decision,
please respond and provide status reports in accordance with the HUD Handbook. Please furnish
us copies of any correspondence or directives issued because of the audit.

The Inspector General Act, Title 5 United States Code, section 8M, requires that OIG post its
publicly available reports on the OIG Web site. Accordingly, this report will be posted at
http://www.hudoig.gov.

If you have any questions or comments about this report, please do not hesitate to call me at
817-978-9309.

MIN 0162

MINIEX_000600



**Audit Report Number: 2017-FW-1003**
**Date: December 27, 2016**

The Houston Housing Authority, Houston, TX, Needs To Improve Its
Procurement and Financial Operations and Its Housing Choice Voucher
Program Subsidy Determinations

# Highlights

## What We Audited and Why

We audited the Houston Housing Authority's public housing and Housing Choice Voucher programs. We selected the Authority for review in accordance with our audit plan and based upon risk analyses. Our objectives were to determine whether the Authority (1) followed U.S. Department of Housing and Urban Development (HUD) requirements when it procured goods and services and incurred miscellaneous expenses, (2) calculated tenant housing assistance payments in accordance with HUD payment standards, and (3) conducted tenant certifications in a timely manner.

## What We Found

The Authority did not follow HUD's regulations or its own policies when contracting for goods and services and paying for miscellaneous expenses. This condition occurred because the Authority did not implement adequate internal controls over its procurement and financial operations. The Authority also did not always use correct payment standards or perform annual tenant recertifications for its voucher program tenants in a timely manner and in accordance with HUD regulations and its administrative plan. This condition occurred because the Authority lacked written procedures for applying payment standards and its staff did not understand HUD's regulations. Further, its staff turnover and caseloads were high. As a result, the Authority paid more than $3.2 million in Federal funds for ineligible and unsupported costs.

## What We Recommend

We recommend that HUD require the Authority to (1) repay more than $183,000 in ineligible expenditures; (2) support or repay more than $3 million in questionable costs; and (3) implement adequate internal controls, including written procedures, to ensure that its procurement and expense payments comply with HUD's regulations and its own policies.

MINIEX_000601

# Table of Contents

**Background and Objective**................................................................................3

**Results of Audit** .............................................................................................4

    **Finding 1:  The Authority Did Not Follow HUD Regulations or Its Own Policies Regarding Procurement and Financial Operations**..........................................4

    **Finding 2:  The Authority Did Not Always Use Correct Payment Standards or Perform Annual Tenant Recertifications in a Timely Manner** ...................................9

**Scope and Methodology**...............................................................................12

**Internal Controls**.........................................................................................14

**Appendixes**..................................................................................................16

    **A.  Schedule of Questioned Costs** .................................................................16

    **B.  Auditee Comments and OIG's Evaluation** .............................................17

    **C.  Contract and Purchase Order Errors**......................................................71

    **D.  Questionable Miscellaneous Purchases**...................................................72

MIN 0164

MINIEX_000602

# Background and Objective

The Houston City Council created the Houston Housing Authority in 1938 in response to the U.S. Housing Act of 1937 and enabling State legislation that charged local entities with providing decent, safe, and sanitary housing for low- to moderate-income families and individuals. While the Authority is independent of the Houston city government, the Houston City Council appointed the first board of commissioners and executive director that same year.

The Authority is governed by a board of commissioners appointed by the mayor of Houston. The board of commissioners helps guide the Authority by setting policy and providing leadership and oversight, which enables the Authority to reach its goals and advance its mission.

As of 2014, the Authority served more than 60,000 low-income persons, the most in the agency's history, including more than 17,000 families housed through the Housing Choice Voucher program and another 5,500 living in 25 public housing and tax credit developments throughout the city.

From fiscal years 2012 through 2014, the Authority received the following funding from the U.S. Department of Housing and Urban Development (HUD) for its public housing and voucher programs. See table 1.

**Table 1:  HUD funding**

| Fiscal year | Public housing program | | Housing Choice Voucher program |
| --- | --- | --- | --- |
| | *Public Housing Operating Fund and moderate rehabilitation grants* | *Public Housing Capital fund* | |
| 2012 | $10,718,595 | $4,837,826 | $123,498,232 |
| 2013 | 13,839,062 | 4,643,927 | 122,079,091 |
| 2014 | 14,468,517 | 4,676,215 | 107,662,642 |
| **Total** | **$39,026,174** | **$14,157,968** | **$353,239,965** |

Our reporting objective was to determine whether the Authority (1) followed HUD requirements when it procured goods and services and incurred miscellaneous expenses, (2) calculated tenant housing assistance payments in accordance with HUD payment standards, and (3) conducted tenant certifications in a timely manner.

3

MINIEX_000603

# Results of Audit

## Finding 1: The Authority Did Not Follow HUD Regulations or Its Own Policies Regarding Procurement and Financial Operations

The Authority did not follow HUD regulations or its own policies when contracting for goods and services and paying for miscellaneous expenses. These conditions occurred because the Authority did not implement adequate internal controls over its procurement and financial operations and its staff did not understand HUD's regulations. As a result, the Authority made nearly $3.2 million in questionable payments to various vendors for goods and services.

**The Authority Had Ineligible and Unsupported Costs of Nearly $3.2 Million**
Of the $10.6 million in Federal funds reviewed, the Authority spent nearly $3.2 million for questionable costs. Of the $3.2 million, the Authority inappropriately spent $142,703 for a contract that had a conflict of interest and $40,548 in excess of contract amounts. Also, it spent $13,043 for ineligible miscellaneous expenses. Further, the Authority could not provide adequate support to show that it spent more than $3 million, including $126,785 to off-duty police officers for security services, in compliance with Federal regulations and its own policies.

### The Authority Did Not Follow HUD Regulations
### Or Its Own Policies When Contracting for Goods and Services

Of 35 procurement files reviewed, 22 procurements[1] violated 24 CFR (Code of Federal Regulations) 85.36 and various requirements in the Authority's procurement policy and procurement procedures manual, resulting in nearly $3.2 million in questioned costs. Specifically, the Authority failed to (1) adequately administer its contracts to prevent conflicts of interest, ensure that it did not make payments in excess of contract or purchase order amounts, and ensure that it received appropriate goods and services for its payments; (2) maintain sufficient support for payments or to document the history of its procurements, such as independent cost estimates; and (3) maintain a complete list of its contracts. Appendix C provides a list of the 22 procurements, the deficiencies identified, and the associated questioned costs.

These deficiencies occurred because the Authority did not implement adequate controls to ensure that it complied with both Federal regulations and its own written policies. Although the Authority's written policies appeared to comply with Federal regulations, the Authority did not enforce them. These deficiencies were also noted regarding the Authority's non-Federal funds.

---

[1] For 8 of the 35 procurement files, either the Authority claimed that expenditures were from non-Federal funds and would not provide us supporting documentation, or the general ledger did not show any payments from Federal funds. Since the Authority would not provide documentation showing that the expenditures were from non-Federal funds, we could not be certain of the funding source.

4

MIN 0166

MINIEX_000604

**The Authority Did Not Adequately Administer Its Contracts**
As shown in table 2, the Authority paid for a contract that had a conflict of interest, and overpaid a contract for relocation services. As a result, it made $183,251 in ineligible payments.

Table 2: **Contract administration violations and resulting ineligible payments**

| Violation | Ineligible amount |
|---|---|
| Payments for a contract with a conflict of interest | $142,703 |
| Payments exceeding contract amounts | 40,548 |
| **Total ineligible payments** | **$183,251** |

The Authority Executed a Contract That Had a Conflict of Interest
Bid evaluation documents from 2010 for one contractor showed that one of the Authority's bid evaluators was the owner. We identified the conflict by matching the bid evaluator's address and phone number to the contractor's address and phone number. The contract file did not include documentation showing that the employee had informed the Authority of the conflict of interest. According to section 3.0, page 2, paragraph II, of the Authority's policy, "No employee, officer, commissioner, or agent of the HHA [Authority] shall participate directly or indirectly in the selection, award, or administration of any contract if a conflict of interest, either real or apparent, would be involved." Thus, any payments using Federal funds under the contract would be ineligible.

After the contract was awarded, records showed that the Authority employee signed documents approving payments to the related company. Further, the procurement file included an amended contract, which modified the payment structure and extended the terms of the contract. The last payment to the vendor was in September 2013. Total Federal payments to the contractor were $142,703, including $52,981 in public housing funds and $89,722 in voucher administrative fees.[2]

The Authority Paid $40,548 in Excess of Agreed-Upon Amounts
The Authority made payments in excess of contract or purchase order amounts. A board resolution and contract for relocation services limited payments to $300,000. The Authority paid $40,548 in Federal funds more than this contract limit and must reimburse the overpayment to its public housing program from non-Federal sources.

**The Authority Did Not Maintain Sufficient Documentation To Support Procurements**
The Authority did not maintain complete procurement records, including contracts, purchase orders, independent cost estimates, the rationale for the method of procurement, selection of contract type, cost analyses, and contractor selection or rejection. This deficiency violated both 24 CFR 85.36(b) and section 18.0, page 19, of the Authority's procurement policy, which require the Authority to maintain sufficient records to detail the history of each of its procurements,

---

[2]   All conflicts of interest involving Housing Choice Voucher program funds are prohibited by 24 CFR 982.161.

5

MINIEX_000605

including the rationale for the method of procurement, selection of contract type, contractor selection or rejection, and the basis for the contract price. As a result, the Authority could not provide adequate support to show that it spent more than $3 million, including $126,785 for security services, in compliance with Federal regulations and its own policies.

For example, the Authority did not have required independent cost estimates for 21 of the procurements reviewed. Both Federal regulations and the Authority's procurement policy require independent cost estimates.[3] Since the Authority did not perform independent cost estimates, it could not ensure that it paid reasonable prices for its goods and services.

Because the Authority failed to maintain records sufficient to detail the significant history of these procurements, we could not determine whether it procured the goods and services properly. For example, the Authority paid $126,785 in Federal public housing program funds to off-duty police officers for security services. The Authority could not provide a contract or evidence of its procurement actions to support the payments. The Authority admitted that there were no contracts between it and the off-duty officers. Further, it executed a separate security service agreement with Harris County Precinct 6 in 2012. Although the Authority paid the off-duty officers with Federal funds, we were uncertain whether it paid the Precinct 6 contract for the same security services or the source of funding for the contract because the Authority did not provide evidence of payments to Precinct 6.

The payments to the off-duty officers may have duplicated services that were to be provided under the executed contract with Precinct 6. The officers submitted invoices, but there was no purchase order or contract to support the payments. Further, there was no documentation to ensure that the officers provided the services during the time specified on the invoices. The payment dates ranged from January 2012 through April 2013.

### The Authority Did Not Maintain a Complete List of Contracts

The Authority did not maintain an adequate and reliable contract log listing its procurement activity as required by section 8.2, page 51, of its procurement procedures manual. Thus, it could not determine how many contracts it had. When asked for a list of current contracts, the Authority provided a four-page list of contractors that it prepared by listing contracts found in the office of its general counsel. The list contained inactive and expired contracts and contracts that had not been paid. We determined the existence of other contracts from our review of the general ledgers, check registers, and purchase order logs.

### The Authority Did Not Follow HUD Regulations or Its Own Policies When Paying for Miscellaneous Expenses

---

[3]   Section 6.0, page 8, of the Authority's procurement policy; section 3.2, page 8, of its procurement procedures manual; and 24 CFR 85.36(f)(1)

6

MINIEX_000606

A review of 62 sample disbursements totaling more than $92,000 found deficiencies with 41 disbursements totaling almost $29,000.[4]  In addition to ineligible payments to a conflict of interest entity and unsupported payments for the security services previously discussed, the Authority made advances and reimbursements to employees for ineligible items and reimbursed employees and a contractor for local mileage without proper support and without filling out the appropriate forms.

The deficiencies occurred because the Authority generally did not implement adequate policies or procedures to ensure that expenditures were eligible and supported.  HUD regulations required the Authority to establish policies and procedures to effectively carry out its financial responsibilities, including internal controls.[5]

### The Authority Inappropriately Spent $13,043 for Ineligible Items

The Authority made 22 disbursements totaling $13,043 for miscellaneous ineligible items.  This amount included purchases of items by the Authority and advances and reimbursements to employees for such items as catered food, gift cards, drinks, picture frames, invitations, t-shirts, and musical entertainment.  Appendix D provides a list of the 22 disbursements.  The Authority failed to show that these purchases were necessary and reasonable for proper and efficient performance and administration of Federal awards.

### The Authority Paid $1,283 in Unsupported Local Mileage Reimbursement

In seven disbursements, the Authority reimbursed employees and a contractor $1,283 for local mileage without proper documentation.  This amount included $1,266, which it approved and reimbursed to employees who did not fill out required information on their mileage reimbursement forms.  None of the employees provided beginning and ending mileage balances as required by the Authority's travel policy.  Further, the Authority paid a $17 mileage reimbursement to a consultant, who failed to provide mileage calculations.  The Authority made $1,222 of the payments with voucher administrative fees and the remaining $61 with public housing program funds.

### Conclusion

Because the Authority's internal controls were not adequate and its staff did not understand HUD's regulations, the Authority did not follow HUD regulations or its own policies when contracting for goods and services and paying for miscellaneous expenses.  As a result, it spent nearly $3.2 million for contracts and expenses that were questionable.

### Recommendations

We recommend that the Director of the Houston Office of Public Housing require the Authority to

---

[4]   Includes three disbursements totaling $6,447 that were questioned earlier as part of $142,703 in procurement costs paid to a person with a conflict of interest and nine payments totaling $8,033 that were questioned earlier as part of $126,785 paid to off-duty police officers for security services

[5]   25 CFR 85.20(b)(1-3) and HUD Handbook 7460.7, section 2-1

7

MIN 0169

MINIEX_000607

1A. Repay its public housing program $52,981 from non-Federal funds for payments made on a contract that had a conflict of interest.

1B. Repay its Housing Choice Voucher administrative fees $89,722 from non-Federal funds for payments made on a contract that had a conflict of interest.

1C. Repay its public housing program $40,548 from non-Federal funds for ineligible payments made in excess of contract amounts and on an expired contract.

1D. Support or repay $3,014,541 to its public housing and voucher programs from non-Federal funds for the contractor payments listed in appendix C.

1E. Implement procedures to ensure that it complies with HUD regulations and its own procurement policies, to include procedures to ensure that it maintains a complete history of its procurements, and prevent it from overpaying contracts and agreed-upon amounts.

1F. Ensure that staff members involved with the procurement process are adequately trained in both Federal procurement regulations and the Authority's procurement policies.

1G. Repay its public housing program $13,043 from non-Federal funds for miscellaneous ineligible items.

1H. Support or repay its Housing Choice Voucher program administrative fees $1,222 from non-Federal funds for unsupported mileage reimbursements.

1I. Support or repay its public housing program $61 from non-Federal funds for unsupported mileage reimbursements.

1J. Implement policies and procedures to ensure that costs are eligible and adequately reviewed, documented, and supported.

MIN 0170

MINIEX_000608

## Finding 2:  The Authority Did Not Always Use Correct Payment Standards or Perform Annual Tenant Recertifications in a Timely Manner

The Authority did not always use correct payment standards or perform annual tenant recertifications for its Housing Choice Voucher program tenants in a timely manner and in accordance with HUD regulations and its administrative plan for 5 of 10 randomly selected tenant files reviewed.  These errors occurred because the Authority lacked written procedures for applying the payment standards, its staff was unfamiliar with HUD's subsidy and payment standards, and its staff turnover and caseload were high.  As a result, the Authority overpaid $639 in rent subsidies for five families.

### The Authority Used Incorrect Payment Standards
The Authority did not always use correct Housing Choice Voucher program payment standards when it calculated housing assistance payments.  In 4[6] of 10 randomly selected cases reviewed, the Authority did not follow HUD's regulations and its administrative plan in applying the correct payment standards, resulting in its paying incorrect rent subsidies.  In one of the four cases, the Authority's internal monitoring detected the error and made a correction, but the corrected recertification was effective 4 months after the incorrect recertification.  As shown in table 3, the Authority overpaid $384 in rent subsidies for the four families.

#### Table 3:  Effect of using incorrect payment standards

| Tenant ID | Type of action | Effective | PHA* payment standard | OIG** payment standard | Over-payment | Number of months | Total over-payment |
|---|---|---|---|---|---|---|---|
| 95213 | Annual | 05/01/2013 | $945 | $1,290 | $34[7] | 4 | $136 |
| 546080 | Annual | 06/01/2013 | 772 | 765 | 7 | 12 | 84 |
| 509269 | Interim | 02/01/2014 | 945 | 937 | 8 | 10 | 80 |
| 509269 | Annual | 10/01/2013 | 945 | 937 | 8 | 4 | 32 |
| 52838 | Interim | 11/01/2014 | 945 | 765 | 13 | 4 | 52 |
| **Total** | | | | | | | **$384** |

\* PHA = public housing agency
\*\* OIG = Office of Inspector General

---

[6]   For two families, cases 509269 and 52838, the Authority also did not perform recertifications in a timely manner.

[7]   Overpayment calculated after netting for the effects of voucher size and income errors that the Authority made but detected and then tried to correct through its quality control process

9

MINIEX_000609

**The Authority Did Not Perform Annual Tenant Recertifications in a Timely Manner**
The Authority failed to perform annual tenant recertifications in a timely manner for 3[8] of the 10 randomly selected cases reviewed.  The three cases were between 1 and 3 months late, which resulted in overpayments totaling $255 for late recertifications.

Further, HUD's Multifamily Tenant Characteristic System reexamination report for January 2015 showed that the Authority had not performed 353 of 14,989 required annual tenant recertifications, or 2.35 percent, in a timely manner.  The Authority performed the recertifications from 1 to 21 months late.[9]

**Various Causes Contributed to These Conditions**
These conditions occurred because the Authority lacked written procedures for applying the payment standards and Authority staff was unfamiliar with HUD regulations regarding subsidy and payment standards.  In addition, according to Authority managers, the Authority's Housing Choice Voucher program department suffered from high staff turnover and a high caseload per staff member.

In response to sequestration,[10] the Authority further complicated the process by changing its payment standards twice in 2013 and twice in 2014 and changing occupancy standards in both 2013 and 2014.  Thus, in addition to determining when to implement a new payment standard during each recertification, caseworkers had to determine which payment standard was to be used.[11]  Staff also had to determine whether the unit size continued to be appropriate after the changes in occupancy standards, even if there was no change in the number of family members living in the unit.

**Conclusion**
The Authority had deficiencies in 5 of 10 randomly selected tenant files reviewed.  The deficiencies included using incorrect payment standards and conducting late recertifications for its tenants.  These conditions occurred because the Authority lacked written procedures for applying the payment standards, its staff was unfamiliar with HUD regulations, and its staff turnover and caseload were high.  As a result, the Authority overpaid $639 in rent subsidies for five families.

**Recommendations**
We recommend that the Director of the Houston Office of Public Housing require the Authority to

    2A.    Repay $639 from non-Federal funds to its Housing Choice Voucher program.

---

[8]  Cases 509269 and 52838 also had incorrect assistance payments due to applying incorrect payment standards.

[9]  The report is a snapshot of files that had not been certified for at least 13 months as of January 1, 2015.

[10]  Sequestration is a term adopted by Congress to describe a fiscal policy process that automatically reduces the Federal budget across most departments and agencies.  The Budget Control Act of 2011 included mandatory budget cuts that were to go into effect on January 2, 2013, later deferred until March 11, 2013.

[11]  HUD does not allow changes that result in increases charged to tenants to take effect until the second annual recertification, except when the family moves into a new unit.

**10**

MINIEX_000610

2B.   Develop and implement appropriate written procedures to reduce the risk of future overpayments and underpayments in its Housing Choice Voucher program.

2C.   Determine a reasonable caseload that should be assigned to each staff member and adjust the caseloads accordingly.

2D.   Ensure that staff members who determine payment standards and perform recertifications and quality control staff are adequately trained.

11

MIN 0173

MINIEX_000611

# Scope and Methodology

We performed the audit from November 2014 through June 2015 at the Authority's office located at 2640 Fountain View Drive, Suite 400, Houston, TX, and the Office of Inspector General's (OIG) Houston field office. The audit generally covered the period January 1, 2012, through October 31, 2014. We adjusted the review period when necessary to accomplish our objective.

To accomplish our audit objective, we

- Interviewed Authority employees and the board of commissioners chairman;
- Reviewed reports issued by an independent auditor for 2012 and 2013;
- Reviewed and obtained an understanding of the Authority's written policies and procedures, relevant laws and regulations, and the Authority's bylaws and consolidated annual contributions contract with HUD;
- Reviewed board of commissioners minutes;
- Obtained and reviewed the Authority's procurement records;
- Obtained and reviewed the Authority's purchase orders and check registers for the audit period;
- Obtained and reviewed the Authority's general ledger; and
- Coordinated with HUD staff.

We limited our review to the use of Federal funds. We focused primarily on public housing funds, but the Authority combined the public housing funds with Housing Choice Voucher program administrative fees, other Federal funds, and non-Federal funds to make its payments. Therefore, some of the questioned costs in the report include both public housing funds and voucher administrative fees.

We identified Federal funds by tracing deposits into specific general ledger accounts and reviewing payments from those accounts. However, we had a scope limitation because the Authority refused to provide documentation for contracts that it stated were paid with non-Federal funds. Therefore, we were unable to conclude whether all the contracts reviewed were paid with Federal or non-Federal funds.

We selected and reviewed a sample of 35 procurements totaling $10.6 million from data provided by the Authority, including a list of contracts and contractors, general ledgers, check registers, and purchase order logs, to determine whether purchase orders and contracts were procured in accordance with regulations and HUD's guidance.[12] The data included 1,074 purchase orders and contracts on a current contracts list provided by the Authority or procured by the Authority between January 1, 2012, and October 31, 2014. We selected contracts and

---

[12]   24 CFR 85.36 and HUD Handbook 7460.8, REV-2

MIN 0174

MINIEX_000612

purchase orders that appeared unusual in nature, were for high dollar amounts, were for potentially duplicate goods and services, or appeared to be renewed for more than 3-year terms. We did not select a statistical sample because we did not intend to project the results of our testing.

We selected and reviewed a sample of 62 disbursement transactions totaling $92,215 from data provided by the Authority to determine whether the disbursements were eligible and adequately supported as required by HUD regulations.[13] The data included 38,947 disbursement transactions between January 1, 2012, and October 31, 2014, totaling $39.1 million. We selected transactions that were (1) for high dollar amounts or personal in nature; (2) for miscellaneous items, such as food or entertainment, or reimbursements to employees for such miscellaneous items; (3) for mileage reimbursements to employees; and (4) payments to individuals for security services. We did not select a statistical sample because we did not intend to project the results of our testing.

We randomly selected 10 tenant files from the list of 16,751 current Housing Choice Voucher program tenants as of December 31, 2014, from HUD's Multifamily Tenant Characteristic System as of December 31, 2014. We selected a random sample to determine what types of errors might exist in the files. We did not select a statistical sample because we did not intend to project the results of the sample testing. We reviewed the files to determine whether the Authority calculated assistance payments properly.

We obtained downloads of procurement files and disbursement transactions and a listing of Housing Choice Voucher program tenants during the audit. We did not assess the reliability of these data because we used the data for sample selection only.

We conducted the audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective(s). We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.

---

[13] 2 CFR Part 225 and 24 CFR 85.20

13

MIN 0175

MINIEX_000613

# Internal Controls

Internal control is a process adopted by those charged with governance and management, designed to provide reasonable assurance about the achievement of the organization's mission, goals, and objectives with regard to

- Effectiveness and efficiency of operations,
- Reliability of financial reporting, and
- Compliance with applicable laws and regulations.

Internal controls comprise the plans, policies, methods, and procedures used to meet the organization's mission, goals, and objectives. Internal controls include the processes and procedures for planning, organizing, directing, and controlling program operations as well as the systems for measuring, reporting, and monitoring program performance.

**Relevant Internal Controls**
We determined that the following internal controls were relevant to our audit objective:

- Effectiveness and efficiency of operations:  Policies and procedures in place to reasonably ensure that program activities were conducted in accordance with applicable laws and regulations; specifically, policies and procedures (controls) intended to ensure that the Houston Housing Authority complied with HUD regulations and its administrative plan in operating its HUD programs.

- Relevance and reliability of information:  Policies and procedures in place to reasonably ensure that participant file errors and housing assistance payment errors were reduced.

- Compliance with applicable laws and regulations:  Policies and procedures in place to reasonably ensure that procurement, housing assistance payment, disbursement, and file documentation was complete and accurate and complied with applicable laws and regulations.

We assessed the relevant controls identified above.

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, the reasonable opportunity to prevent, detect, or correct (1) impairments to effectiveness or efficiency of operations, (2) misstatements in financial or performance information, or (3) violations of laws and regulations on a timely basis.

14

MIN 0176

MINIEX_000614

**Significant Deficiencies**

Based on our review, we believe that the following items are significant deficiencies:

- The Authority did not have adequate controls in place to ensure that goods and services were procured in accordance with HUD's and the Authority's requirements and that purchases, advances, and reimbursements to employees who purchased miscellaneous items were eligible and supported (finding 1).

- The Authority did not have adequate controls in place to ensure that housing assistance payments were always accurate, properly calculated, eligible, and supported. Specifically, the Authority did not always use correct Housing Choice Voucher payment standards when it calculated housing assistance payments. In addition, the Authority did not perform annual recertifications in a timely manner (finding 2).

15

MIN 0177

MINIEX_000615

# Appendixes

## Appendix A

**Schedule of Questioned Costs**

| Recommendation number | Ineligible 1/ | Unsupported 2/ |
|---|---|---|
| 1A | $52,981 | |
| 1B | 89,722 | |
| 1C | 40,548 | |
| 1D | | $3,014,541 |
| 1G | $13,043 | |
| 1H | | 1,222 |
| 1I | | 61 |
| 2A | 639 | |
| **Totals** | **$196,933** | **$3,015,824** |

1/     Ineligible costs are costs charged to a HUD-financed or HUD-insured program or activity that the auditor believes are not allowable by law; contract; or Federal, State, or local policies or regulations.

2/     Unsupported costs are those costs charged to a HUD-financed or HUD-insured program or activity when we cannot determine eligibility at the time of the audit. Unsupported costs require a decision by HUD program officials. This decision, in addition to obtaining supporting documentation, might involve a legal interpretation or clarification of departmental policies and procedures.

16

MIN 0178

MINIEX_000616

# Appendix B

## Auditee Comments and OIG's Evaluation

**Ref to OIG
Evaluation**



HOUSTON
HOUSING AUTHORITY
Transforming Lives & Communities

June 16, 2016

Tracey Carney                                          *Via Email to tcarney@hudoig.gov*
United States Dept. of Housing & Urban Dev.
HUD Office of the Inspector General
Office of Audit, Region 6
819 Taylor Street
Suite 13A09
Fort Worth, Texas 76102

    **Re:**   **Audit Report Number 2016-FW-XXXX**

Dear Inspector Carney:

    Enclosed please find the response and comments of the Houston Housing Authority (the "HHA") to the Draft Audit Report (the "Draft Audit") provided by your office to HHA on May 12, 2016. As agreed to by the Office of Inspector General (the "OIG"), these comments are submitted timely. Consistent with the OIG Audit Operations Manual (the "Manual"), the attached response should be included in its entirety with the Draft Report

    Thank you for the opportunity to respond to and comment on the Draft Audit. If you have any questions concerning the HHA's response and comments, please do not hesitate to contact me.

                    Very truly yours,

                    Tory Gunsolley
                    President & CEO
Enclosures              Houston Housing Authority

Cc:   Jacob Williams               *Via Hand Delivery*
      United States Dept. of Housing & Urban Dev.
      HUD Office of the Inspector General
      1301 Fannin Street
      Suite 2200
      Houston, Texas 77002

17

MIN 0179

MINIEX_000617

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

## Response of Houston Housing Authority
## to Draft Audit Report No. 2016-FW-XXXX

### Introduction

Comment 1

Throughout this response to the Draft Audit, the HHA repeatedly notes that the Draft Audit includes incorrect findings due to misinformation or erroneous conclusions by the OIG – findings which the HHA believes could have been easily resolved prior to issuance of the Draft Audit if the OIG had followed its own procedures as set forth in its Audit Operations Manual (the "Manual").

Comment 2

Section 3-18 of the Manual states that "timely communication" of audit findings and conclusions "provides the auditee an opportunity to give feedback to the auditors on their conclusions, helps ensure the completeness and accuracy of factual matters, and provides additional assurances of the OIG's fairness and objectivity." The Manual also states that communicating audit results to the auditee "should be a continuous process throughout the audit" and that "[d]raft finding details should be provided to the auditee *as the issues are developed on site*" (emphasis added). Unfortunately, that did not happen here. No written findings were communicated to the HHA's executive staff either during the course of the OIG's [15] months of active field work, nor when the HHA requested them from the auditors at the exit conference held at the conclusion of the auditors' field work. As a result, the Draft Audit is not

18

MINIEX_000618

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

complete or accurate with respect to certain factual matters. If the
OIG had shared its draft findings with the HHA's executive staff

Comment 2        on a continuous basis and as issues arose during the audit, the
HHA would have had the opportunity to provide the particular
feedback and documentation necessary to dispel these audit
findings prior to the issuance of the Draft Audit. The HHA has

Comment 2        instead been forced to respond for the first time to written findings
contained in the Draft Audit.

Furthermore, Section 3-19 of the Manual states: "Since the
audit findings should have been fully discussed and comments on
finding outlines obtained during the audit, there should be no
surprises when the draft report is issued." However, contrary to
the Manual's guidance, the OIG delayed communication of its
draft findings to the HHA until issuance of the Draft Audit.
Consequently, these findings *did* come as a surprise to the HHA
and left the HHA with little time to review its records in order to

Comment 2        respond to the findings at the exit conference on May 26, 2016.
In particular, the HHA was surprised to discover: (a) findings that
penalize the HHA for uncovering and reporting fraud by an
employee; (b) findings that are contrary to HUD's own guidance
regarding eligible uses of funding, including PIH Notice 2013-21;

Comment 3        (c) findings outside the scope of the OIG's audit authority; and

Comment 3        (d) findings for high dollar amounts that seem like they are being

Comment 4        used for shock value rather than reflecting actual payment issues.

Since the OIG failed to follow its own procedures to keep
the HHA informed in writing of findings so that they could be
resolved during the audit, the HHA is now left with this singular

19

MIN 0181

MINIEX_000619

**Auditee Comments**

**Ref to OIG
Evaluation**

Comment 1

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

opportunity to refute the incorrect findings in the Draft Audit. As detailed in the responses below, the HHA believes that each of the findings in the Draft Audit should be removed or significantly revised.

### _Response to Finding 1:_

**THE HHA GENERALLY FOLLOWED HUD REGULATIONS AND ITS OWN PROCUREMENT POLICIES AND CAN PROVIDE DOCUMENTATION THAT THE PAYMENTS QUESTIONED IN THE DRAFT AUDIT ARE, IN FACT, ELIGIBLE COSTS AND PROPERLY SUPPORTED.**

The crux of Finding 1 is that the HHA made over $3,200,000 in payments the OIG alleges are ineligible or unsupported. According to the Draft Audit, these payments resulted from the HHA's alleged failure to: (a) adequately administer its contracts; (b) maintain sufficient documentation for procurements; (c) maintain a complete list of contracts; or (d) follow HUD regulations or its own procurement policy when paying for certain miscellaneous expenses. Each questioned payment is listed in Appendix C to the Draft Audit ("_Appendix C_"). The HHA recognizes that not all of the procurements reviewed by the OIG fully complied with all technical requirements. But, as explained more fully below, the HHA strongly disagrees with the Draft Audit's characterization of the procurements in question as being unsupported or ineligible.

20

MIN 0182

MINIEX_000620

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

Numerous times in the Draft Audit, the OIG misapplies public housing requirements to use of non-public housing funds. We have tried to identify these issues below, but note overall that neither HUD Handbook 7460.8 (the "Handbook") nor the HHA's procurement policy apply to non-public housing funds. Both the Handbook and the HHA's procurement policy expressly state that

**Comment 3**

they do not apply to payments made using Section 8 funds, Section 8 administrative fees, or fee income generated by the Central Office Cost Center. It is therefore inapposite for the Draft Audit to include in Finding One payments from non-public housing funds made by the HHA. Instances where the Draft Audit incorrectly applies the Handbook and the HHA's procurement policy to non-public housing payments are noted below.

**1. The HHA maintained its contracts in accordance with HUD requirements.**

The Draft Audit incorrectly asserts that the HHA made $227,157 in ineligible payments. According to the Draft Audit, the payments identified as ineligible stemmed from the execution of a contract for which the HHA had a conflict of interest and the payments in excess of contract amounts. For the reasons set forth below, the HHA disagrees with these findings.

21

MIN 0183

MINIEX_000621

**Auditee Comments**

| Ref to OIG Evaluation | |
|---|---|

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone. 713.260.0500 | TTY 713.260.0547 | www.housingforhouston.com

Comment 5

(a)  *The HHA already uncovered and reported to the OIG the contract that the Draft Audit cites as evidencing a conflict of interest.*

The Draft Audit states that the HHA paid $152,959 from public housing funds on a contract for which a conflict of interest existed.  The contract in question, Reference No. 539066[1], was for the provision of criminal background check services.  The Draft Audit notes that a former HHA employee who participated in evaluation of the bids received for the procurement of these services was related to the owner of the company who received the contract.  The Draft Audit, without support, states that the HHA should have known of the relationship between the bid evaluator and the company due to commonality of addresses and telephone numbers.

For the reasons below, the HHA disagrees with the Draft Audit's characterization of the events surrounding the contract associated with Reference No. 539066 and disagrees with the Draft Audit's recommendation that the HHA repay $152,959 from non-federal funds due to the conflict of interest.

Comment 5

- *The HHA reported the conflict of interest to the OIG and the Harris County District Attorney in October 2013 and, subsequently, alerted the auditors of this situation at our first meeting:*

---

[1] As used herein, all "Reference Nos." correspond to the number listed in the column on Appendix C of the Draft Audit titled "Payee, purchase order, or request for proposals or quotation number."

22

MIN 0184

MINIEX_000622

**Auditee Comments**

Ref to OIG
Evaluation

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

*nevertheless, the Draft Audit gives the*
*appearance that the auditors themselves*
*uncovered the conflict of interest.*

At the audit's entrance conference, the HHA
informed the OIG auditors of the conflict of
interest which HHA had discovered in October
2013 and subsequently taken appropriate steps
to remedy. In 2013, HHA had reported the issue
both to the OIG and the Harris County District
Attorney's office. The Draft Audit makes no
mention of the HHA's actions in uncovering,
reporting, and resolving this very issue.

Comment 5

The Draft Audit's attempt to, first, take credit
for HHA's discovery and, second, to penalize
them for it creates a significant disincentive for
any whistleblowers to take similar action in the
future. Not only does the Draft Audit seek to
penalize HHA for uncovering, reporting, and
actively participating in the resolution of the
conflict of interest, but the Draft Audit conveys
the clear impression that the OIG auditors are
taking credit for uncovering the issues
surrounding Reference No. 539066. Thus, the
Draft Audit wholly ignores the HHA's own
commendable actions in reporting the matter to
the OIG and the District Attorney – reporting
that occurred well before the auditors arrived.
Instead, the auditors appear to transfer to

23

MIN 0185

MINIEX_000623

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0600 | TTY: 713.260.0547 | www.housingforhouston.com

themselves all credit for uncovering the conflict of interest.

- *The former HHA employee with the conflict of interest was indicted on various counts of fraud.*

The former HHA employee with the conflict of interest associated with Reference No. 539066 was indicted by the Harris County District Attorney's on various counts of fraud. The employee was terminated by the HHA, and the HHA fully cooperated in the District Attorney's investigation into the employee. The former HHA employee was ordered to pay restitution to HHA, and that money was received. HHA should not be punished for uncovering fraudulent activity and cooperating in the prosecution of the former employee.

Comment 5

- *Without legal support, the Draft Audit indicates that the HHA should have uncovered the conflict of interest by cross-checking the address of the vendor and the employee in question.*

The Draft Audit appears to suggest that the HHA should have uncovered the conflict of interest at the outset by using LexisNexis (or a similar database) to search for all addresses and telephone numbers ever associated with the

Comment 6

24

MIN 0186

MINIEX_000624

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

contractor.[2] The Draft Audit insinuates that
such a search would have shown an overlap
with the address or telephone number of the
employee. But, there is no legal authority cited
to (or in existence) for the proposition that a
housing authority must (or even should) cross-
check the addresses and telephone numbers of
its prospective vendors against the addresses
and telephone numbers of all of its employees.
The HHA notes that it uncovered the conflict of
interest through its own internal processes and
actions. When it did uncover the conflict of
interest, the HHA immediately reported its
discovery, which occurred in or around October
2013, to the OIG and the Harris County District
Attorney. The HHA would submit that no
sizable organization can entirely prevent a

Comment 6

---

[2] At the exit conference, the auditors stated that the HHA
should have used LexisNexis to cross-check the contractor's
telephone number and address with its employees' telephone
numbers and addresses. The auditors made this suggestion even
though the HHA, when the contractor was hired, had no reason to
be suspicious that anything was amiss. The HHA notes that on
an annual basis, all of its employees are required to sign a conflict
of interest statement; furthermore, the HHA's Employee
Handbook, which all employees are briefed on in detail upon hire,
includes a section detailing the HHA's prohibition against
conflicts of interest and requiring employees to promptly disclose
any such conflicts.

Comment 6

25

MIN 0187

MINIEX_000625

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

Comment 6

rogue employee from engaging in wrongful acts but the fact that HHA *did* uncover the wrongdoing would suggest that HHA indeed had and has adequate and appropriate procedures in place to identify these types of issues.

- *The Draft Audit fails to note that $99,770 of the total paid to the vendor in question was not paid from public housing funds.*

Comment 7

Contrary to the Draft Audit's conclusion that the HHA used public housing funds to pay all of the $152,959 paid under the contract associated with Reference No. 539066, the HHA's ledger shows that $99,770 of the total paid was remitted from funds other than public housing funds, and is thus not subject to the procurement policies and regulations referenced in the Draft Audit. While HHA would submit that no costs should be questioned related to this matter, at a minimum the OIG's finding should be reduced to $53,189 the amount of payments made from public housing funds.[3]

Comment 7

[3] Per correspondence received from the auditor on June 3, 2016, the HHA understands that the OIG has agreed to revise the Draft Audit to properly identify the sources of funds used for these payments. We would urge, however, that findings

26

MIN 0188

MINIEX_000626

**Auditee Comments**

Ref to OIG
Evaluation

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

- *Despite the conflict of interest, the HHA received valuable services at a competitive rate.*

  While it should have been disqualified due to the conflict of interest, the vendor who received the contract associated with Reference No. 539066, as compared to the other 8 vendors who responded to the applicable request for proposal, did in fact provide the lowest price for the services provided. As the OIG is aware, pursuant to 24 CFR §§ 960.203 (public housing) and 982.553 (HCV program), HHA is required to conduct criminal background checks on all applicants. Thus, the service is a vital to ensure HHA's compliance with HUD's regulations. Furthermore, the vendor in question was paid only for performing criminal background checks that were requested by the HHA and that were in fact performed. Therefore, while the HHA, again, does not question that the vendor should have been disqualified due to the conflict of interest that the former employee did not disclose, the facts show that the HHA received the required services from the vendor at the most competitive price available. Due to the fact that

Comment 8

Comment 8

pertaining to non-public housing funds be entirely removed from the Draft Audit.

27

MIN 0189

MINIEX_000627

**Auditee Comments**

**Ref to OIG
Evaluation**

**Houston Housing Authority**
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

required services at a competitive price were received, the HHA disagrees with the Draft Audit's conclusory statement that payments pursuant to Reference No. 539066 were ineligible solely due to the conflict of interest in question.[4]

**Comment 8**

In sum, the HHA respectfully disagrees with the Draft Audit's finding regarding Reference No. 539066, and requests that these findings be removed.

*(b)  The Authority did not make payments of public housing funds in excess of agreed upon amounts pursuant to its contracts.*

The Draft Audit identifies payments that it asserts were paid in excess of agreed-upon contract amounts.  According to the Draft Audit, the payments in question consisted of: (1) $40,548 for relocation services; (2) $22,270 for floor decking replacement; and (3) $102 for leasing services.[5] As explained in detail below, the HHA disagrees with these findings in the Draft Audit because: (1) in the case of the relocation contract the OIG misinterpreted the Uniform Relocation Act ("URA") payments

**Comment 7**

_____

[4] The Draft Audit provides no authority to the contrary.

**Comment 9**

[5] The Draft Audit states that $11,278 in payments associated with for Reference No. 576459 were ineligible.  Based on an email communication from OIG dated June 8, 2016, the HHA understands that the Draft Audit will be amended such that no payments associated with Reference No. 576450 are listed as ineligible.

28

MIN 0190

MINIEX_000628

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

made to residents as payments made to a vendor under the contract; (2) the floor decking replacement was properly paid pursuant to a change order; and (3) the payments for leasing services were not made from public housing funds, and thus are not subject to the procurement policies and regulations referenced in the Draft Audit.

- *The HHA did not pay any monies for relocation services in excess of the contract amount.*

After receiving approval from HUD, the HHA demolished one of its public housing properties. The demolition was a component of the HHA's strategic redevelopment plan for its properties. The demolition entailed the relocation of residents from the property in question. To facilitate the relocation, the HHA sought the assistance of a professional relocation service through the publication of request for proposal no. 12-16. Pursuant to request for proposal no. 12-16, the HHA entered a contract (Reference No. 578946) for services to include, among others, the development of a relocation plan and interfacing with residents to assist them in relocating. For these services, the contract authorized the expenditure of up to $300,000. Notably, this amount did not include reimbursable expenses incurred by individual residents during their relocation. Instead, these reimbursable expenses were paid to individual residents in accordance with the URA.

Comment 10

29

MIN 0191

MINIEX_000629

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

Under the contract, the HHA paid its vendor to provide relocation services a total sum $193,056.42, well below the contract limit of $300,000. The total sum includes $9,200 paid to the vendor pursuant to Task Order No. 3, which task order was entered for the purpose of the vendor handling the logistics of reimbursing residents under the URA for their relocation costs. The aggregate amount of relocation reimbursable amounts paid to individual residents was $155,146.19. Task Order No. 3 and the invoices for resident reimbursements are included as Exhibit 1.

Based on the HHA's review, it appears that in concluding that the HHA paid in excess of the contract amount, the auditors included as payments under the contract those amounts that were in fact paid to residents under the URA as reimbursements for relocation expenses. But, as noted above, such reimbursable expenses were not in fact payments under the contract associated with Reference No. 578946. When these reimbursable payments are properly counted, it is readily apparent that the HHA did not pay in excess of the amount of its contract for relocation services. Thus, this finding should be removed from the final report.

Comment 10

30

MIN 0192

MINIEX_000630

**Auditee Comments**

| Ref to OIG Evaluation | |
|---|---|

**Ref to OIG Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

Comment 11

- *The $22,270 in payments allegedly in excess of the contract amount are explained by a change order that the Draft Audit does not take into account.*

The Draft Audit states that, pursuant to a contract for the replacement of floor decking, the HHA paid $22,270 in excess of the contract amount (Reference No. A011445). The original amount of the contract in question was $106,990. But, a change order in the amount of $22,270 was necessitated by the unanticipated discovery of asbestos during the course of the work. The change order, attached hereto as Exhibit 2, increased the contract amount by $22,270. Issuance of the change order was consistent with HUD requirements and HHA's policies. As such, the Draft Audit's assertion that the HHA paid $22,270 in excess of the amount of the contract in question is incorrect and should be removed.

Comment 11

Comment 12

- *The $102 in leasing services allegedly in excess of the applicable contract's amount was not paid from public housing funds and is thus the payment is not subject to the procurement policies and regulations referred to in the Draft Audit.*

The Draft Audit states that the HHA paid $102 for "leasing services" that exceeded the

31

MIN 0193

MINIEX_000631

**Auditee Comments**

Ref to OIG
Evaluation

**Houston Housing Authority**
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

applicable contract's amount (Reference No. A011855). According to the HHA's records, the payment referenced in the Draft Audit was not made with public housing funds, placing it beyond the scope of the procurement policies and regulations referenced in the Draft Audit. The finding should thus be removed.

Comment 12

In addition to the foregoing, although it is not referenced in the body of the Draft Audit, Appendix C indicates that the HHA paid $71,512 in excess of a contract for Reference No. A009263. In email correspondence from June 3, 2016, the auditors clarified that they had miscalculated their claims for this contract, and that the amount in question for Reference No. A009263 was in fact $68,271. In the same email, the auditors listed the payments comprising the $68,271. Based on the HHA's review, all of the payments listed correlate to a contract with a not to exceed amount of $300,000; the HHA's ledger shows that no payments on this contract were made in excess of $300,000. As such, this finding should be removed as there were no payments in excess of the contracted amount.

Comment 13

In sum, the HHA respectfully disagrees with the Draft Audit's findings that it paid any monies in excess of contract amounts and requests that these findings be removed in their entirety from the Draft Audit.

MIN 0194

MINIEX_000632

**Auditee Comments**

**Ref to OIG**
**Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.cc

**2. The HHA disagrees with the Draft Audit's conclusory and speculative assertion that it did not pay reasonable prices for its goods and services.**

The Draft Audit asserts that the HHA "did not maintain sufficient documentation to support procurements." As a result of this alleged deficiency, the Draft Audit asserts that the HHA was unable to provide adequate support "to show that it spent more than [$3,000,000] . . . in compliance with [f]ederal regulations and its own policies."

While it cursorily asserts that the HHA did not comply with a range of procurement requirements, the body of the Draft Report provides only two specific examples of how the HHA allegedly failed to maintain sufficient documentation for its procurements. First, the Draft Audit alleges that the HHA failed to obtain an independent cost estimate ("ICE") for twenty-three of the procurements reviewed by the auditors. Second, the Draft Audit references payments made by the HHA to off-duty security officers and speculates that because of the absence of sufficient records, the HHA may have been double-billed for some of these services.

*(a) Independent cost estimates.*

As listed in its Appendix C, the Draft Audit asserts that the HHA made $3,006,503 in unsupported payments due to its failure to obtain an ICE. For the following reasons, the HHA disagrees with these findings.

Comment 14

First, for a number of the procurements listed in Appendix C, totaling $1,699,101 in payments, the HHA did in fact obtain

33

MINIEX_000633

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

ICEs, each of which are included as Exhibits to this response.[6]
These procurements include the following:

- *Reference No. 011445.* As noted above, the Reference
  No. 011445 pertains to the replacement of floor decking
  at one of the HHA's public housing properties.
  Appendix C questions $130,990 in payments for this
  work due to the lack of an ICE. In fact, the HHA did
  prepare an ICE wherein it estimated that the work

Comment 14

Comment 14

_____

[6] These independent cost estimates were maintained in the
operations files of the Real Estate Investment and Development
Department ("REID") and were not located in the procurement
files. When assembling documents requested by the auditors, the
HHA inadvertently overlooked REID's operations files, focusing
instead on the HHA's procurement files. Hence, the ICEs listed
herein were mistakenly not provided to the auditors when they
were on site at the HHA. However, upon receiving the findings
in the Draft Audit for the first time, HHA compiled the ICEs
referenced herein and offered them to the OIG at the exit
conference so that the OIG could have more complete
documentation. On June 3, the OIG auditor provided vague
feedback that the ICEs presented at the exit conference were
"unsupported." HHA has additional documentation on the
reasonableness of the costs associated with the procurements
reviewed by the OIG. Had the OIG's shared its written findings
prior to inclusion in the Draft Audit, HHA would have had time
to provide this additional documentation. Additionally, the HHA
believes that it will locate ICEs for other procurements listed in
Appendix C following further review of its operations files.

34

MIN 0196

MINIEX_000634

**Auditee Comments**

Ref to OIG
Evaluation

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

would cost $130,000.  The ICE is attached hereto as
Exhibit 3.

- *Reference No. 572431*.  Reference No. 572431 pertains
to exterior painting at one of the HHA's public housing
properties.   Appendix C erroneously states that the
HHA made $107,130 in unsupported payments for this

Comment 14       work due to the lack of an ICE.  In fact, the HHA did
prepare an ICE wherein it estimated that the work
would cost $130,000.  The ICE is attached hereto as
Exhibit 4.

- *Reference No. A220451*.     Reference No. A220451
pertains to interior renovation work done at one the
HHA's public housing properties.  Appendix C states
that the HHA made $1,167,015 in unsupported

Comment 14       payments for this work due to the lack of an ICE.  In
fact, the HHA did prepare an ICE wherein it estimated
that the work would cost $2,090,650.   The ICE is
attached hereto as Exhibit 5.

- *Reference No. 583013*.  Reference No. 583013 pertains
to work done to demolish one of the HHA's public
housing properties.  Appendix C states that the HHA
made $224,232 in unsupported payments for this work

Comment 14       due to the lack of an independent cost estimate.  In fact,
the HHA did prepare an ICE wherein it estimated that
the work would cost $300,000.  The HHA's ICE is
attached hereto as Exhibit 6.  The HHA further notes
that HUD approved the HHA's demolition application
before the procurement associated with Reference No.

35

MIN 0197

MINIEX_000635

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

583013 and the application included a cost estimate of $300,000.

- *Reference No. PO 7254*. Reference No. PO 7254 pertains to the purchase by the HHA for $11,125 of standard, commercially available household appliances for which prices are readily available at several retailers and wholesalers. The HHA obtained pricing for these appliances from at least three commercial vendors, thereby effectively obtaining an ICE. Alternatively, even assuming the HHA did not obtain an ICE for this acquisition, the quoted prices for appliances that are readily available on the open market assured that the price paid by the HHA was reasonable.

Comment 15

- *Reference No. A220248*. Reference No. A220248 pertains to the payment of management fees by the HHA to one of the property management companies it retains to manage its properties.   According to Appendix C, $58,609 may be unsupported due to the lack of an ICE. The HHA disagrees. Each year, HUD publishes a "safe harbor" that sets forth the maximum amount a PHA may pay to a property management company.  The amount paid by the HHA to a property management company, as listed in Appendix C, is lower than the applicable safe harbor rate.  Therefore, the HHA believes that (a) the safe harbor published by HUD is effectively, if not practically, an ICE, and (b) because it paid fifty percent less than the applicable safe harbor, the HHA, by definition, did not make an

Comment 16

36

MIN 0198

MINIEX_000636

**Auditee Comments**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

unsupported or unreasonable payment for Reference No. A220248.

Given that the Draft Audit's sole reason for questioning the payments made under the above contracts was the purportedly absent ICE, these findings, totaling $1,699,101, should be removed from the audit.

Second, for at least one of the items listed on Appendix C, Reference No. 585329, the HHA does not believe an ICE was required. Reference No. 585329 pertains to an amount paid by the HHA to a vendor to terminate a contract. The amount paid, $11,934, was negotiated down forty percent by the HHA as compared to the vendor's original proposed amount to terminate the contract. Termination of the contract was made necessary by the fact that the property at which the services in question were being provided was being demolished. This payment was not one for which an ICE could reasonably be conducted, nor was it a procurement transaction for which an ICE was required.

Comment 17

Third, for Reference No. 570732, the replacement of an HVAC system at one of the HHA's properties in the amount of $463,095, the HHA has files containing evidence that includes all working papers necessary to formulate an ICE, which shows that the HHA did obtain information regarding the cost of the work prior to publication of the solicitation. The HHA will present this evidence to the local PIH Office for review, or, to the HUD OIG, upon its request.

Comment 18

Finally, for all of the procurements listed in Appendix C, the HHA believes that the applicable files demonstrate that the prices

37

MINIEX_000637

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713 260 0547 | www.housingforhouston.com

it paid were both supported and reasonable. The HHA notes that of the twenty-three procurements referred to in Appendix C, at least 21 were competitively procured. The HHA recognizes the value and importance of obtaining an ICE (and the requirement of doing so for any procurement above the micro-purchase amount). But, the HHA does not agree with the Draft Audit's assertions or implications that the lack of an ICE, standing alone, renders a procurement "questionable" or "unsupported." The competitive procurement process for the procurements listed in Appendix C demonstrates that the payments it made for the goods and services associated with each procurement were in fact supported and reasonable.

Comment 19

*(b)   Payments for security services were not duplicative and are supported by invoices and timesheets.*

Comment 20

As the Draft Audit notes, the HHA paid $126,785 for security services from off-duty police officers. Contrary to the OIG's unsupported speculation in the Draft Audit, the services provided were generally outside the scope of a separate contract the HHA had with Precinct 6. Notably, the coverage of the Precinct 6 services was different from that of the off-duty officers. The Precinct 6 contract was for additional patrols of the properties specifically noted in the scope. In contrast, the off duty officers were not on general patrols but were specifically paid for their attendance at necessary times of higher need, including a presence at the HHA headquarters which was not in the scope of the Precinct 6 contract.

In addition to the foregoing, although it speculates about the possibility of duplicate payments to off-duty police officers

38

MIN 0200

MINIEX_000638

**Auditee Comments**

**Ref to OIG Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

occurring, the Draft Audit does not mention the fact that this very issue has previously been adjudicated in Harris County District Court.   The adjudication occurred in connection with the prosecution of certain constables with Harris County for fraudulently billing government entities.   The HHA fully cooperated in the investigation, both with the Harris County District Attorney and HUD OIG. The prosecutions that resulted from the investigation have been completed. The defendants in

Comment 21

several of the prosecutions entered plea deals that required them to pay restitution to the HHA and restitution has been received by the HHA. The HHA submits that because it has previously been investigated by HUD OIG and the Harris County District Attorney, and adjudicated in a court of law, references to duplicative billing should be removed from the Draft Audit because any duplicate payments have already been repaid.

Comment 22

*(c)   The HHA acknowledges that it did not maintain a complete list of contracts for the audit period, but notes that the Draft Audit does not attribute any improper or unsupported payments to the HHA's lack of a complete contract list; furthermore, the HHA now maintains a complete list of contracts.*

The Draft Audit asserts that the HHA "did not maintain a complete list of contracts as required by section 8.2, page 51, of its procurement procedures manual."[7] The HHA acknowledges that during the audit period (January 2012 to October 2014), a

Comment 22

centralized list of contracts did not exist.   But, since

---

[7] The HHA presumes that the Draft Audit's reference to "its procurement procedures manual" means HUD Handbook 7460.8 (REV-2).

MINIEX_000639

**Auditee Comments**

| Ref to OIG Evaluation | |
|---|---|

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0647 | www.housingforhouston.com

approximately 2015, the HHA has maintained a complete list of contracts in compliance with HUD Handbook 7460.8. The HHA notes that the Draft Audit does not attribute any ineligible or unsupported payments to its lack of a complete contract list during the audit period.

**Comment 22**

**Comment 23**

3.    **The Authority disagrees with the Draft Audit's assertion that it did not follow HUD regulations and its own policies when paying for miscellaneous expenses.**

The fourth and final subpart of Finding 1 alleges that the HHA "did not follow HUD regulations or its own policies when paying miscellaneous expenses." For the reasons stated below, the HHA disagrees with the Draft Audit's findings regarding its payment of miscellaneous expenses and believes they should be removed.

**Comment 23**

*(a)   The HHA did not inappropriately spend $13,043 for ineligible items.*

The Draft Audit questions $13,043 expenditures which it asserts, without authority, are ineligible.    Nearly all the expenditures relate to resident educational and other activities. The expenditures were comprised of twenty-two disbursements, all of which are listed in Appendix D of the Draft Audit ("Appendix D"). Contrary to OIG's assertions, the HHA strongly believes that these expenditures were not only eligible, but are integral to resident participation in HHA programs.

**Comment 23**

**Comment 23**

The HHA has several issues of concern regarding findings set forth in Draft Audit. First, according to the HHA's review, ten of the twenty-two disbursements were not paid with public

40

MINIEX_000640

**Auditee Comments**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

housing funds. These ten disbursements, totaling $3,928, were in
fact paid from Section 8 administrative fees for the purpose of
supporting the Family Self-Sufficiency Program and other
allowable Section 8 activities, and thus are not subject to the
procurement policies and regulations relied on in the Draft Audit.

Comment 23

The remaining twelve disbursements, totaling $9,115, were
paid from public housing funds. But, the HHA disagrees with the
Draft Audit's finding that these disbursements were for ineligible
expenses. Based on comments made by the auditors at the exit
conference, it appears that the main basis for deeming the
expenses in question as "ineligible" is a subjective determination
by the auditors that the expenses in question were not "necessary
and reasonable" for the administration of the HHA's public
housing programs.   To the contrary these, were not only
"necessary and reasonable" but were clearly eligible – and in
some cases encouraged – expenses under guidance provided by
HUD.

Comment 23

For instance, four of the twelve disbursements, totaling
$3,002, were paid to support an HHA wide Father's Day event at
one of the HHA's public housing properties. Guidance provided
by HUD since 2011 encourages PHAs to support Father's Day
initiatives. Indeed, such initiatives are a component of a larger
effort by President Obama to promote responsible fatherhood (*see*
https://www.fatherhood.gov). By holding such events, the HHA
is endeavoring to keep fathers involved in the lives of their
children in the hope of reducing dropout rates, teen drug use, and
criminal activity, all objectives the HHA believes are both
reasonable and necessary to the effective administration of public
housing. HUD shares this view, as evidenced by its strategic plan

Comment 23

41

MINIEX_000641

**Auditee Comments**

**Ref to OIG
Evaluation**

Comment 23

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

to use housing as a platform to improve the quality of life of
public housing residents. Consistent with its strategic plan,
HUD's website contains a document titled "Strategies for a
Successful Father's Day Event," which directly aligns with the
activities for which the Draft Audit questions expenses (*see*
Exhibit 7).

Comment 23

Other disbursements listed in Appendix D that were paid for
with public housing funds include expenditures made to support
resident council leadership. These disbursements, five in all,
totaled $4,577, and covered three meetings, one from October
2012, one from December 2013, and one from August 2014.
Resident council leadership meetings generally require resident
council leaders to travel to a public housing site for a half or full
day of meetings for the purpose of informing residents about
important issues and operations relating to their housing. The
meetings foster active participation between HHA staff and
residents, and result in the collection of considerable resident
input. In addition, the meetings contain training components for
members of the resident council. HHA believes that all of the
expenses associated with these meetings are eligible activities
pursuant to PIH Notice 2013-21. We believe that the Draft Audit
is overly restrictive in its interpretation of the notice and that the
costs were reasonable and supported a necessary function of the
operation of public housing (e.g., resident councils).

Finally, with respect to the remaining disbursements in
Appendix D, the HHA notes as follows:

Comment 23

● Appendix D lists as ineligible a disbursement
   for $56 for school supplies and back to school

42

MINIEX_000642

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

assistance for public housing residents who
completed a summer internship at the HHA.
Appendix D also lists as ineligible a $100
disbursement for entertainment at a summer
literacy festival held at one of the HHA's public
housing properties. The HHA believes that
these disbursements are supported by PIH
Notice 2013-21 as well as HUD's strategic goal
to use housing as a platform to improve
residents' quality of life.

**Comment 23**

- The final disbursement was for the purchase of
four grills at an elderly development in the
amount of $1,380 for which the Draft Audit
fails to provide any citation to HUD regulations
or guidance stating that this is not a reasonable
operation or maintenance cost. Further, the
location and availability of these grills to
residents helps build community and foster
resident interactions – which is certainly
necessary and reasonable.

Based on the foregoing, these expenditures were supported
and eligible and contrary findings should be removed from the
audit. In the alternative, the recommendation for resolution
should involve a requirement for HHA to provide support to the
Houston office of public housing that the funds were eligible
program expenses under the public housing program or to repay
the amounts.

**Comment 24**

43

MIN 0205

MINIEX_000643

**Auditee Comments**

Ref to OIG
Evaluation

Houston Housing Authority
2640 Fountain View Dr Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

### *(b) The HHA did not pay $1,283 in unsupported local mileage reimbursement.*

After several inquiries by the HHA regarding the basis for this finding, the auditors, on or about June 6, 2016, finally provided the HHA with information regarding the same. Based on the HHA's review of the information provided, $1,222 of the total amount of $1,283 was paid to HHA employees who inspect houses for the Housing Choice Voucher program. These inspectors were not paid for mileage from public housing funds; thus, $1,222 of the total amount contained in the Draft Audit is not subject to the procurement rules and regulations relied on by the auditors in the Draft Audit.

Comment 25

That leaves a total of $61 in local mileage reimbursements for which the OIG seeks justification. The HHA paid the remaining $61 to public housing staff for travel to properties and to a contract employee for travel reimbursement. This small amount can be supported by recreating the mileage through use of Google maps; the HHA will provide this information to the local PIH Office.

Comment 25

Comment 26

### 4.   The Draft Audit fails to acknowledge that HHA has taken steps to improve its procurement procedures.

The Draft Audit, at various places, states or implies that the HHA's staff was not properly trained regarding procurements. The Draft Audit also indicates that the HHA needs to implement procedures and policies to ensure compliance with HUD regulations and the HHA's own polices.

44

MIN 0206

MINIEX_000644

**Auditee Comments**

Ref to OIG
Evaluation


Comment 26

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

Well in advance of the audit's start, HHA had already taken
significant actions to improve its procurement operations, but the
Draft Audit fails to acknowledge that all of its recommendations
in this regard have already been addressed by the HHA. For
example, the HHA completed the following:

- *Acquired and implemented the use of a contract
  management software in 2015.* In 2015, the
  HHA procured a software program for use in
  managing its contracts. Applicable staff
  received training on how to use the software and
  it is currently being used by the HHA to oversee
  the administration of its contracts. The use of
  this software has greatly improved the
  administration and tracking of the HHA's
  contracts and ensures that a complete,
  automated list of active contracts is maintained.

- *Providing ongoing procurement training to
  appropriate staff, including in 2015 and 2016.*
  In addition to providing applicable staff with
  training on how to use the HHA's new contract
  management software, the HHA has also
  conducted multiple training seminars for its
  employees on HUD procurement regulations
  and HHA procurement policies. Such trainings
  occurred in 2015 and 2016 and will continue on
  an on-going (or as-needed) basis going forward.

- *Improved management of procurement files.*
  Beginning in 2014, and continuing, the

45

MIN 0207

MINIEX_000645

**Auditee Comments**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

Procurement Department has undertaken to ensure that all procurements are documented in a single file that includes all of a given procurement's required components. Although not mandated by HUD requirements, this new document management system makes procurements easier to oversee. File management has also been facilitated by efforts to hire and retain long-term Procurement Department staff, which typically total 3-4 employees.

- *Hired a dedicated Contract Administrator*. In 2015, the HHA hired a dedicated Contract Administrator (previously, contracts were administered by a member of the contracting department). The HHA believes that having a dedicated Contract Administrator will further assist with uniform and proper administration and of its contracts and procurements.

**5.    The recommendations related to Finding 1 should be substantially revised to reflect the discussion above.**

Based on the foregoing, the HHA respectfully requests that the Draft Audit's recommendations regarding Finding 1 be revised as follows:

Comment 5

- *Recommendation   1A.*    Recommendation   1A recommends that the HHA repay its public housing program $152,959 for payments made in connection

46

MINIEX_000646

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

with Reference No. 539066. For the reasons stated above, the HHA disagrees with this recommendation and respectfully requests that it be removed from the Draft Audit. In the alternative, the HHA requests that the Draft Audit be amended to reflect the fact that the HHA – not OIG – uncovered and reported the conflict of interest associated with Reference No. 539066 and took all necessary steps to assist with prosecution of the individual in question.

- *Recommendation 1B*. Recommendation 1B recommends that the HHA repay its public housing program $74,198 for payments allegedly made in excess of contract amounts. For the reasons stated

Comment 13

above, the HHA disagrees that the payments in question were made above contract amounts; accordingly, the HHA respectfully requests that this recommendation be removed from the Draft Audit.

- *Recommendation 1C*. Recommendation 1C recommends that the HHA support or repay the $3,006,503. As noted, the almost exclusive basis for why the Draft Audit considers these payments "unsupported" is the lack of an ICE. The HHA has,

Comment 14

however provided ICEs for $1,699,101 of the payments listed in Appendix C. The HHA respectfully requests that the related findings be removed. With respect to the remaining amounts, the HHA will provide additional support for the reasonableness of the payments, as evidenced, for instance, by the extensive competition associated with the procurements.

47

MIN 0209

MINIEX_000647

**Auditee Comments**

| Ref to OIG Evaluation | |
|---|---|

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

- *Recommendation 1D.*  Recommendation 1D recommends that the HHA implement procedures to ensure that it complies with applicable procurement regulations and policies and to ensure that it maintains a complete list of procurements and does not pay contracts above the agreed upon amount. As stated above, the HHA has already instituted procedures to ensure compliance with applicable procurement requirements. Further, the HHA disagrees that it paid contracts in excess of the contract amount since, as discussed with respect to the draft Recommendation 1B, no such action was taken. The HHA respectfully requests that this finding in the Draft Audit be removed since the recommended action was completed well prior to issuance of the Draft Audit.

Comment 26

- *Recommendation 1E.*  Recommendation 1E recommends that the HHA provide adequate training on procurement for appropriate staff. As noted above, the HHA has conducted such training on multiple occasions since the audit was conducted; the HHA will continue to provide appropriate training on a routine and as needed basis. Accordingly, this finding should be removed.

Comment 26

- *Recommendation 1F.*  Recommendation 1F recommends that the HHA repay its public housing program $13,043 for the miscellaneous expenses set forth in Appendix D. As these were all necessary expenditures related to resident self-sufficiently, and

Comment 23

48

MIN 0210

MINIEX_000648

**Auditee Comments**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

Comment 23

because a subset of the expenditures occurred outside the scope of the policies and regulations relied on by the Draft Audit, the HHA disagrees with this recommendation and asks that it be removed.

Comment 25

- *Recommendation 1G.* Recommendation 1G recommends that the HHA repay its public housing program $1,283 for the miscellaneous expenses set forth for allegedly unsupported local mileage reimbursements. As noted above, of the total amount of $1,283 cited in the Draft Audit, only $61 was paid from public housing funds. The HHA respectfully requests that the Draft Audit be revised accordingly.

Comment 26

- *Recommendation 1H.* Recommendation 1H recommends that the HHA implement policies and procedures to ensure that costs are eligible and adequately reviewed, document, and supported. The HHA, as noted above, has improved its procurement procedures. As part of this improvement, the HHA has taken steps to ensure that all procurement files are properly documented.

49

MINIEX_000649

**Auditee Comments**

Houston Housing Authority
2640 Fountain View Dr Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

### Response to Finding 2:

**AFTER REVIEWING RECERTIFICATIONS, NEARLY
$150,000 IN PAYMENTS, AND TEN PAYMENT
STANDARD DETERMINATIONS, THE OIG FOUND
$639 IN ERRORS. RATHER THAN ACKNOWLEDGE
THESE AS MINOR ERRORS IN A VERY LARGE
PROGRAM, THE DRAFT AUDIT ERRONEOUSLY
ASSERTS THAT MORE SWEEPING, UNNECESSARY
CHANGES TO THE PROGRAM ARE REQUIRED.**

Comment 27

In Finding 2, the Draft Audit concluded that the HHA, in administering its Housing Choice Voucher ("HCV") program failed to "always use" correct payment standards or to timely perform annual recertifications. The Draft Audit alleges that errors occurred because the HHA lacked appropriate written procedures for applying payment standards and because of staff turnover and caseloads. The Draft Audit asserts that the HHA overpaid $639 in rent subsidies.

The HHA's HCV program has an approximately a $120,000,000 annual budget. The HHA was pleased to note that, after review of several recertifications, $146,000 in HAP payments, and 10 payment standard determinations, the OIG identified $639 in errors. While the HHA strives for 100% compliance in all its program obligations, this small deviation was caused by simple human errors exacerbated by dramatic Congressional budgetary cuts under sequestration (which are no longer in effect), and should be acknowledged and classified as such.

Comment 27

MIN 0212

MINIEX_000650

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

> **1. Any minor errors related to use of payment standards were *de minimis* and are attributable to significant funding cuts that are no longer an issue in the HCV program.**
>
> The HHA agrees that "[i]n response to sequestration, the Authority ... chang[ed] its payment standards twice in 2013 and twice in 2014 and chang[ed] occupancy standards in both 2013 and 2014." The HHA suggests, however, that the OIG should have considered errors related to this complicated situation a minor deficiency. The OIG should further acknowledge that the HHA made these changes in furtherance of a critically important public purpose: namely, to preserve subsidies for the maximum number of vulnerable Houstonians in response to the highly unusual Housing Assistance Payment ("HAP") funding cuts resulting from sequestration. Sequestration was the Congressionally-imposed budget cut that dramatically and suddenly reduced HHA's funding from HUD. Errors in the sample were limited to 2013 and 2014, when specifically challenging circumstances existed due to sequestration. The funding situation caused by sequestration no longer exists, thus the circumstances that led to the minor errors in payment standard determinations also no longer exist.
>
> Finally, the attached Exhibit 8 indicates that the payment standard overpayments ($384) represent only 0.26% of the $145,780.50 in HAP payments made on behalf of these 10 families. While HHA strives for 100% compliance with applicable regulations and takes seriously our fiduciary role in the administration of funds, HHA believes that a 0.26% overpayment

Comment 28

Comment 29

51

MINIEX_000651

**Auditee Comments**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

should be considered *de minimis*, and, therefore, a minor deficiency.

**2. Errors with respect to the timing of annual recertifications were *de minimis* and should be reflected as such in the final audit.**

Comment 30

The Draft Report states: "HUD's Multifamily Tenant Characteristic System reexamination report for January 2015 showed that the Authority had not performed 353 of 14,989 required annual tenant recertifications, or 2.35 percent, in a timely manner." Conversely, 14,636 or 97.6% *were* performed timely (a fact the Draft Audit does not acknowledge). HUD's Section Eight Management Assessment Program or "SEMAP" scoring, detailed in relevant part at 24 CFR 985.3(j), does not penalize agencies that conduct 95% or more of recertifications timely; to the contrary, if fewer than 5% of all recertifications are more than two months overdue, the agency is still allotted the maximum ten points. This is HUD's regulatory standard for recertifications – and in fact HUD found that the HHA met its top performance criteria for this indicator in each of the three years covered by the Draft Audit. The OIG should not hold the HHA to a different standard than the one already required by HUD. While the HHA continues to strive for 100% compliance through various methods including management oversight, ongoing staff training and quality control initiatives, the HHA urges the OIG to categorize a 2.35% non-compliance rate as a minor deficiency.

MIN 0214

MINIEX_000652

**Auditee Comments**

Ref to OIG
Evaluation

Houston Housing Authority
2640 Fountain View Dr Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

Comment 31

**3. The HHA's response to the Draft Audit's recommendation that it develop and implement appropriate written procedures to reduce the risk of future overpayments and underpayments in its HCV program.**

The HHA appreciates this recommendation, and indeed implemented it well before the OIG started its audit. Written procedures for correctly applying payment standard decreases were issued to staff on July 2, 2013. The procedure is detailed, with several examples of appropriate application for payment standard decreases.[8]

The HHA requires all housing specialists to obtain HCV Specialist Certification within one year of employment, and Rent Calculation training as part of continuing education requirements. These include specific training on the normal application of payment standards.

Payment standard *increases* are not administratively complex and occur with regularly. Conversely, payment standard *decreases* are more complicated and less frequent.

As previously noted, HHA argues that payment standard errors in the sample were limited to 2013 and 2014 when particularly challenging circumstances existed due to the drastic and abrupt decrease in appropriations caused by sequestration. The HHA adopted and executed a more complicated strategy to preserve subsidies for the maximum number of low income Houstonian families. The HHA does not foresee another

[8] Please see Exhibit 9.

53

MIN 0215

MINIEX_000653

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

similarly extreme event that would trigger the need for a decrease in payment standards.

**4.   The HHA's has a manageable and reasonable caseload for its staff members.**

The HHA is strongly committed to having a manageable workload for its staff. Due to this commitment, HHA caseloads progressively decreased throughout the audit review period, despite both an unprecedented reduction in the Administrative Fees upon which we rely for funding (and staffing) and an increase in the vouchers made available to HHA for low-income families. In 2011 HHA caseloads averaged over 700 annual cases assigned.    Annual recertification caseloads now average approximately 570 per Housing Specialist.  HHA continues to monitor this caseload and make adjustments where needed. However, in light of HHA's generally strong performance on SEMAP indicators and severe ongoing Administrative Fee reductions, HHA believes that the current staffing configuration is reasonable, efficient, and effective.

**Comment 32**

It is also important to note that professional opinions regarding caseload averages differ and depend upon how caseloads are structured, and that merely looking at the number of cases per Housing Specialist is a flawed approach  because it gives no weight or consideration to the support services provided to the Housing Specialists by other staff or through technology enhancements. As documented in the 2015 HCV Administrative Fee Study commissioned and published by HUD, there is significant variation in caseloads, even among SEMAP "high performer" PHAs. Some housing authorities are organized by

54

MIN 0216

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0600 | TTY: 713.260.0547 | www.housingforhouston.com

function or transaction type, i.e. have different caseloads for annual recertifications, moves, new admissions, etc. Other housing authorities apply a full service caseload approach. Size, jurisdiction, and local factors such as office location also impact caseload structure. HHA uses the first approach, which in our experience allows for larger caseloads because of the specialization. Additionally, in an on-going effort to improve customer service, HHA added a call center and additional lobby staff beginning in 2011. This initiative decreased calls and in-person customer service transactions previously directed to the Housing Specialists, allowing the Specialists to focus more time on completing transactions.

Comment 32

We believe the payment standard errors were more directly related to the HCV Department's efforts to execute a complex strategy in reaction to sequestration as opposed to caseload size. Regardless, this perceived issue has been resolved.

**5. The HHA is committed to robust training and compliance.**

Comment 33

The HHA is committed to a robust training and compliance processes. The HHA uses compliance software and also includes on its staff a dedicated trainer and quality control personnel. The HHA's training process for new hires contains some twenty-one separate training modules encompassing core aspects of the program ranging from Rent Calculations (which includes payment standards and subsidy standards) to security awareness training and inspections shadowing, to provide a more comprehensive view of the program. Upon hiring, the initial training process lasts approximately six weeks. Upon completing

55

MIN 0217

MINIEX_000655

**Auditee Comments**

**Ref to OIG
Evaluation**

Comment 33

Houston Housing Authority
2640 Fountain View Dr, Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

the initial training, there are numerous ongoing training initiatives for all HCV staff including supervisors and quality control staff.

As indicated above, the HHA requires all Housing Specialists to obtain HCV Specialist Certification within one year of employment, and Rent Calculation training as part of continuing education requirements. Each of these include specific detailed training on the application of payment standards and the importance of timely annual recertifications.

Within the past twenty-four months, HHA has provided three HCV specialist certification trainings and two Rent Calculation trainings. Housing Specialists normally attend certification training within nine months of hire.

HHA uses QualCheck to monitor compliance. QualCheck is a web-based compliance software tool developed by Quadel Consulting, an industry leader in HCV program management. The tool was first developed to better measure performance in HCV programs. It is currently in use for HCV and Public Housing programs and measures key performance indicators including Determination of Adjusted Income, Rent Reasonableness and HAP payment compliance. HHA has utilized Qualcheck to monitor program compliance for housing specialists and market analysts since 2012. HHA's quality control program is robust, with over 2,900 reviews completed in 2013 and 2014.

Comment 33

56

MIN 0218

MINIEX_000656

**Auditee Comments**

**Ref to OIG
Evaluation**

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

**6.   The recommendations related to Finding 2 should be substantially revised to reflect the discussion above.**

Based on the foregoing, the HHA respectfully requests that the Draft Audit's recommendations regarding Finding 2 be revised as follows:

Comment 29

- *Recommendation 2A*. While we do not quarrel with the repayment, this Finding should clarify that the amounts discovered were *de minimis*.

Comment 31

- Recommendation 2B. This recommendation and the corresponding finding should be deleted. HHA has already developed and implemented appropriate written procedures to reduce the risk of future over- or under-payments in the HCV program.

Comment 32

- *Recommendation 2C*. This recommendation and the corresponding finding should be removed. As discussed, HHA has reduced its caseload size since the time period covered by the audit. The current caseload is reasonable.

Comment 33

- *Recommendation 2D*. This recommendation and the corresponding finding should be removed. As discussed above, HHA has a robust training program for its HCV and quality control staff.

57

MIN 0219

**Ref to OIG
Evaluation**

**Auditee Comments**

Comment 34

Houston Housing Authority
2640 Fountain View Dr. Suite 400 | Houston, Texas 77057 | Phone: 713.260.0500 | TTY: 713.260.0547 | www.housingforhouston.com

## CONCLUSION

For the reasons discussed above, the Draft Audit requires substantial revisions prior to its finalization. Given that the Draft Audit was the first opportunity the HHA was given to review OIG's written findings, and given the limited time provided to compile a response, [9] we respectfully request an additional opportunity to review what we anticipate should be substantial revisions to the Draft Audit.

---

[9] We note the OIG gave the HHA a short extension from the original 15 days provided to respond to the Draft Audit. While the HHA appreciates the short extension, we note that the OIG took over a year to conduct its fieldwork and then another year to write the Draft Audit.

58

MIN 0220

MINIEX_000658

## OIG Evaluation of Auditee Comments

Comment 1:   The Authority generally disagreed with the findings and believed that they should
be removed from the report or significantly revised.

We reviewed the Authority's response and supporting documentation, and made
such changes as the documentation warranted.

Comment 2:   The Authority stated that written audit conclusions and findings were not
provided in a timely manner and in a continuous process throughout the audit, and
as the issues were developed onsite as required by the OIG Audit Operations
Manual. Further, the Authority stated that no written findings were
communicated to the executive staff during the field work or after the executive
staff requested them at the exit conference. The Authority also stated that it had
been forced to respond for the first time to written findings in the report and that
the findings were a surprise to it, and that it had little time to review records prior
to the exit conference. Finally, the Authority stated that the draft report was not
complete or accurate and that if the OIG had shared the findings on a continuous
basis and as issues arose, the Authority would have been able to dispel the
findings.

We disagree. We provided the Authority written findings in an e-mail on
March 27, 2015, at the end of the survey phase. We met with the executive
director and his senior staff on April 2, 2015 to discuss the specifics of these
findings and answer any questions. Between December 2014, and June 2015, we
had face to face meetings between the audit supervisor and the executive director
and his staff and numerous phone calls and e-mails providing status updates.

We reviewed the information we collected during the remainder of 2015, and
drafted a report which we presented to the Authority on May 12, 2016. We
provided specific information in response to Authority questions regarding the
draft report in e-mails on May 23, 2016, June 3, 2016, and June 6, 2016. We held
an exit conference to address the Authority's questions regarding the report and
findings on May 26, 2016, and evaluated documentation provided by the
Authority both at and after the exit conference. Further, we extended the deadline
for written comments from June 1, 2016, to June 10, 2016, as the Authority
requested. We believe that we have provided appropriate timely and continuous
feedback to the Authority both during and after the audit work. We further
believe that we have given ample opportunity for the Authority to address the
findings, and that we have been very responsive to the Authority's questions.

Comment 3:   The Authority stated that findings were contrary to HUD's guidance regarding
eligible uses of funding and that the findings were outside the scope of the OIG's
audit authority.

59

MINIEX_000659

Regarding eligible uses of funding, we made appropriate changes to the draft report when the Authority provided documentation that warranted such changes. Regarding our audit authority, we avoided reference to the Authority's use of non-Federal funds where possible. From the beginning of the audit, the Authority expressed concern that we might review how it used its non-Federal funds. Its refusal to provide certain documentation during the audit made it impossible for us to conclusively determine which contracts were paid in whole or in part with Federal funds.

Comment 4:   The Authority stated that findings for high dollar value seemed like they were being used for shock value rather than payment issues.

We disagree. We selected our samples based on the methodology stated in the report and reported on the deficiencies identified.

Comment 5:   The Authority stated that it had already uncovered and reported a conflict of interest contract to the OIG and the Harris County District Attorney in October 2013, and told auditors about the situation at their first meeting. It further stated that auditors took credit for the Authority's discovering and reporting fraud, and that the report penalized it and created a disincentive for reporting fraud. It also stated that the employee was terminated, it cooperated with the District Attorney, the employee paid restitution, and the money was received. The Authority requested recommendation 1A be removed from the audit report. Alternatively, it requested that the report be revised to reflect that the Authority, and not OIG uncovered and reported the conflict of interest and helped prosecute the individual involved.

We disagree and did not remove the recommendation or change the report based on this comment. The Authority did not call the conflict of interest to our attention. We selected this contract because (1) one of the payments was a high dollar value in our expenditure sample, (2) the contract was a possible duplication of services since two contractors provided background check services, and (3) the contract was renewed. We concluded from the procurement file documents that the contract was improperly procured due to a conflict of interest with one of the Authority's former employees. In an interview in December 2014, the Authority stated that the employee committed fraud by making false pension withdrawals. The Authority did not mention a conflict of interest or procurement. Further, the court documents that the Authority provided us showed the conviction to be based on tampering with government records (specifically, a police report) and theft by a public servant.

Neither the court documents, nor the Authority referred to the conflict of interest or a fraudulent procurement. Finally, the court-ordered restitution was not for

60

MINIEX_000660

payments on the improperly procured contract, but for repaying false pension withdrawals and tampering with governmental records.

Comment 6:   The Authority stated that there was no legal authority for requiring or suggesting that it should have cross-checked address and telephone numbers of vendors with employees. The Authority further stated that no large organization can prevent all employees' wrongful acts, and that the Authority's detection of the wrong doing suggests it has adequate and appropriate procedures in place to identify such issues. The Authority noted that it has all employees sign a conflict of interest statement annually, and that its new hires are briefed on its employee handbook which includes a section prohibiting conflicts of interest, and requiring employees to promptly disclose such conflicts.

Internal controls are the steps that the Authority can take to help ensure it complies with the requirements. A policy of random cross checking addresses and telephone numbers with employees and the families of employees is an internal control that would probably reinforce the idea that a perpetrator could get caught, and thus have a deterrent effect on employee fraud. The Authority should seek assistance from the PIH office in Houston if it is unable to determine what internal controls it can or cannot implement.

The Authority's policy on disclosures may give the Authority more leverage when it pursues an employee for violating its prohibitions against conflicts of interest. However, a policy of independently reviewing employees could have a deterrent effect and could help to limit the Authority's exposure to such noncompliance.

Comment 7:   The Authority stated that $99,770 of the conflict of interest contract was paid with non-public housing funds, and the finding amount should be reduced to $53,189.

We were unable to reconcile the dollar amounts that the Authority provided in its response with the extracts from the general ledger and check registers that it provided during the field work. According to the extracts, the Authority paid a total of $142,703 in Federal funds for the conflict of interest contract. The Authority paid $52,981 in public housing funds and $89,722 in voucher administrative fees.

Comment 8:   The Authority stated that although the vendor should have been disqualified due to the conflict of interest, the vendor provided the lowest price and actually provided the services. The Authority also stated that there was no authority to make conflict of interest payments ineligible based solely on the conflict of interest.

We disagree. Regardless of the price, and whether the Authority received services under this contract, the conflict of interest clearly violated both Federal

61

MIN 0223

MINIEX_000661

regulations and the Authority's own policies. The Authority's employee was the contractor, evaluated his own contract for the Authority during the procurement process, and signed documents that approved his own payments under the contract. Therefore, the $142,703 paid in violation of conflict of interest requirements is ineligible.

Comment 9:    The Authority stated in a footnote that OIG told it in an e-mail on June 8, 2016, that no payments associated with reference 576450[14] were ineligible.

We initially considered the payments to be ineligible, but ultimately deemed them unsupported because we could not determine whether they were Federal or non-Federal funds. However, they are still questionable expenses.

Comment 10:   Regarding a questioned relocation services contract, the Authority stated that the vendor was paid to handle the logistics of reimbursing tenants for their moves, and that these payments were not part of the contract. The Authority provided an exhibit which included a task order referring to relocation benefit checks and several invoices which included line items for relocation checks.

The documents in the exhibit appeared to be incomplete and did not support the Authority's assertion regarding payments to tenants. The Authority's general ledger coding did not differentiate between payments to the vendor and payments to the tenants. The Authority will have to provide clear evidence of payments made to the tenants through the vendor. We did not change the report or the recommendations based on this comment. We did not include the exhibit in the report, but it is available upon request.

Comment 11:   The Authority stated floor decking was paid with a change order, and that the change order was consistent with HUD requirements and with Authority policies. In response to the draft report, the Authority provided an exhibit which included the change order.

We agreed that the change order approved the overpayment and revised the report.

Comment 12:   The Authority stated that the leasing services payments were not made with public housing funds and not subject to procurement policies and regulations referenced in the audit.

The Authority made the leasing service payments with Community Program Development funds instead of public housing funds. The questioned costs were $102. We advised the Authority and removed the reference from the report.

---

[14]   We did not reference vendor 57450. We assume that the Authority meant to say vendor 576459.

MINIEX_000662

Comment 13:   The Authority stated that an amount for $71,512 in excess of a contract for
reference A009263 was correlated with a not to exceed amount of $300,000.  The
Authority stated that its ledger showed no payments in excess of $300,000 and
that we had changed the amount to $68,271.  The Authority requested
recommendation 1B be removed from the report.

According to data provided by the Authority during the field work, it spent a total
of $410,806 for this "not to exceed $300,000" contract.  It paid $68,272 in public
housing funds between January 2012 and August 2012, and exceeded the
$300,000 limit from December 2012 through May 2013.  We deleted the
overpayment reference in Appendix C because the Authority paid the Federal
funds portion of the contract before it began overpaying the contract in December
2012; however, the Federal funds portion is still unsupported because the
Authority did not provide an acceptable independent cost estimate.  We did not
remove the recommendation from the report.

Comment 14:   The Authority stated that the independent cost estimates were maintained in a
separate department and not in the procurement files.  It provided copies in four
exhibits attached to its response.  The four exhibits and some additional
explanation were for six contracts with questioned expenses totaling $1,699,101.
The expenses were for replacing floor decking, exterior painting, interior
renovation work, demolition, household appliances, and management fees.  The
Authority requested recommendation 1C be removed from the report.

We disagree and did not change the report based on this comment.  We reviewed
the documents that the Authority provided as independent cost estimates.  HUD
Handbook 7460.8 section 3.2, paragraphs D.2 and D.3 outline the different
requirements for independent cost estimates on purchases at or above the small
purchase threshold ($2,000 for the Authority).  According to the handbook,
independent cost estimates for purchases above the small purchase threshold are
normally broken out into categories including labor, materials, and other direct
costs.  The Authority's documentation contained no such details.  Without the
breakouts, we could not determine the source of the total estimates, and the costs
remain unsupported.  We did not include the exhibits in the report, but they are
available upon request.

Comment 15:   The Authority stated that it obtained pricing from at least three commercial
vendors for household appliances, and that the pricing was effectively an
independent cost estimate.  It further stated that even if it did not obtain an
independent cost estimate, the quoted prices for commercially available
appliances ensured that the price paid was reasonable.

The Authority did not provide documentation showing that it obtained pricing
from at least three commercial vendors for the appliances, or that it compared
quoted prices for commercially available appliances.  Therefore, these costs

63

MINIEX_000663

remain unsupported. The Authority can provide HUD with any additional information available during the audit resolution process.

Comment 16: The Authority stated that management fees for one of its properties did not need an independent cost estimate because HUD's published safe harbor rate sets a maximum amount a PHA can pay a property management company, and that the safe harbor rate is effectively an independent cost estimate. It further stated that it paid 50 percent less than the safe harbor rate which means that it was not an unsupported or unreasonable amount.

We disagree. The Authority should not assume that the maximum it could pay under current regulations is in any way related to the most cost effective amount. The Authority missed an opportunity to determine whether it could reasonably pay less than 50 percent of the safe harbor rate because it did not perform an independent cost estimate.

Comment 17: The Authority stated an independent cost estimate was unnecessary for an amount paid to terminate a services contract for a property that was being demolished. It further stated that this amount was negotiated down 40 percent and was not a procurement action.

We agreed that an independent cost estimate might not be appropriate for this contract and deleted the reference to a missing independent cost estimate in Appendix C. However, the amount is still questionable because the Authority did not provide a timely written cancellation notice as required by the contract. Instead, it allowed the contract to automatically renew for an additional 7 years, while HUD regulations state contracts should not exceed 5 years.

Comment 18: The Authority stated it maintained evidence for replacing an HVAC system for $463,095. It stated the evidence included the material necessary for an independent cost estimate, and that the material showed it obtained information regarding cost of work before the solicitation. It offered to provide the evidence to the local PIH office or to OIG upon request.

The Authority did not provide the evidence in either the package of materials that it gave us at the exit conference or as part of the support for its written comments. The Authority should provide the evidence to the local PIH office during the audit resolution process.

Comment 19: The Authority stated that the draft audit asserted or implied that the lack of an independent cost estimate alone rendered a procurement questionable or unsupported and that its competitive procurement process demonstrated that payments were supported and reasonable.

64

MINIEX_000664

The lack of an independent cost estimate (which both Federal regulations and Authority policy require) renders a procurement unsupported because there is no evidence that the payments were reasonable.

Comment 20:   The Authority stated that services provided by off duty officers were generally outside the scope of a contract the Authority had with Precinct 6.  It further stated that the Precinct 6 contract was for additional property patrols; while the off-duty officers were paid for attendance when necessary, including a presence at its headquarters.

The Authority did not provide evidence to show what services it received from the off duty officers, or that the services were outside the scope of the Precinct 6 contract.  The Authority should have provided a contract or other documentation showing the scope of work the off duty officers performed so that we could compare the duties.  However, an Authority manager stated that the Authority did not have contracts with the off duty officers.  Further, when we requested the 2012 payments to Precinct 6 under the contract, the Authority manager stated that the Authority paid the off duty officers instead of Precinct 6

Comment 21:   The Authority noted that the report did not mention that duplicate payments to off duty police officers had previously been adjudicated in Harris County District Court.  The Authority stated that it fully cooperated, the prosecutions were complete, defendants paid restitution to the Authority, and that references to duplicative billing should be removed from the report because duplicate payments had already been repaid.

During the audit, the Authority did not provide evidence that the amount of restitution was appropriate, or that it repaid the restitution to its public housing fund.  The audit noted that direct payments to the officers may have duplicated payments under a contract with Precinct 6.  We did not remove references to duplicative billing from the report.

Comment 22:   The Authority acknowledged that it did not maintain a complete list of contracts for the audit period, but stated that it now maintains a complete list.  It further noted that the audit did not attribute improper or unsupported payments to the lack of a complete list.

The audit report contains the results of testing at the time of the field work.  We did not test for changes after the field work was complete.  The audit did not attribute improper or unsupported payments to the lack of a complete list of contracts.  Rather, references to the lack of a complete list show that the Authority's documentation was not organized and did not comply with regulations at the time of the field work.  The Authority should work with HUD to ensure that the newly maintained list of contractors complies with the regulations.

65

MIN 0227

MINIEX_000665

Comment 23: The Authority disagreed with the audit assertion that it did not follow HUD
regulations or its own policies when paying miscellaneous expenses and believes
the assertion and recommendation 1F[15] should be removed from the report. The
Authority strongly believes that the expenses are both eligible and integral to
residence participation in Authority programs. The Authority stated:

- Ten of the 22 questioned disbursements were not made with public
  housing funds, but were instead paid with voucher administrative fees.
- Four of the 12 remaining disbursements were to support a Father's Day
  event which HUD encourages and supports though its guidance.
- Five of the 12 remaining disbursements were for three resident council
  meetings, and the Authority believed that PIH Notice 2013-21 made them
  eligible activities.
- Two of the 12 remaining disbursements were for school supplies for
  summer interns and entertainment at a summer literacy festival and the
  Authority believed that PIH Notice 2013-21 made them eligible expenses.
- One of the 12 remaining disbursements was for purchasing grills at an
  elderly development and was a necessary and reasonable cost.

We disagree and did not change the report based on this comment. Regarding the
10 of 22 questioned disbursements, the Authority did not provide evidence
showing the source of the payments in its response. The coding used in its
general ledger did not show the payments as administrative fees. Further, even if
these purchases were made with voucher administrative fees, they would still be
an ineligible use of Federal funds.

Regarding all 22 questioned disbursements, the Authority cited PIH Notice 2013-
21 to support them, but it gave no support for its advancements and
reimbursements to employees for these purchases. The Notice requires the
Authority to have policies and procedures to address employee advances and
reimbursements, which the Authority did not have during the audit. According to
the Notice, the Authority must establish policies regarding the funds, and the
funds must meet the intent of HUD regulations. The Authority could not provide
specific policies for employment reimbursements during the audit except for
policies governing annual tune ups, tuition, and mileage. There were no policies
for reimbursing other expenditures.

Regarding the purchase of food, the Notice states reasonable refreshments and
light snack costs are allowable. Some of the food expenses consisted of catered
events which would not be considered light snacks. The Notice makes no
mention of t-shirts, invitations, grills, games, etc. Further, the Notice refers to
OMB Circular A-87 to determine allowable expenses. According to the Circular,

---

[15]   Recommendation number changed from 1F in draft report to 1G in final report.

66

MINIEX_000666

expenses must be necessary and reasonable for proper and efficient performance and administration of Federal awards, which would not include clothing, barbecue grills, and games. It further stated that entertainment expenses are not allowed. Therefore, these costs, consisting of 22 questioned disbursements, and totaling $13,043 remain ineligible and must be repaid from non-Federal funds.

The Authority should work with HUD during the audit resolution process to ensure the recommendation is adequately addressed.

Comment 24: The Authority believed the finding should be removed from the report or that the recommendation should be for the Authority to provide support to the Houston PIH office or repay.

We did not remove the finding or reclassify the nature of the questionable costs. We reiterate that there were two problems with the Authority's advances and reimbursements for the miscellaneous expenses. First, the expenses did not appear to be reasonable or necessary uses of Federal funding. Second, these are employee advances and reimbursements for miscellaneous costs. The Authority will need to provide support to the Houston PIH office that it has developed policies and procedures to address such advances and reimbursements to help reconcile recommendation 1I, and repay any remaining questioned costs.

Comment 25: The Authority stated that $1,222 of the $1,283 in questioned mileage reimbursements were paid with non public housing funds, and the remaining $61 could be supported through mileage per an internet map site. It offered to provide this information to the local PIH office. The Authority requested that recommendation 1G[16] be revised to reflect that only $61 of the questioned costs were paid with public housing funds.

Further review showed that the Authority paid $1,222 in questioned mileage reimbursements with voucher administrative fees. The Authority's travel policy requires beginning and ending mileage on the reimbursement forms which the employees did not provide. Therefore, these reimbursements were unsupported, and the Authority should reimburse them from non-Federal funds to its voucher administrative fees fund. We revised the report and added a recommendation to provide support for or reimburse the $1,222 of questioned voucher administrative fees, and the $61 of questioned public housing program funds.

Comment 26: The Authority stated it had taken steps to improve procurement before the audit started, and that the report failed to acknowledge that the procurement recommendations had already been addressed. Specifically, it had (1) procured a contract administration software program and trained staff to use it, resulting in improved contract administration and tracking, and ensured a complete list of

---

[16] Recommendation changed from 1G in draft report to 1J and 1I in final report.

MINIEX_000667

active contracts was maintained, (2) provided ongoing training to staff on HUD procurement regulations and Authority policies, and how to use the new contract management software, (3) initiated steps to ensure all procurements were documented in a single file, and (4) hired a dedicated contract administrator to help ensure its contracts and procurements were uniform and properly administered. Therefore, the Authority requested that recommendations 1D and 1E be removed from the report. [17]

Despite the claimed improvements, the Authority's controls were not effective during the audit period. The Authority should provide evidence to HUD that it adequately implemented the recommendations during the audit resolution process. We did not remove the recommendations from the report.

Comment 27:   The Authority stated that the Housing Choice Voucher program errors were minor and should be classified as such.

We disagree. The issues noted in the audit were not minor. They affected 5 of 10 randomly selected samples. We limited testing to 10 random samples from a population of 16,751 vouchers because we believed that the sample results would tell us what types of problems the population of files would contain. We intended to focus on the types of problems and did not intend to project the results. However, projecting the results using EZ Quant software shows that with a 95 percent certainty, at least 22 percent, or 3,685 of the voucher files either used incorrect payment standards, or were not recertified within 12 months as required. Projecting only the incorrect payment standards rate shows that the Authority made payment standard errors in at least 15 percent, or 2,513 files.

Comment 28:   The Authority noted that the payment standard errors in the report were from 2013 and 2014, and blamed them on sequestration, a budget funding situation that no longer exists.

The audit showed that several problems contributed to the payment standard errors, including the lack of written procedures, staff being unfamiliar with HUD regulations, high staff turnover, and high caseload per staff member. Better controls would put the Authority in a better position to prevent and identify the problems that we identified.

Comment 29:   The Authority stated that the amount of overpayments was minimal and provided a spreadsheet showing that the errors resulted in a total overpayment of about one quarter of one percent, or $384 out of nearly $150,000. The Authority agreed with the repayment amount.

---

[17]   Recommendations changed from 1D and 1E in draft report to 1E and 1F, respectively, in the final report.

MINIEX_000668

The Authority correctly noted that the error rate was about one quarter of one percent of the nearly $150,000 that it spent for the 10 vouchers. However, we would point out that the Authority spent more than $353 million for about 16,700 vouchers during the audit period, and not just $150,000 for 10 vouchers. We did not consider the overpayments to be minimal.

Comment 30:  The Authority stated that the annual recertification timing errors were only 2.35 percent of its total recertifications and were within HUD's 5 percent standard. The Authority requested OIG classify the 2.35 percent noncompliance rate as a minor deficiency.

As noted in the report, this was a snapshot of files that had not been recertified for at least 13 months and some had not been recertified for as much as 33 months.[18] We noted that the Authority did not provide a reason for failing to recertify files for nearly two years after the due date. We did not consider this to be a minor error.

Comment 31:  The Authority stated it had implemented written procedures to correctly apply payment standard decreases well before the audit. It stated that recommendation 2B and the finding should be deleted because it had already developed and implemented procedures to reduce over- and under-payments in the Housing Choice Voucher program.

We disagree and did not delete the finding or recommendation based on this comment. The errors occurred after the Authority said it had implemented the written procedures. Therefore, the written procedures were not effective.

Comment 32:  The Authority stated its caseloads decreased throughout the audit period and that it continues to monitor and make adjustments as necessary. However, it believed that its current staffing was reasonable, efficient, and effective as shown by its generally strong performance on Section 8 Management Assessment Program (SEMAP)[19] indicators, and despite severe reductions to its administrative fees. It believed the payment standard errors were more attributable to its efforts to operate under sequestration instead of its caseload size. It further believed this issue has been resolved, and stated that recommendation 2C and the finding should be removed as it has already reduced the caseload to a reasonable point.

As noted in the report, we did not conclude that the high caseloads per staff contributed to the errors. Rather, the Authority's managers made that conclusion.

---

[18]  12 month recertification requirement + 21 months late = 33 months without a recertification

[19]  SEMAP is a set of performance standards that HUD established to measure whether a public housing agency administers its Section 8 program properly and effectively. SEMAP scores are the public housing agency's self assessment of its performance, and help HUD target monitoring and assistance to PHA programs that need the most improvement.

69

MINIEX_000669

We acknowledge that the Authority said it was addressing the issue, but we did not test files after the audit period and cannot conclude whether the error rate changed. Further, we do not believe SEMAP scores are a definitive indicator of performance as they are self-reported numbers, and could be subject to internal bias. We did not delete the finding or recommendation based on this comment. The Authority should work with HUD to ensure the recommendation is adequately addressed.

Comment 33: The Authority stated it was committed to training and compliance, and used compliance software, a dedicated trainer, and quality control. Further, it required housing specialists to become certified within one year. It also implemented continuing education requirements and provided training initiatives for all voucher staff, including supervisors and quality control personnel. It said it already has a robust training program for its voucher and quality control personnel and stated that recommendation 2D and the finding should be removed.

We acknowledge that the Authority said it was committed to training and quality control. We did not evaluate the quality of the Authority's training program. Further, the only file we reviewed that had been through the Authority's quality control program had been corrected, but the correction was not implemented properly. We did not delete the finding or recommendation based on this comment. The Authority should work with HUD to ensure that the recommendation is adequately addressed.

Comment 34: The Authority requested an opportunity to review the revised report. We did not submit a revised report to the Authority because there were few revisions, none of which warranted a formal revised draft report.

MIN 0232

MINIEX_000670

## Appendix C

**Contract and Purchase Order Errors**

| Payee, purchase order, or request for proposals or quotation number | No independent cost estimate | No contract administration, missing files or documents, and conflict of interest | Payments exceeding contract amount or without contract | Ineligible payments using Federal funds | Unsupported payments using Federal funds |
|---|---|---|---|---|---|
| 539066 | X | X | | $142,703 | |
| 578946 | X | | X | 40,548 | |
| A011445 | X | | | | $130,990 |
| 576459 | X | | X | | 211,594 |
| A009263 | X | | | | 68,272 |
| 585329 | | X | | | 11,934 |
| A011224 | X | X | X | | 126,785 |
| 583794 | X | | | | 229,566 |
| PO 5096 | X | X | | | 13,120 |
| PO 7254 | X | | | | 11,125 |
| PO 7253 | X | | | | 10,900 |
| A008296 | X | | | | 24,974 |
| 570110 | X | | | | 3,596 |
| 570732 | X | | | | 463,905 |
| 572431 | X | | | | 107,130 |
| A220451 | X | | | | 1,167,015 |
| A220248 | X | | | | 58,609 |
| 589106 | X | | | | 35,900 |
| 581823 | X | | | | 41,334 |
| 580431 | X | | | | 31,560 |
| 580170 | X | | | | 42,000 |
| 583013 | X | X | | | 224,232 |
| **Totals** | **21** | **5** | **3** | **$183,251** | **$3,014,541** |

71

MIN 0233

MINIEX_000671

## Appendix D

### Questionable Miscellaneous Purchases

| Payee number | Payment to employee for misc. items | Other misc. item purchase | Expenditure | Line item description for misc. items as described in the Authority's general ledger |
|---|---|---|---|---|
| 539378 | X | | $ 13 | Reimbursement - refreshments Father's Day celebration |
| 558626 | X | | 56 | Reimbursement - student intern expenses |
| 570683 | X | | 136 | Reimbursement - decorations for Appreciation Day |
| 558626 | X | | 509 | Reimbursement - misc. expenses & car mileage |
| 578379 | X | | 200 | Advance - decorations FSS graduation |
| 578379 | X | | 150 | Advance - drinks/snacks FSS M&G Conf |
| 578379 | X | | 420 | Advance - invitations |
| 580637 | | X | 1,019 | Catering HHA awards ceremony |
| 578379 | X | | 110 | Advance - (picture) frames for Opportunity Center |
| 570683 | X | | 229 | Reimbursement - misc. expenses |
| E220087 | X | | 65 | Reimbursement - donuts for intake briefing |
| 574112 | | X | 750 | Richard Davis Unique Sounds - Sound & DJ |
| 559180 | | X | 350 | Balance due for musical entertainment |
| 588446 | | X | 100 | Family Literacy Fest Duney Homes |
| 574012 | | X | 1,044 | Affordable Moonwalks - basketball toss, football |
| A012911 | | X | 1,049 | Academy Awards - 95 G880 Gildan Golf Shirt - For |
| 535600 | | X | 1,195 | James Coney Island - food for Fatherhood event |
| 566870 | | X | 400 | Breakfast resident ldrshp mtg |
| 577839 | | X | 1,090 | Catering for FSS graduation 12/20/13 |
| 577956 | | X | 2,380 | Catering Christmas lunches |
| A220169 | | X | 398 | 50 Breakfast - Omelettes & Such Breakfast |
| 574330 | | X | 1,380 | Qty 4 Park grill with mounting pole each grill is |
| **Totals** | **10** | **12** | **$13,043** | |

MIN 0234

MINIEX_000672